Nathan P. Eimer (*Pro Hac Vice*)
Email: neimer@eimerstahl.com
Vanessa G. Jacobsen (*Pro Hac Vice*)
Email: vjacobsen@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718

John H. L'Estrange, Jr. (SBN 049594)
Email: jlestrange@wlelaw.com
Andrew E. Schouten (SBN 263684)
Email: aschouten@wlelaw.com
WRIGHT, L'ESTRANGE & ERGASTOLO
402 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: (619) 231-4844
Fax: (619)231-6710

Additional attorneys listed on signature page

*Attorneys for Defendants SK hynix, Inc. and SK hynix America, Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| MICHELE JONES, DAVID LAIETTA, KIMBERLY YORK, BENJAMIN MURRAY, WANDA DUREYA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., SAMSUNG ELECTRONICS CO., LTD., SAMSUNG SEMICONDUCTOR, INC., SK HYNIX, INC. (F/K/A HYNIX SEMICONDUCTOR, INC.), SK HYNIX AMERICA, INC. (F/K/A HYNIX SEMICONDUCTOR AMERICA, INC.),<br><br>Defendants. | Case No.: 4:18-cv-02518-JSW<br><br>**DEFENDANTS SK HYNIX, INC. AND SK HYNIX AMERICA, INC.'S NOTICE OF MOTION AND SUPPLEMENTAL MOTION TO DISMISS UNDER RULE 12(b)(6) AND MEMORANDUM OF SUPPORTING POINTS AND AUTHORITIES**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Hearing Date: October 12, 2018<br>Time: 9:00 a.m.<br>Place: Courtroom 5 – 2nd Floor<br>Judge: Hon. Jeffrey S. White<br><br>*[Proposed] Order Filed Concurrently* |

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 12, 2018, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 5, 2nd Floor, at 1301 Clay Street, Oakland, CA 94612, before the Honorable Jeffrey S. White, Defendants SK hynix, Inc. and SK hynix America, Inc. will and hereby do move the Court for an order, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, dismissing all claims against them asserted by Plaintiffs Michele Jones, David Laietta, Kimberly York, Benjamin Murray, and Wanda Dureya.

This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Jacob M. Hamann and exhibits thereto, the oral argument of counsel, and all other pleadings and proceedings herein.

**STATEMENT OF THE ISSUE TO BE DECIDED**

Plaintiffs allege that Defendants participated in a supply restraint conspiracy in violation of the antitrust laws, but the Complaint alleges no conduct by SK hynix, Inc. ("SK hynix Korea") or SK hynix America, Inc. ("SK hynix America") (collectively, "SK hynix") related to the alleged conspiracy. Plaintiffs' conspiracy claims against SK hynix, therefore, must be dismissed as not "plausible on [their] face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**INTRODUCTION**

The SK hynix Defendants respectfully submit this supplemental memorandum in support of their motion to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth in Defendants' Joint Motion to Dismiss, Plaintiffs have failed to plausibly allege the existence of any antitrust conspiracy. But even assuming that the Complaint sufficiently alleges *some* conspiracy (which it does not), the Complaint lacks *any* factual allegations, much less plausible ones, that either SK hynix Korea or SK hynix America played any part in any purported conspiracy. Indeed, the Complaint, which extends for seventy-six pages, is conspicuous for what is absent—it contains virtually no allegations regarding SK hynix, and in particular pleads no direct evidence of any conspiracy involving SK hynix, no facts showing SK hynix's engagement in any parallel conduct with its competitors, and no facts tending to exclude the possibility that SK hynix acted independently. Remarkably, the documents that Plaintiffs themselves reference in the Complaint flatly contradict their conclusory allegations that SK hynix somehow took part in any purported antitrust conspiracy to restrict DRAM supply by not adding wafer capacity.[1] As discussed below, these documents unequivocally show that, throughout the purported conspiracy period, SK hynix publicly stated that it planned to substantially *increase*, not

---

[1] Adding wafer capacity means increasing the number of silicon wafers that a manufacturer can process into DRAM. This can be accomplished by adding production units to an existing facility, expanding an existing facility, or building a new facility. The other way that a manufacturer can increase DRAM supply, or "bit growth," is through technology transitions or technology migrations. This refers to refining the production process to increase the number of microchips that can be produced from a given wafer.

restrict, its wafer capacity. Plaintiffs have thus failed to plausibly allege that the SK hynix Defendants participated in a conspiracy to restrict the supply of DRAM.

**STATEMENT OF FACTS**

Plaintiffs allege that, beginning in 2016, Defendants participated in a conspiracy to restrict the supply of DRAM by agreeing to not add wafer capacity, keep growth in DRAM supply below that of demand, and refrain from taking each other's market share. Compl. ¶¶ 6, 7, 80, 131. Defendants allegedly effected this conspiracy through public statements or "signals" to one another. *Id.* In support of their claim, Plaintiffs allege that, prior to the supposed conspiracy, Samsung's articulated supply strategy, as expressed in earnings calls, was to increase supply in order to increase its market share. Compl. ¶¶ 64-67. Plaintiffs further allege that DRAM prices declined from August 2014 until May 2016. Compl. ¶ 63. There are no allegations in the Complaint regarding any other Defendant's publicly articulated pricing or supply strategy (to say nothing of conduct) before the alleged conspiracy began. According to the Complaint, Micron's CEO made a series of statements during earnings calls in late 2015 that Plaintiffs characterize as an invitation to restrain DRAM supply growth by ceasing to add additional wafer capacity. Compl. ¶¶ 68-69. The conspiracy allegedly began when Samsung accepted Micron's purported invitation by changing its strategy, stating during earnings calls that it would start to focus on maximizing profits instead of increasing market share. Compl. ¶¶ 70, 72, 86.

In support of their claim, Plaintiffs devote most of the allegations to describing instances where representatives from Micron or Samsung forecasted bit growth in the teens as demand was expected to grow by 20 to 25%. Compl. ¶¶ 75, 78, 79, 92, 98, 99, 103, 104, 105, 111, 113, 115, 116, 121, 122, 126. Plaintiffs further allege several instances where they say representatives from Micron or Samsung stated that their respective companies were not seeking to increase market share because they were focused on profitability, Compl. ¶¶ 88, 90, 100, 102, 121-123, 130, or did not intend to increase DRAM wafer capacity or increase capital investments beyond the technology migrations in progress. Compl. ¶¶ 91, 98, 104, 106, 109, 111, 113, 115, 117, 119, 124, 129. There are, however, *no* similar allegations against SK hynix. In fact, there is not a single allegation in the

DEFENDANTS SK HYNIX, INC. AND SK HYNIX AMERICA, INC.'S NOTICE OF MOT. AND
SUPPLEMENTAL MOT. TO DISMISS UNDER RULE 12(b)(6)
CASE NO. 4:18-cv-02518-JSW

2

Complaint even hinting that SK hynix made any public statements that it intended to curtail production or limit capacity increases nor are there any factual allegations that SK hynix in fact did curtail production or limit capacity increases. To the contrary, the documents that Plaintiffs cite and other judicially noticeable public documents demonstrate the opposite – that during the alleged conspiracy period, SK hynix publicly stated that it planned to *increase* wafer capacity, gain market share and increase bit growth by 20 to 25%.

## ARGUMENT

Section 1 of the Sherman Act prohibits contracts, combinations, or conspiracies between two or more entities that are unreasonably in restraint of trade.[2] 15 U.S.C. § 1; *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). "Allegations of facts that could just as easily suggest rational, legal business behavior . . . as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008). Moreover, "to allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Id.* at 1047 (quoting *Twombly*, 550 U.S. at 565 n.10).

Particularly relevant here, if a complaint asserts claims against multiple defendants, its allegations must show that each claim is plausibly stated as to *each* defendant; it cannot simply lump the defendants together and level accusations indiscriminately against the group. *See, e.g.*, *Frost v. LG Elecs. Inc.*, No. 16-cv-05206-BLF, 2017 WL 1425919, at *1 (N.D. Cal. Apr. 21, 2017) (dismissing complaint because "allegations are vague and lodged against all Defendants as a group"); *In re iPhone Application Litig.*, No. 11-MD-02250-LHK, 2011 WL 4403963, at *8 (N.D. Cal. Sept. 20, 2011) (dismissing a complaint because, "by lumping all eight [defendants] together, Plaintiffs ha[d] not stated sufficient facts to state a claim for relief that [was] plausible against *one* Defendant") (emphasis original). In antitrust cases, this means that a complaint must contain

---

[2] Plaintiffs' state law claims are largely derivative of their Sherman Act claim and thus fail for the same reasons. *See* Defendants' Joint Motion to Dismiss at 34-37. Plaintiffs' state law claims fail for many other reasons as well. *See id.* at 31-34, 38-40.

allegations sufficient to plausibly show "that each individual defendant joined the conspiracy and played some role in it." *In re Cal. Title Ins. Antitrust Litig.*, No. C 08-01341 JSW, 2009 WL 1458025, at *7 (N.D. Cal. May 21, 2009) (quotation marks omitted). Plaintiffs fail to plausibly allege that either SK hynix Korea or SK hynix America joined a conspiracy to restrict the supply of DRAM.

> A. **Plaintiffs Allege No Facts that Support a Plausible Inference that SK hynix Joined an Antirust Conspiracy.**

Plaintiffs' seventy-six-page Complaint contains just six paragraphs, barely amounting to a single page, alleging substantive facts purporting to support a claim that SK hynix Korea (but *not* SK hynix America) participated in the alleged conspiracy.[3] Compl. ¶¶ 97, 107, 112, 120, 125, 138. None of the paragraphs contain any direct evidence of SK hynix Korea's participation in any antitrust conspiracy. Instead, Plaintiffs rely entirely upon a few selectively chosen statements from six earnings calls as circumstantial evidence of such participation. These six allegations, however, fail to state a claim against SK hynix because they: (i) fail to show SK hynix engaged in parallel conduct with its competitors; and (ii) fail to show any difference in SK hynix's business strategy between the periods before and during the alleged conspiracy. *See Twombly*, 550 U.S. at 557 (holding that an antitrust plaintiff relying on circumstantial evidence must allege facts showing defendants' parallel conduct and facts placing the parallelism "in a context that raises a suggestion of a preceding agreement").

---

[3] There are *no* factual allegations relating to SK hynix America's conduct or participation in the alleged conspiracy. Plaintiffs instead lump members of corporate families together and assert claims without distinguishing between them. Compl. ¶ 40. This is not permitted. *See, e.g.*, *Prime Healthcare Servs., Inc. v. Serv. Employees Int'l Union*, No. 11-CV-02652 JLS (RBB), 2012 WL 3778348, at *5 n.7 (S.D. Cal. Aug. 30, 2012) (dismissing antitrust claims where the complaint "fail[ed] to allege how each named defendant [Kaiser corporate affiliate] participated in the conspiracy, and instead refer[red] generically to 'Kaiser' and not to any named Kaiser defendants") (quotation marks omitted); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (dismissing antitrust claims because "general allegations as to all defendants, to 'Japanese defendants,' or to a single corporate entity such as 'Hitachi' [are] insufficient to put specific defendants on notice of the claims against them.").

Plaintiffs allege that all Defendants joined a common "industry plan of keeping supply growth between 15-20%" and below the 20-25% rate of demand growth. Compl. ¶ 99. Plaintiffs allege that Samsung and Micron representatives made statements projecting that their respective companies' rate of supply, or bit growth, would be in the mid-to-high teens, *see, e.g.,* Compl. ¶¶ 75, 79, 99, 103, 105, 111, 113, 115, 119, 121. But notably, Plaintiffs make no similar allegations against SK hynix representatives. Instead, Plaintiffs allege that SK hynix representatives projected SK hynix's bit growth would be at or above 20% and on par with the market. *See* Compl. ¶¶ 97 (bit growth in "the mid-20 percent range"); 107 (bit growth "on par with the market"); 112 (bit growth would be "in line with the market about 20%"); 120 (bit growth rate of "low 20%, on par with the market"); 125 (growth would be "in line with the market."). These allegations do not show that SK hynix acted pursuant to any purported agreement to "only grow DRAM supply between 15-20%." *See* Compl. ¶ 7.

Plaintiffs have also failed to allege facts from which the Court could infer that SK hynix's conduct changed in parallel with its competitors at the onset of the supposed conspiracy period. Plaintiffs make the conclusory allegation that SK hynix, along with other Defendants, made a "near simultaneous decision in 2016" to restrict supply growth, Compl. ¶ 6, in "deviation from past business practices." Compl. ¶ 83. There are no allegations regarding SK hynix's supply growth strategy or conduct *prior* to the alleged conspiracy period, nor are there any factual allegations demonstrating how SK hynix's supply growth strategy changed when the alleged conspiracy purportedly began or if it even changed at all. Without these baseline facts, the Court simply cannot infer that SK hynix's conduct or its statements regarding supply in the earnings calls "represented a deviation from past business practices," *see id.*, or that it even engaged in parallel conduct with the other Defendants at all. *See, e.g., In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) ("Plaintiffs' allegations also fail to show that this behavior was 'historically unprecedented' because they make scant allegations of pricing behavior that came *before* the alleged conspiracy") (emphasis in original); *In re California Title Ins.*, 2009 WL 1458025, at *7 (dismissing antitrust claim where Plaintiffs did not allege facts regarding

Defendants' behavior prior to the alleged conspiracy). For this reason alone, Plaintiffs have failed to state a claim against SK hynix.

Even if the Plaintiffs had pleaded parallel conduct, which they have not, Plaintiffs have not pleaded facts demonstrating SK hynix actions were "inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015). There are no allegations establishing that SK hynix undertook any action against its economic self-interest. The statements made during the alleged conspiracy by SK hynix Korea executives that the company's production growth would be "in line with" or "on par with" market growth, Compl. ¶¶ 97, 107, 112, 120, 125, as well as the purported announcement made after the alleged conspiracy period by SK hynix Korea that it was adding capacity by 6-7% per year,[4] Compl. ¶ 138, are unremarkable and completely consistent with rational, legal business behavior. *See, e.g., In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig*. 906 F.2d 432, 443-44 (9th Cir. 1990) (follow-the-leader practices are insufficient to establish a violation of the Sherman Act); *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 871 (7th Cir. 2015) (not attempting to gain market share is consistent with independent decision-making). These allegations, which are the *only* allegations in the Complaint relating specifically to SK hynix (besides jurisdictional allegations and allegations relating to SK hynix's membership in trade organizations), come nowhere close to plausibly establishing that SK hynix undertook conduct that was "so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement." *In re Musical Instruments,* 798 F.3d at 1195.

---

[4] Plaintiffs flatly mischaracterize the statement that a SK hynix Korea representative made in the April 2018 earnings call, alleging that SK hynix announced that "*it* was adding wafer capacity by 6-7%." Compl. ¶ 138 (emphasis added). As the actual earnings call transcript shows, the SK hynix representative was, in fact, projecting that capacity would grow at that rate *across the market*. By April 2018, SK hynix had already stated publicly that *it* planned to increase wafer capacity and would not rely on technology transitions to meet demand. *See infra* at 8. In the portion of the call referenced by Plaintiffs, the SK hynix representative stated that the "suppliers," *i.e.* Samsung and Micron, would likely have to do the same. *See* Exhibit F to the Decl. of Jacob Hamann in Support of SK hynix, Inc. and SK hynix America, Inc.'s Request for Judicial Notice of Earnings Calls and Financial Supervisory Service Filings ("Hamann Decl.") at 8.

### B. Allegations about SK hynix's Public Signaling Are Also Contradicted by the Sources Cited in the Complaint.

The documents Plaintiffs cite (and other public, judicially noticeable documents) flatly contradict Plaintiffs' conclusory allegations that SK hynix conspired to restrain supply. Contrary to the claim that SK hynix executives signaled to competitors that it would go along with restricting output through public statements, SK hynix executives explicitly, unambiguously and publicly stated during the claimed conspiracy period that SK hynix planned to *increase* wafer capacity and rejected the idea of meeting demand through technology improvements alone. *Compare, e.g.,* Compl. ¶ 98 (alleging Micron's CFO stated that Micron "would expect all of our bit growth to come from technology transitions as opposed to any sort of wafer expansion"). During the July 2017 earnings call, cited in paragraph 120 of the Complaint, an SK hynix representative stated "now for both DRAM and NAND, there is some capacity increase planned within this year, especially because for DRAM it is -- we cannot meet the growing market demand only with technology migration, so we do need some capacity increase[s]."[5] *See* Hamann Decl., Exhibit C at 7. He repeated this point later in the call, stating "because of the demand growth, simply -- and also because of the limitation in the technology migration, it's simply not enough for us to just implement technology migration to fully meet the demand." *Id.* at 8.

Remarkably, this is the same message that SK hynix conveyed in its April 2018 earnings call, which Plaintiffs cite as evidence of the end of the supposed conspiracy: "So given such demand growth that we see these days, it's simply not enough to fulfill such demand growth using only tech migration. So this means that to meet demand growth, then it is almost unavoidable that we increase capacity by increasing investments." *See* Hamann Decl., Exhibit F at 8. Thus, in direct

---

[5] The transcripts of the July 26, 2016, April 25, 2017, July 25, 2017, October 26, 2017 and April 24, 2018 SK hynix Korea earnings calls are incorporated by reference in Plaintiffs' Complaint. The Court may take judicial notice of the statements made in these transcripts because the Complaint necessarily relies on the documents and their authenticity is uncontested. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (a court may "take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading") (quotation marks omitted); *see also Twombly*, 550 U.S. at 568 n.13 (holding that courts are "entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn").

contradiction to Plaintiffs' allegations, SK hynix stated that it intended to increase wafer capacity to meet demand during the alleged conspiracy period and conveyed the same message after the supposed conspiracy ended. Plaintiffs' claim that the April 2018 statement represented a "change in practice" for SK hynix is simply false. *See* Compl. ¶ 138.

Throughout the alleged conspiracy period, SK hynix representatives repeatedly and consistently stated in public that SK hynix was adding DRAM wafer capacity and increasing supply, including by way of massive investments to expand cleanroom (or production) space at an existing facility and to build a new DRAM manufacturing facility. For example, in December 2016, SK hynix Korea filed a public disclosure with Korean government securities regulators revealing that it planned to invest approximately $790 million to expand a new DRAM production facility, or "fab," it was building in Wuxi, China. *See* Hamann Decl., Exhibit G.[6] In a later public disclosure on July 26, 2017, in the midst of the purported conspiracy, SK hynix emphasized its commitment to increase capacity and output, disclosing that it had increased its 2017 investments in overseas production facilities by about $2 billion, in order to "aggressively respond to changes in the market environment," including DRAM demand. *See* Hamann Decl., Exhibit H.

In addition to investing in the new Wuxi DRAM fab, SK hynix was also expanding another of its DRAM fabs in Icheon, Korea in order to expand DRAM production capacity. SK hynix executives spoke repeatedly and publicly during this period about both projects in the very same earnings calls cited by Plaintiffs.

- In the April 2017 earnings call, cited in paragraph 112 of the Complaint, an executive stated that SK hynix was constructing a second floor on its M14 fab in Icheon so that it would accommodate more DRAM production beginning in December 2017. *See* Hamann Decl., Exhibit B at 8. He also discussed the Wuxi fab, noting that construction had already started. *Id.*

---

[6] The Court may take judicial notice of SK hynix Korea's filings with Korean regulators for the reasons set forth in SK hynix, Inc. and SK hynix America Inc.'s Request for Judicial Notice in Support of the Motion to Dismiss.

- As demand increased over the class period, SK hynix executives stated during earnings calls that they planned to accelerate the construction schedule for the Wuxi fab and further expand its planned capacity in order to meet growing DRAM demand. *See* Hamann Decl., Exhibit C at 7-8.

- During the October 26, 2017 earnings call, a representative stated that SK hynix intended to *double* the capacity of the Wuxi fab. *See* Hamann Decl., Exhibit D at 7.

- During the January 25, 2018 earnings call, an SK hynix representative disclosed that SK hynix had, in fact, accelerated the construction schedule for the Wuxi fabs such that it would be completed by the end of 2018 instead of early 2019. *See* Hamann Decl., Exhibit E at 9.

Further, contrary to Plaintiffs' allegations, SK hynix representatives publicly affirmed the company's commitment to increase its market share. *See* Hamann Decl., Ex A at 6. (stating the Company intended to "increase market share while putting [its] priority on profitability."). This publicly stated strategy to substantially increase wafer capacity and gain market share directly contradicts Plaintiffs' unsubstantiated theory that SK hynix signaled to its competitors a shared intention to restrict supply growth.

Plaintiffs' allegations against SK hynix do not withstand even the slightest scrutiny. Plaintiffs attempt to twist six anodyne statements made during earnings calls to fit SK hynix into a story that the Defendants were in lock step calling for supply discipline. The documents they cite, however, tell a very different story. SK hynix representatives repeatedly spoke during the alleged class period about the company's efforts to increase supply and invest in additional wafer capacity – the complete *opposite* of signaling production restraints as Plaintiffs allege. Plaintiffs have therefore failed to state a plausible claim against SK hynix. *See Kelsey K. v. NFL Enterprises, LLC*, 254 F. Supp. 3d 1140, 1147-47 (N.D. Cal. 2017) (dismissing antitrust claim based on parallel conduct as implausible where factual allegations were inconsistent with Plaintiffs' claim); *Oliver v. SD-3C LLC*, No. C 11-01260 JSW, 2015 WL 10890656, at *4 (N.D. Cal. Sept. 30, 2015) (same).

## CONCLUSION

For the foregoing reasons, Plaintiffs have failed to state a claim upon which relief can be granted, and this Court should dismiss all claims against SK hynix.

Dated: July 30, 2018

By: */s/ Nathan P. Eimer*

EIMER STAHL LLP

Nathan P. Eimer
Email: neimer@eimerstahl.com
Vanessa G. Jacobsen
Email: vjacobsen@eimerstahl.com
Jacob M. Hamann
Email: jhamann@eimerstahl.com
Brian Chang
Email: bchang@eimerstahl.com
Jungmin Lee
Email: jlee@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718

WRIGHT, L'ESTRANGE & ERGASTOLO

John H. L'Estrange, Jr. (SBN 049594)
Email: jlestrange@wlelaw.com
Andrew E. Schouten (SBN 263684)
Email: aschouten@wlelaw.com
402 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: (619) 231-4844
Fax: (619)231-6710

*Attorneys for Defendants SK hynix, Inc. and SK hynix America, Inc.*