IAN SIMMONS (*pro hac vice*)
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: 202 383 5300
Facsimile: 202 383 5414

*Attorney for Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.*

NATHAN P. EIMER (*pro hac vice*)
neimer@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Telephone: 312 660 7601
Facsimile: 312 692 1718

*Attorney for Defendants SK hynix Inc., and SK hynix America, Inc.*

HARRISON (BUZZ) FRAHN (S.B. #206822)
hfrahn@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California 94304
Telephone: 650 251 5065
Facsimile: 650 251 5002

*Attorney for Defendants Micron Technology, Inc. and Micron Semiconductor Products, Inc.*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

MICHELE JONES, DAVID LAIETTA, KIMBERLY YORK, BENJAMIN MURRAY, and WANDA DUREYA, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., SAMSUNG ELECTRONICS CO., LTD., SAMSUNG SEMICONDUCTOR, INC., SK HYNIX, INC., and SK HYNIX AMERICA, INC.,

Defendants.

Case No. 4:18-cv-02518-JSW

**DEFENDANTS' JOINT NOTICE OF MOTION AND JOINT MOTION TO DISMISS INDIRECT PURCHASER COMPLAINT AND MEMORANDUM OF SUPPORTING POINTS AND AUTHORITIES**

**ORAL ARGUMENT REQUESTED**

Hearing Date: October 12, 2018
Time: 9:00 am
Place: Courtroom 5 - 2nd Floor
Judge: Hon. Jeffrey S. White

*[Proposed] Order Filed Concurrently*

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 12, 2018 at 9:00 a.m., or as soon thereafter as the matter may be heard, Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., SK hynix Inc., and SK hynix America, Inc. (collectively, the "Defendants") will and hereby do move the Court, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, for an Order dismissing the Indirect Purchaser Plaintiffs' (the "IPPs") Class Action Complaint with prejudice.

This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities and Appendices, the Declaration of Ian Simmons and exhibits thereto, the oral argument of counsel, and all other pleadings and proceedings herein.[1]

[1] All citations to "App'x __" are to the Appendices included after the Memorandum of Points and Authorities, and all citations to "Ex. __" are to the Exhibits attached to the Declaration of Ian Simmons, filed in support of this Motion.

## SUMMARY OF ARGUMENT

Indirect purchaser plaintiffs (the "IPPs") allege that Defendants conspired to restrain capacity and output in the market for dynamic random-access memory ("DRAM"). The crux of the IPPs' claim is that Defendants "agreed" with each other by and through public statements to equity analysts, investors, and anyone else who listened to an earnings call or attended an investor conference between June or July of 2016 to February 1, 2018 (the "Class Period"). The IPPs' claims are patently implausible, and their Complaint warrants a speedy dismissal under the familiar principles of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

The IPPs do not allege direct evidence of a conspiracy. The Complaint does not include a single allegation that Defendants met or otherwise communicated about a plan to suppress capacity and output, much less any evidence that establishes the existence of a conspiracy. Part III.B.1.

The Complaint does not set forth plausible allegations of either parallel conduct or the conspiracy "plus factors" necessary to infer an unlawful agreement. As reflected in the Complaint and in the materials it incorporates by reference, Defendants did not act in parallel over the Class Period. Instead, Defendants responded unilaterally and at different times to the changing market conditions they encountered. The IPPs' plus-factor allegations similarly fail to nudge their claims across the plausibility threshold: the IPPs neither account for myriad lawful justifications for rising prices—including admittedly surging demand or conscious parallelism—nor do they raise any inference of conspiratorial conduct. Part III.B.2–C.

The IPPs fail to establish their constitutional and statutory standing to bring antitrust conspiracy claims. Their threadbare allegations do not permit a reasonable inference of traceable injury attributable to Defendants' conduct, and their purchase of consumable electronic devices is too indirect and attenuated from the sale of DRAM to confer standing. Part III.D.

Finally, several of the IPPs' state-law causes of action warrant dismissal because (i) the statutes do not provide for private rights of action, (ii) the IPPs have not alleged essential elements of those claims, or (iii) the statute under which the IPPs seek relief no longer exists, or never did in the first place. Part III.E.

# TABLE OF CONTENTS


I. INTRODUCTION ... 1

II. SUMMARY OF RELEVANT ALLEGATIONS ... 3

III. ARGUMENT ... 6

A. Legal Standard ... 6

B. The IPPs Fail to Allege Facts Indicative of a Conspiracy ... 7

1. The Complaint does not set forth direct evidence of conspiracy ... 7

2. The IPPs' circumstantial factual allegations do not support an inference of conspiracy ... 9

a. The IPPs fail to allege parallel conduct ... 9

(1) The IPPs fail to allege parallel capacity and output decisions ... 9

(2) The IPPs' price charts are incapable of demonstrating parallel conduct ... 12

b. None of the IPPs' "plus factor" allegations raises an inference of conspiracy ... 13

(1) The IPPs' allegations with respect to the "structural market conditions," "motive to conspire," and "action against self-interest" plus factors restate the conditions for lawful conscious parallelism ... 14

(2) The IPPs do not allege facts demonstrating that Defendants abruptly changed their capacity management practices in similar ways ... 17

(3) Defendants' public statements to investors and market analysts do not evince a conspiracy to suppress wafer capacity ... 20

(a) None of Defendants' public comments rises to the level of an "invitation to collude" ... 21

(b) The IPPs fail to allege facts connecting Defendants' public commentary to an agreement to restrain wafer capacity ... 23

(4) Defendants' attendance at trade association meetings does not make a conspiracy more likely than unilateral conduct ... 27

(5) Neither Defendants' alleged "prior collusion" nor the NDRC investigation brings the IPPs any closer to stating a claim of conspiracy ... 28

C. The IPPs Fail to Allege That Each Defendant Joined and Played a Role in the Purported Conspiracy ... 30

D. The IPPs Lack Standing to Assert Their Claims ... 31

1. The IPPs lack Article III standing because they do not allege an injury that is traceable to Defendants' alleged acts ... 31

2. The named plaintiffs lack Article III standing to bring claims under the laws of twenty jurisdictions .......... 34

3. The IPPs lack antitrust standing because they have not established any antitrust injury .......... 34

4. The IPPs lack antitrust standing under *AGC* .......... 36

E. Several of the IPPs' State-Law Claims Fail for Additional Reasons .......... 38

1. The IPPs' California UCL claim fails .......... 38

2. The IPPs did not comply with three states' notice requirements .......... 39

3. The IPPs do not plead intrastate effects under the laws of ten jurisdictions .......... 39

4. The Arkansas Unfair Practices Act and Illinois Antitrust Act do not provide for private rights of action .......... 39

5. The IPPs cannot use the Florida Deceptive and Unfair Trade Practices Act as an end-run around Florida's indirect purchaser bar .......... 40

F. The Court Should Not Grant the IPPs Leave to Amend .......... 40

IV. CONCLUSION .......... 41

# TABLE OF AUTHORITIES

**Cases**

*Advanced Tech. Corp. v. Instron, Inc.*,
925 F. Supp. 2d 170 (D. Mass. 2013) .......... 14

*Allen v. Beverly Hills*,
911 F.2d 367 (9th Cir. 1990) .......... 40

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) .......... 31, 34, 35, 36

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
No. 11-cv-01846-LHK, 2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) .......... 38

*Ascon Props., Inc. v. Mobile Oil Co.*,
866 F.2d 1149 (9th Cir. 1989) .......... 40, 41

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) .......... 6, 37

*Bardin v. DaimlerChrysler Corp.*,
136 Cal. App. 4th 1255 (2006) .......... 38

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... passim

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
203 F.3d 1028 (8th Cir. 2000) .......... 21

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982) .......... 35

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) .......... 13

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011) .......... 12

*California v. Infineon Techs. AG*,
531 F. Supp. 2d 1124 (N.D. Cal. 2007) .......... 39

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986) .......... 34

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co., Ltd.*
973 P.2d 527 (Cal. 1999) .......... 38

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001) .......... 38

*Clayworth v. Pfizer, Inc.*,
233 P.3d 1066 (Cal. 2010) .......... 37

*DePriest v. AstraZeneca Pharms., L.P.*,
351 S.W.3d 168 (Ark. 2009) .......... 39

*Digital Sun v. Toro Co.*,
No. 10-cv-4567-LHK, 2011 WL 1044502 (N.D. Cal. Mar. 22, 2011) .......... 38

*Erie Cty. v. Morton Salt, Inc.*,
702 F.3d 860 (6th Cir. 2012) .......... 14

*Faulkner v. ADT Sec. Servs., Inc.*,
No. 11-cv-00968-JSW, 2011 WL 181274 (N.D. Cal. May 12, 2011) .......... 7

*Feitelson v. Google Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) .......... 34

*Flagship Theatres of Palm Desert, LLC v. Century Theatres*,
198 Cal. App. 4th 1366 (2011) .......... 7

*Frost v. LG Elecs. Inc.*,
No. 16-cv-05206-BLF, 2017 WL 1425919 (N.D. Cal. Apr. 21, 2017) .......... 30, 31

*Fucile v. Visa U.S.A., Inc.*,
No. S1560-03 CNC, 2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004) .......... 37

*Gauvin v. Trombatore*,
682 F. Supp. 1067 (N.D. Cal. 1988) .......... 30

*Gen-Probe, Inc. v. Amoco Corp.*,
926 F. Supp. 948 (S.D. Cal. 1996) .......... 30

*Glen Holly Entm't Inc. v. Tektronix Inc.*,
343 F.3d 1000 (9th Cir. 2003) .......... 7

*Golinski v. U.S. Office of Pers. Mgmt.*,
824 F. Supp. 2d 968 (N.D. Cal. 2012) .......... 4

*Gonzalez v. Planned Parenthood of L.A.*,
759 F.3d 1112 (9th Cir. 2014) .......... 12

*Grunewald v. United States*,
353 U.S. 391 (1957) .......... 26

*GTE New Media Servs., Inc. v. Ameritech Corp.*,
21 F. Supp. 2d 27 (D.D.C. 1998) ........................................ 39

*Hall v. United Air Lines, Inc.*,
296 F. Supp. 2d 652 (E.D.N.C. 2003) ........................................ 28

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*,
231 F. Supp. 2d 1253 (N.D. Ga. 2002) ........................................ passim

*Ill. Brick Co. v. Illinois*,
431 U.S. 720 (1977) ........................................ 40

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ........................................ 21

*In re Broiler Chicken Antitrust Litigation*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ........................................ 24, 25, 26

*In re Capacitors Antitrust Litigation*,
106 F. Supp. 3d 1051 (N.D. Cal. 2015) ........................................ 29

*In re Chocolate Confectionary Antitrust Litig.*,
602 F. Supp. 2d 538 (M.D. Pa. 2009) ........................................ 39

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015) ........................................ 15

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ........................................ 9, 27

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
906 F.2d 432 (9th Cir. 1990) ........................................ 15, 16, 28

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
No. 9 CV 3690, 2015 WL 3988488 (N.D. Ill. June 29, 2015) ........................................ 36, 40

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
245 F. Supp. 3d 1343 (N.D. Ga. 2017) ........................................ 21, 22, 23, 25

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011) ........................................ 39

*In re Ditropan XL Antitrust Litig.*,
529 F. Supp. 2d 1098 (N.D. Cal 2007) ........................................ 34

*In re Domestic Airline Travel Antitrust Litig.*,
221 F. Supp. 3d 46 (D.D.C. 2016) ........................................ 24, 25

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.* (*DRAM I*)
516 F. Supp. 2d 1072 (N.D. Cal. 2007) ........................................ 35, 37, 39

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.* (*DRAM II*),
536 F. Supp. 2d 1129 (N.D. Cal. 2008) .......... 35

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007).......... 28

*In re Fla. Cement & Concrete Antitrust Litig.*,
746 F. Supp. 2d 1291 (S.D. Fla. 2010) .......... 40

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004).......... 15, 16

*In re Flonase Antitrust Litig.*,
692 F. Supp. 2d 524 (E.D. Pa. 2010) .......... 39, 40

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008).......... 6

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......... 10, 13, 27, 29

*In re iPhone Application Litig.*,
No. 11-md-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) .......... 30

*In re Late Fee & Over-Limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007) .......... 14, 27

*In re Lithium Ion Batteries Antitrust Litig.*,
No. 13-md-2420-YGR, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) .......... 31, 35

*In re Magnesium Oxide Antitrust Litig.*,
No. 10-cv-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) .......... 32, 33

*In re Musical Instruments and Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015).......... passim

*In re Napster, Inc. Copyright Litig.*,
354 F. Supp. 2d 1113 (N.D. Cal. 2005) .......... 35

*In re Nat'l Ass'n of Music Merchs., Musical Instruments & Equip. Antitrust Litig.*,
No. 09-cv-2002, 2012 WL 3637291 (S.D. Cal. Aug. 20, 2012).......... 8, 20

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
997 F. Supp. 2d 526 (N.D. Tex. 2014).......... 19

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015).......... 26

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
586 F. Supp. 2d 1109 (N.D. Cal. 2008) .......... 30, 31

*In re Wyo. Tight Sands Antitrust Cases*,
No. 85-2349, 1990 WL 136788 (D. Kan. Aug. 2, 1990) ........ 39

*Interstate Circuit v. United States*,
306 U.S. 208 (1939) ........ 22

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ........ 38

*Kendall v. Visa U.S.A. Inc.*,
04-cv-04276-JSW, 2005 WL 2216941 (N.D. Cal. July 25, 2005) ........ 31

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ........ 6, 7, 28

*Kleen Prods. LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017) ........ 26, 28

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ........ 36

*Kolling v. Dow Jones & Co.*,
137 Cal. App. 3d 709 (1982) ........ 34

*LiveUniverse, Inc. v. MySpace, Inc.*,
304 F. App'x 554 (9th Cir. 2008) ........ 38

*Lorix v. Crompton Corp.*,
736 N.W.2d 619 (Minn. 2007) ........ 36

*Los Gatos Mercantile, Inc. v. E.I. du Pont de Nemours & Co.* (*Los Gatos I*),
No. 13-cv-01180-BLF, 2014 WL 4774611 (N.D. Cal. Sept. 22, 2014) ........ 34

*Los Gatos Mercantile, Inc. v. E.I. du Pont de Nemours & Co.* (*Los Gatos II*),
No. 13-cv-01180-BLF, 2015 WL 4755335 (N.D. Cal. Aug. 11, 2015) ........ 32, 33, 36

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........ 31

*Mack v. Bristol-Myers Squibb Co.*,
673 So.2d 100 (Fla. Ct. App. 1996) ........ 40

*Marsh v. Anesthesia Servs. Med. Grp.*,
200 Cal. App. 4th 480 (2011) ........ 8

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) ........ 31, 32

*Moore v. Kayport Package Express, Inc.*,
885 F.2d 531 (9th Cir. 1989) ........ 40

*Oliver v. SD-3C LLC* (*Oliver I*),
No. 11-cv-01260-JSW, 2015 WL 10890656 (N.D. Cal. Sept. 30, 2015) .................................. 8

*Oliver v. SD-3C LLC* (*Oliver II*),
No. 11-cv-01260-JSW, 2016 WL 5950345 (N.D. Cal. Sept. 30, 2016) ............................. 7, 12

*Onshore Networks of Ill., L.L.C. v. Micron Tech., Inc.*,
No. 3:18-cv-03905 (June 28, 2018) ............................................................................ 37

*Papasan v. Allain*,
478 U.S. 265 (1986) ................................................................................................ 28

*Salveson v. JP Morgan Chase & Co.*,
166 F. Supp. 3d 242 (E.D.N.Y. 2016) ........................................................................ 36

*Sonoma Cty. Ass'n of Retired Emps. v. Sonoma Cty.*,
708 F.3d 1109 (9th Cir. 2013)...................................................................................... 40

*Treanor v. Micron Tech., Inc.*,
No. 3:18-cv-03805 (June 26, 2018) ............................................................................ 37

*United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA, Inc.*,
74 F. Supp. 3d 1052 (N.D. Cal. 2014) ........................................................................ 39

*United States v. Am. Airlines, Inc.*,
743 F.2d 1114 (5th Cir. 1984)...................................................................................... 22

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) ................................................................................................ 35

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003).......................................................................................... 4

*United States v. Standard Oil Co.*,
316 F.2d 884 (7th Cir. 1963)...................................................................................... 25

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*,
873 F.3d 185 (3d Cir. 2017)............................................................................. 14, 15, 16

*Vinci v. Waste Mgmt., Inc.*,
36 Cal. App. 4th 1811 (1995) ...................................................................................... 36

*Warth v. Seldin*,
422 U.S. 490 (1975) ................................................................................................ 34

*Wash. Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
No. 16-cv-10324, 2018 WL 3313010 (N.D. Ill. July 5, 2018)......................................... passim

*White v. R.M. Packer Co.*,
635 F.3d 571 (1st Cir. 2011) ...................................................................................... 15

*Wilcox v. First Interstate Bank of Or., N.A.*,
815 F.2d 522 (9th Cir. 1987) .... 16

*Williamson Oil Co. v. Philip Morris USA*,
346 F.3d 1287 (11th Cir. 2003) .... 15, 21

*Wrestlereunion, LLC v. Live Nation Television Holdings, Inc.*,
No. 8:07-cv-2093-JDW-MSS, 2008 WL 3048859 (M.D. Fla. Aug. 4, 2008) .... 40

**Statutes**

2013 Utah Laws Ch. 187 (H.B. 108) .... 39

740 Ill. Comp. Stat. 10/7(2) .... 39

Ariz. Rev. Stat. § 44-1415.A .... 39

Ark. Code § 4-75-201 *et seq.* .... 39

Ark. Code § 4-75-212-315(a)(3) *et. seq.* .... 39

Arkansas's Unfair Practices Act .... 39

Cal. Bus. Prof. Code. § 17200 .... 38

D.C. Code § 28-4503 .... 39

Fla. Stat. §§ 501.201 *et seq.* .... 40

Illinois Antitrust Act .... 39

Kan. Stat. § 50-112 .... 39

Mich. Comp. Laws §§ 445.771–72 .... 39

Miss. Code Ann. §§ 75-21-1 *et seq.* .... 39

N.C. Gen. Stat. §§ 75-1 *et seq.* .... 39

N.Y. Gen. Bus. Law § 340 .... 39

N.Y. Gen. Bus. Law § 340.5 .... 39

S.D. Codified Laws § 37-1-3.1 .... 39

Tenn. Code Ann. §§ 47-25-101 *et seq.* .... 39

Utah Code § 76-10-3109(9) .... 39

Utah Code Annotated §§ 76-10-911, *et seq.* .... 39

W. Va. Code §47-18-3(a) .......... 39

Wis. Stat. § 133.03 .......... 39

**Other Authorities**

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (3rd and 4th eds., 2018 Cum. Supp. 2010-2017) .......... 17, 23, 24, 28

*China State Planner, Samsung Electronics in Deal for Chip Cooperation: China Daily*, Reuters, Feb. 6, 2018, https://www.reuters.com/article/us-china-samsung-elec-chips/china-state-planner-samsung-electronics-in-deal-for-chip-cooperation-china-daily-idUSKBN1FQ081?il=0 .......... 29

Paula W. Render et al., *Sending the Wrong Message? Antitrust Liability for Signaling*, 31 Antitrust 83, 83 (Fall 2016) .......... 24

**Rules**

Fed R. Civ. P. 12(b)(6) .......... i, 4, 6

Fed. R. Civ. P. 12(b)(1) .......... i

Fed. R. Civ. P. 15(a)(2) .......... 40

Fed. R. Civ. P. 8(a)(2) .......... 30

## I. INTRODUCTION

The IPPs' Complaint does not come close to alleging conspiratorial conduct, and should be dismissed. The core of the IPPs' Complaint is that Defendants hatched a conspiracy to suppress output in the market for DRAM via public statements to equity analysts and investors. But the handful of selectively edited and misleadingly excerpted statements upon which the IPPs premise their claims fall far short of demonstrating any conspiracy. On their face, these quotations reflect nothing more than routine comments by company officials to the investing community, often in response to analysts' specific questions about the DRAM industry and Defendants' business strategies. Nowhere does the Complaint allege any connections between these public statements and Defendants' DRAM output, any industrywide changes in conduct, or any specific Defendant's DRAM prices. The IPPs' central theory—that Defendants gradually deserted the competitive battlefield one-by-one over the course of *eight months*, and through a series of public comments to shareholders and analysts adopted a vague plan to suppress capacity—is not only implausible, but contradicted by the Complaint itself and the materials cited therein.

The IPPs' Complaint should be dismissed in full for the following reasons:

*First*, there are no factual allegations directly evidencing any agreement between Defendants—no direct communications, no backroom meetings, no private exchanges between Defendants, nothing. Defendants' alleged statements at routine investor relations events and in other public meetings are not direct evidence of a conspiracy and do not support the IPPs' claims of an industrywide agreement to suppress DRAM capacity. In fact, the IPPs altogether fail to allege the "who, what, when, and how" of the supposed conspiracy; they do not identify the role each Defendant played, how the supposed conspiracy was organized and carried out, or the means by which Defendants implemented, monitored, and enforced this alleged agreement. That failing is fatal to the IPPs' claims, especially given that the conspiracy alleged here took place during a time of surging demand, increased technological output, and changing market conditions. In these circumstances, it is wholly implausible that a plain-vanilla "agreement to restrict capacity" could form, persist, or be effective. And the IPPs' inability to provide any particulars of the

supposed conspiracy confirms their failure to plausibly allege its existence.

*Second*, the circumstantial evidence alleged by the IPPs does not support an inference of an agreement to suppress DRAM capacity. This is unsurprising given the facial implausibility of the IPPs' alleged "conspiracy in plain view." To start, the allegations do not even support an inference that Defendants engaged in parallel conduct; rather, they reflect that different Defendant employees made a variety of public statements over a period of eight months, and do not include any specific factual allegations of actual parallel behavior. In fact, while the IPPs allege a conspiracy to constrict capacity, one of the Defendants notified investors of its plans to *increase* capacity. Moreover, all of the IPPs' factual allegations about Defendants' conduct are consistent with independent and self-interested business decisions, and do not plausibly suggest that each Defendant joined and publicly orchestrated an agreement to restrain output. Because the IPPs' claims rest on baseless assertions of the kind that the Supreme Court, the Ninth Circuit, and this Court have repeatedly described as inadequate to state a plausible claim for relief, the Complaint should be dismissed in full.

*Third*, the IPPs' claims fail for the additional and independent reason that they do not establish the IPPs' constitutional or statutory standing to bring suit. The IPPs, who purportedly bought consumer electronics products containing DRAM, do not plead facts demonstrating how allegedly inflated DRAM-component prices could have trickled down through countless complex supply chains and impacted end purchasers. When presented with virtually identical allegations of harm in a prior litigation involving DRAM, another court in this District dismissed indirect purchasers' antitrust claims because their purported injuries were too far removed from the alleged misconduct to support antitrust standing. This Court should do likewise.

* * * * *

In the end, the IPPs should not be allowed to assume the existence of a conspiracy, arrange cherry-picked market facts accordingly, and proceed directly to antitrust discovery. They must plead evidentiary facts that, taken as true, are more consistent with conspiracy than with independent decision-making. The IPPs' bid to infer an agreement from Defendants' candid public statements to investors falls far short of the plausibility mark and if countenanced would

stifle the very conduct that the antitrust laws are designed to protect. Defendants respectfully request that the Court reject IPPs' attempt to stymie public transparency and the free flow of information—hallmarks of properly functioning markets—and dismiss the IPPs' Complaint in full and without leave to amend.

## II. SUMMARY OF RELEVANT ALLEGATIONS

The IPPs purport to represent a class of individuals and entities that allegedly purchased unidentified "DRAM Devices" between June 1 or July 1, 2016 and February 1, 2018 (the "Class Period"). Compl. ¶¶ 22–26, 244.[2] The named plaintiffs allegedly purchased a variety of finished consumer products that contained DRAM, including Lenovo and Apple laptops and Samsung and Motorola mobile phones. *Id.* ¶¶ 22–26.

Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., SK hynix, Inc., and SK hynix America, Inc. are manufacturers and sellers of various types of DRAM, and collectively accounted for the bulk of worldwide DRAM sales during the Class Period.[3] *Id.* ¶¶ 2, 11, 27–37. Defendants manufactured and customized various types of DRAM for use in specific applications, such as mobile phones, servers, TVs, and computers. *Id.* ¶¶ 50–52. Defendants primarily sell DRAM to Original Equipment Manufacturers ("OEMs") pursuant to contracts that identify price, quantity, quality, and other specifications. *Id.* ¶¶ 53, 56. OEMs incorporate DRAM into the various products they manufacture. *Id.* ¶¶ 22–26, 53. DRAM is one of many component parts in the finished products that the IPPs allegedly purchased.

DRAM manufacturers build grids of individual DRAM chips (or "die") on wafers of silicon, a substrate whose properties as a semiconductor make it popular among memory manufacturers. *Id.* ¶¶ 12, 44, 49. Defendants are under constant pressure to reduce die size (*i.e.*, to shrink the dimensions of the squares on each wafer's grid), to increase the "memory density" of each square or "die" by boosting its capacity to store bits of data, and to improve energy

---

[2] IPPs varyingly allege that the Class Period began on June 1, 2016, *see* Compl. ¶¶ 3, 6, 61, 80–81, 192, or July 1, 2016, *see id.* ¶¶ 244–45, 276, 286.

[3] In reciting the IPPs' allegations, Defendants do not thereby admit to their accuracy.

efficiency and speed. *Id.* ¶ 165. Because *storage* is the focus of demand, supply and output in the DRAM industry are measured in terms of *bits* rather than wafers or chips. *See id.* ¶¶ 44, 64, 163, 180. The IPPs concede that Defendants made certain technological improvements to their products throughout the Class Period, which the IPPs refer to as "technology migrations" or "technology transitions." *See, e.g.*, *id.* ¶¶ 78, 98, 103, 106, 115.

The IPPs claim that at some point in "early 2016," Defendants began to "artificially constrain the growth of wafer capacity in order to inflate the price of DRAM." *Id.* ¶ 138. According to the IPPs, the conspiracy formed at some point after (i) Micron told investors in November 2015 that it did not foresee any immediate and "significant DRAM capacity expansion"; (ii) Samsung announced on an earnings call two months later that it planned "to grow supply . . . at market growth levels"; and (iii) SK hynix, several months later in July 2016, allegedly aligned its output strategy with that of its competitors, albeit without ever making any announcements about its capacity decisions. *Id.* ¶¶ 6, 86–88, 97. The IPPs refer to this gradual, *eight-month sequence* as a "near simultaneous decision" to restrict wafer capacity. *Id.* ¶ 6. The Complaint and materials it cites[4] reflect an unanticipated and contemporaneous surge in demand for DRAM across various customer segments during the Class Period. *See, e.g.*, *id.* ¶ 98 ("increasing demand"); *id.* ¶ 131 ("strong demand"); *id.* ¶ 135 ("soaring demand").[5]

---

[4] "Documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss. Such consideration does not convert the motion to dismiss into a motion for summary judgment." *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 978 (N.D. Cal. 2012) (citing *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n.13 (2007) (recognizing that courts are "entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn").

[5] *See, e.g.*, Ex. A at 3 ("There was a particularly strong demand for server DRAM as the cloud computing market began to take off.") (cited in Compl. ¶ 112); Ex. B at 5 ("In the third quarter [of 2016], [t]he demand for memory increased remarkably, due to seasonality and new smartphone launches.") (cited in Compl. ¶¶ 72, 100); Ex. C at 4 ("Thanks to the higher-than-expected growth in demand for server DRAM . . . , the undersupply is likely to continue for some time despite the attempts to increase supply.") (cited in Compl. ¶ 125, incorrectly dated in the Compl. as Oct. 16, 2017); Ex. H at 4 ("[W]ithin the [graphics] client segment we saw market demand which exceeded our expectations.") (cited in Compl. ¶ 99).

The IPPs allege that as a result of this supposed conspiracy, Defendants were able to charge "inflated prices" for DRAM, and that these prices included an "overcharge"—an increment over the competitive price that DRAM purchasers would have paid but for the alleged conspiracy—that was passed on intact, purchase-by-purchase, through every step of every distribution chain until it injured each member of a putative class of consumers who purchased unidentified "DRAM Devices." *Id.* ¶¶ 234–43. The IPPs do not allege facts detailing these intervening and independent steps, nor do they set forth the factual basis of their assertion that "it is likely that pass through [of the overcharge to end purchasers] is greater than 100 percent." *Id.* ¶ 242.

The Complaint is otherwise silent as to Defendants' conduct before, during, and after the Class Period. The IPPs do not allege *any* direct communications between Defendants—the Complaint does not identify any conversations, telephone calls, or meetings between Defendants' employees or executives—nor do they allege facts reflecting the formation, object, or operation of the alleged conspiracy. The IPPs do not even identify the types of DRAM or DRAM Devices the conspiracy purportedly impacted. *See, e.g.*, *id.* ¶¶ 234, 237, 239, 244–45 (discussing overcharges for unidentified "DRAM Devices").

The IPPs contend that Defendants' conspiracy ended shortly after *Reuters* reported on December 27, 2017 that China's National Development and Reform Commission (the "NDRC") was investigating the DRAM industry. *Id.* ¶ 134. Contradicting their own claim that "Defendants' [c]onduct [c]hanged [a]bruptly" after *Reuters* broke the NDRC story, the IPPs also assert that Samsung and SK hynix did not change their supply strategies until February and April 2018, respectively, *see id.* ¶¶ 137–38, and do not allege that Micron *ever* altered course to add more capacity following the publication of the *Reuters* story. Moreover, the IPPs allege that average DRAM prices remained high into the spring of 2018, *see id.* ¶ 58, months after Defendants purportedly became aware of the NDRC investigation and allegedly acted "abruptly" to add wafer capacity. *See id.* ¶¶ 58, 134–35, 179.

## III. ARGUMENT

### A. Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests a plaintiff's allegations to determine whether they "raise a right to relief above the speculative level" and contain sufficient factual material "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555–56, 570. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) ("[M]erely conclusory, unwarranted deductions of fact, or unreasonable inferences" do not state a claim for relief). Allegations cross the threshold into "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Allegations that are "merely consistent with" conspiracy must be dismissed. *Twombly*, 550 U.S. at 557, 570.

Antitrust plaintiffs "must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). Given the expense of antitrust discovery, courts "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* (*AGC*), 459 U.S. 519, 528 n.17 (1983). Accordingly, the IPPs must "answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Kendall*, 518 F.3d at 1048. "[M]ere allegations of parallel conduct—even consciously parallel conduct—are insufficient to state a claim under § 1." *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015). There must be "'something more,' 'some further factual enhancement,' a 'further circumstance pointing toward a meeting of the minds' of the alleged conspirators." *Id.* (quoting *Twombly*, 550 U.S. at 557, 560). Additionally, antitrust plaintiffs must demonstrate "antitrust injury," or "injury of the type

the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Glen Holly Entm't Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1007–08 (9th Cir. 2003) (quotations omitted).[6]

### B. The IPPs Fail to Allege Facts Indicative of a Conspiracy.

Plaintiffs must plead an antitrust conspiracy in one of two ways. They can plead evidentiary facts directly establishing a conspiracy—allegations that are "explicit and require no inferences to establish the existence of a conspiracy." *Oliver v. SD-3C LLC* (*Oliver II*), No. 11-cv-01260-JSW, 2016 WL 5950345, at *4 (N.D. Cal. Sept. 30, 2016). Alternatively, plaintiffs can plead circumstantial evidence that "raises a suggestion of a preceding agreement." *Id.* (quoting *Twombly*, 550 U.S. at 557). To survive a motion to dismiss based on circumstantial factual allegations, a complainant must plead more than mere parallel conduct; plaintiffs must also plead "plus factors" that give rise to a circumstantial but plausible inference of conspiracy. *Musical Instruments*, 798 F.3d at 1193.

The IPPs' Complaint should be dismissed because it does not include direct allegations of a conspiracy, does not plead parallel conduct, and does not plead circumstantial facts that support a plausible inference of a conspiracy.

#### 1. The Complaint does not set forth direct evidence of conspiracy.

The IPPs' Complaint lacks any direct evidence of conspiracy. The IPPs do not allege direct communications between Defendants, criminal pleas, inculpatory testimony, or "smoking gun" documents. Simply put, the IPPs have not alleged any facts that directly establish the formation, object, and operation of the purported conspiracy between Defendants.

In so doing, the IPPs wholly fail to answer *Kendall*'s call for answers to the questions: "who, did what, to whom (or with whom), where, and when?" 518 F.3d at 1048. The IPPs do

---

[6] These pleading standards apply with equal force to all of the IPPs' claims. *See, e.g.*, *Faulkner v. ADT Sec. Servs., Inc.*, No. 11-cv-00968-JSW, 2011 WL 1812744, at *1 (N.D. Cal. May 12, 2011) (applying *Twombly* and *Iqbal* to California privacy law claim), *aff'd*, 706 F.3d 1017 (9th Cir. 2013); *Flagship Theatres of Palm Desert, LLC v. Century Theatres*, 198 Cal. App. 4th 1366, 1378–79 (2011) (plaintiffs must satisfy antitrust injury requirements under Cartwright Act); *see also* App'x B.

not plead a *single* evidentiary fact describing the formation or scope of the purported agreement to restrict capacity; the organizing principles that governed the agreement's operation; the role that each Defendant was to play; or the way in which Defendants implemented, monitored, or enforced the alleged conspiracy. *See Musical Instruments*, 798 F.3d at 1193 n.5 (affirming dismissal of complaint that failed to explain "*how the alleged conspiracy was organized and carried out*") (emphasis added); *Marsh v. Anesthesia Servs. Med. Grp.*, 200 Cal. App. 4th 480, 493 (2011) (Cartwright Act plaintiffs "must plead the formation and operation of the conspiracy and the illegal acts done in furtherance of the conspiracy") (citation omitted).

The IPPs' inability to plead facts describing the elements of the purported agreement is particularly telling in light of their contention that Defendants orchestrated the restraint in plain view of investors, industry analysts, and members of the trade press. *See* Compl. ¶¶ 81–82, 86–139. Courts are suspicious of alleged conspiracies in plain view because of their inherently implausible character. *See In re Nat'l Ass'n of Music Merchs., Musical Instruments & Equip. Antitrust Litig.*, No. 09-cv-2002, 2012 WL 3637291, at *2 (S.D. Cal. Aug. 20, 2012) ("The presence of numerous uninvolved observers at [trade-association] meetings tends to dispel any specter of illegality."), *aff'd sub nom. In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015). Here, the IPPs' failure to allege the rudiments of an agreement they claim Defendants hashed out in public underscores the implausibility of their claims. *See id.* ("[I]f any price-fixing agreements were made during such meetings, the presence of numerous witnesses would allow Plaintiffs to allege the specifics of such agreements."). That is especially true given the complicated nature of the DRAM industry, the different means of competition among Defendants on price, quantity, and quality, and soaring demand for DRAM. Compl. ¶¶ 98, 131, 135.

These factors all make it implausible that the alleged conspiracy could form, persist, or be effective absent elaborate coordination and enforcement among Defendants—and yet the IPPs' Complaint pleads no facts on this front. Simply put, the IPPs do not come close to alleging facts that are "explicit and require[] no inferences to establish the existence of a conspiracy," *see Oliver v. SD-3C LLC* (*Oliver I*), No. 11-cv-01260-JSW, 2015 WL 10890656, at *3 (N.D. Cal.

Sept. 30, 2015) (quoting *In re Citric Acid Litig.*, 191 F.3d 1090, 1094, 1104 n.8 (9th Cir. 1999)). Conclusory assertions of conspiracy "do[] not supply facts adequate to show illegality" and "will not suffice" to state a claim for relief. *Twombly*, 550 U.S. at 556–57. *Twombly*, *Kendall*, and *Musical Instruments* put an end to antitrust fishing expeditions based on similarly indeterminate allegations.

**2. The IPPs' circumstantial factual allegations do not support an inference of conspiracy.**

Without factual allegations directly evidencing a conspiracy, the IPPs must rely on circumstantial allegations. The Complaint falls flat: the IPPs do not adequately allege either *parallel conduct* among Defendants or any *plus factors* that "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

a. <u>The IPPs fail to allege parallel conduct.</u>

The *sine qua non* of the IPPs' Complaint is that allegedly parallel decisions to restrict wafer capacity give rise to a plausible inference of conspiracy. The IPPs attempt to carry their burden of pleading parallelism by citing to (i) excerpts from earnings call transcripts and statements at investor conferences and (ii) charts tracking average spot market prices for certain categories of DRAM. But neither set of allegations shows that Defendants in fact engaged in parallel (or even *similar*) conduct with respect to capacity decisions. The IPPs' failure to plead facts on this issue, the central tenet of their case, is both characteristic of their broader pleading failures and an independent ground for dismissing their Complaint.

(1) *The IPPs fail to allege parallel capacity and output decisions.*

The IPPs rely almost exclusively on the public statements of Defendants' employees—often unattributed and selectively excerpted—to substantiate their allegations regarding Defendants' wafer capacity decisions. While the IPPs assert these public statements represent a parallel "deviation from past business practices," Compl. ¶ 83, they fail to plead any facts from which the Court could infer a collective change in conduct. The IPPs do not proffer *any* market data on supply trends, wafer production (called "wafer starts"), or total DRAM output. And while the Complaint cites a few pre-Class Period statements by Samsung that the IPPs

characterize as suggestive of a change in strategy when compared against later statements, the IPPs do not allege *any* facts or statements from which the Court could infer that Micron or SK hynix *ever* adjusted their wafer capacity strategy. There is simply no basis for inferring that the excerpted statements are evidence of any change in Defendants' conduct, let alone a parallel change. *See In re Graphics Processing Units Antitrust Litig.* (*GPU*), 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) ("Plaintiffs' allegations also fail to show that [Defendants'] behavior was 'historically unprecedented' because they make scant allegations of pricing behavior that came *before* the alleged conspiracy.").

In fact, when considered in their entirety, Defendants' public statements do not reflect parallel conduct, to say nothing of collusive conduct—a reality the IPPs attempt to conceal through misleading excerpts and selective omissions. Rather, Defendants' statements affirm that each company was pursuing its own independent strategy. For example:

- The IPPs omit portions of Micron Technology, Inc. CEO Mark Durcan's pre-Class Period response to an analyst's question about whether Micron anticipated any pricing stabilization "as [its] competitors remain disciplined in terms of capacity expansion?" Ex. E at 8. Durcan responded: "[M]y expectation, as I sit here today, is that as long as nobody adds any incremental DRAM wafers, *which I think is unlikely that anyone would do that given the ROI on incremental wafers*, then bit growth next year will be 20%-ish." *Id.* (emphasis added). The IPPs do not include Durcan's explanation that incremental wafers would have a low return on investment, and omit another portion of Durcan's comments in which he emphasized that each manufacturer would "*deal with that* [capacity decisions] *as each of us deems appropriate*." *Compare* Ex. E at 9 (emphasis added), *with* Compl. ¶ 92.
- Likewise, the IPPs cite the portions of Samsung's October 27, 2016 earnings call in which a speaker emphasizes that Samsung's "focus is not to increase our market share but to maximize our profits," Compl. ¶ 72, but omit the speaker's prediction that *Samsung would outgrow market bit growth by a substantial margin in 2016*, *see* Ex. B at 9, and develop its own "scenario-based strategies to respond to whatever situation

unfolds" with respect to "the demand-supply balance." *Id.* at 15.

- In a similar vein, the IPPs reference a July 26, 2016 (incorrectly dated in the Complaint as July 21, 2016) earnings call in which an SK hynix representative "stated that [the manufacturer's] bit growth for the year would be in the low to mid 20 percent range, in line with market growth." Compl. ¶ 97. The IPPs do not include the portion of the call in which the representative emphasized that the company wanted to "increase market share while putting [its] priority on profitability." Ex. F at 6.
- The IPPs' summary of SK hynix's July 25, 2017 earnings call may include the most egregious omission of this set. The IPPs allege that SK hynix "told investors on its second quarter 2017 earnings call that its DRAM shipment growth for the year would be 'at low 20%, on par with the market,'" Compl. ¶ 120, but omit the company's announcement of an *increase* in capacity during the Class Period. *See* Ex. G at 7 ("[N]ow for both DRAM and NAND, there is some capacity increase planned within this year, especially because for DRAM it is — we cannot meet the growing demand only with technology migration, so we do need some capacity increase.").

The picture that emerges from these public statements is not one in which three competitors suddenly changed course in pursuit of a functionally identical approach to capacity. Quite the opposite. These comments depict three firms making independent decisions over the course of many months based on their own analyses of the optimal level of wafer capacity and bit output in the face of admittedly "strong demand" for DRAM. Compl. ¶ 104.[7] SK hynix assured investors of its determination to add wafer capacity to meet demand and gain market share, Ex. G at 7;

---

[7] *See also* Ex. B at 5 ("In the third quarter [of 2016], [t]he demand for memory increased remarkably, due to seasonality and new smartphone launches."); *id*. at 15 ("[T]he gigabyte per system this year for smartphones and servers have both grown very strong, higher than what we had expected.") (cited in Compl. ¶¶ 72, 100); Ex. A at 3 ("There was a particularly strong demand for server DRAM as the cloud computing market began to take off.") (cited in Compl. ¶ 112); Ex. C at 4 ("Thanks to the higher-than-expected growth in demand for server DRAM . . . , the undersupply is likely to continue for some time despite the attempts to increase supply.") (cited in Compl. ¶ 125); Ex. D at 2 ("And we saw increased enterprise demand as analytics workloads are driving more use of in-memory databases with higher server memory content.") (cited in Compl. ¶ 119).

Samsung indicated that its bit output would outgrow that of the market during the heart of the alleged conspiracy and that it would calibrate its capacity depending on market conditions, Ex. B at 9; and Micron underscored its commitment to manage periods of oversupply as it "deem[ed] appropriate," Ex. E at 9.[8]

Because the unfiltered versions of these statements do not support the collusive gloss that the IPPs have applied to them, the Court need not accept the IPPs' strained inferences of conspiracy. *See Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014) (in deciding a Rule 12(b)(6) motion to dismiss, a district court need not accept as true allegations that are contradicted by materials incorporated by reference). The IPPs have the burden of alleging parallel behavior that is more consistent with conspiracy than with a common but independent response to a common stimulus (like "soaring demand"), and they have not carried it. *See Twombly*, 550 U.S. at 556 n.4 (antitrust conspiracy plaintiffs must plead "parallel behavior that would probably not result from chance, coincidence, *independent responses to common stimuli*, or mere interdependence unaided by an advance understanding among the parties") (quotations and citation omitted) (emphasis added).

(2) *The IPPs' price charts are incapable of demonstrating parallel conduct.*

Lacking allegations of true parallel conduct by Defendants, the IPPs fall back on a series of price charts that purport to demonstrate "Defendants' concerted actions to curtail supply and forego market share expansion." Compl. ¶ 7; *see also* ¶¶ 58, 203–04. None of the charts is capable of substantiating that conclusion. Each graph (i) tracks industrywide *average* DRAM prices on the spot market without delineating the prices that each Defendant charged various customers over time, (ii) does not indicate whether the depicted prices are drawn from worldwide or U.S. data on DRAM purchases, and (iii) does not and cannot demonstrate whether and to what extent Defendants' prices moved together before, during, or after the Class Period. *See Oliver II*, 2016 WL 5950345, at *6–*7 (discounting price charts incapable of showing simultaneous changes or stabilization of pricing during conspiracy period).

---

[8] *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011) (affirming dismissal of antitrust complaint because allegations of parallelism evinced independent decision-making).

The Complaint's related allegations that Defendants charged higher prices for (and collected more revenue from) sales of DRAM during the Class Period, *see* Compl. ¶¶ 10, 181, are flawed for the same reasons. The IPPs' conclusory allegations do not reveal any parallel behavior, and say nothing about the extent to which Defendants did or did not engage in parallel pricing before, during, or after the Class Period. As the Supreme Court has put it, "the occurrence of a price increase does not in itself permit a rational inference of conscious parallelism or supracompetitive pricing." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993); *see Wash. Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, No. 16-cv-10324, 2018 WL 3313010, at *12 (N.D. Ill. July 5, 2018) ("[P]rice hikes in highly concentrated industries are often the result of typical, non-conspiratorial market behavior."); *GPU*, 527 F. Supp. 2d at 1022 ("[C]ompetitive market forces will tend to drive the prices of like goods to the same level.").

* * * * *

Considered together, neither the IPPs' price charts nor Defendants' public statements bespeak parallel pricing or wafer capacity management. Far from it. The unfiltered statements show three firms making independent decisions over the course of many months, relying on their own analyses of the optimal level of wafer capacity and bit output in the face of "soaring" demand for DRAM. Compl. ¶ 135. Without factual allegations of parallelism, the IPPs' claims do not even begin to support an inference of conspiracy.

b. <u>None of the IPPs' "plus factor" allegations raises an inference of conspiracy.</u>

The Complaint's "plus factor" allegations also fail to support an inference of a conspiracy. The IPPs allege that (1) the DRAM industry was primed for collusion due to "structural market conditions," (2) Defendants shared a strong motive to collude, (3) Defendants acted contrary to their economic interest, (4) Defendants' business behavior changed abruptly and nearly simultaneously at the beginning of the Class Period, (5) Defendants engaged in public signaling, (6) Defendants' attendance at trade association meetings provided an opportunity to collude, and (7) Defendants were involved in prior antitrust litigation. These allegations miss their mark. Even assuming the IPPs had carried their burden to allege parallel conduct—which they have

not—none of these allegations evinces conduct that is "so unusual that in the absence of advance agreement, no reasonable firm would have engaged in it." *Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 873 F.3d 185, 193 (3d Cir. 2017) (quotations omitted).

(1) *The IPPs' allegations with respect to the "structural market conditions," "motive to conspire," and "action against self-interest" plus factors restate the conditions for lawful conscious parallelism.*

The Complaint's allegations going to "structural market conditions," "motive to conspire," and "actions against self-interest," do not support an inference of conspiracy because they "fail to account for conscious parallelism and the pressures of an interdependent market." *Musical Instruments*, 798 F.3d at 1195.

To substantiate their claim that the DRAM market was primed for collusion, the IPPs allege that DRAM was a commodity product, Compl. ¶¶ 141–44; three firms controlled 96% of the worldwide DRAM market (which is never defined), *id*. ¶¶ 145–51; the market shares of manufacturers did not fluctuate as expected "in a competitive market," *id*. ¶ 152; and entry was difficult for upstarts who did not possess the intellectual property rights or economies of scale necessary to break into the industry, *id.* ¶¶ 156–65. But as other courts have long and consistently recognized, these descriptors (i) "indicate only that the market was an oligopoly," (ii) do "not explain why the fact that the market was an oligopoly makes reasonable an inference that Defendants" allegedly entered into a conspiracy, and (iii) "are not sufficiently suggestive of any actual collusion between Defendants." *See Advanced Tech. Corp. v. Instron, Inc*., 925 F. Supp. 2d 170, 181–82 (D. Mass. 2013) (citing *Erie Cty. v. Morton Salt, Inc*., 702 F.3d 860, 870 (6th Cir. 2012)); *see also In re Late Fee & Over-Limit Fee Litig*., 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) ("[E]ven if the alleged market were concentrated, this would not render the asserted conspiracy plausible."), *aff'd*, 741 F.3d 1022 (9th Cir. 2014).

Because the IPPs' allegation that the DRAM market was concentrated is merely their way of saying that the DRAM market was an oligopoly,[9] the next alleged plus factors—motive to

---

[9] An "oligopoly" is the term economists use to describe a market with only a few sellers. With few sellers, each oligopolist (*i.e*., each of the handful of relevant sellers) is likely to be aware of the actions of the other oligopolists and recognize that "its pricing and output decisions [will] have an effect on market conditions" and the decisions of its competitors. *See In re Coordinated*

conspire and action against interest—mean little. As the Third Circuit recently explained, "in the case of oligopolies the first two [plus] factors [motive to conspire and action against self-interest] are *deemphasized because they largely restate the phenomenon of interdependence*." *Valspar*, 873 F.3d at 193 (emphasis added); *see also Musical Instruments*, 798 F.3d at 1195 ("[A]lleging 'common motive to conspire' simply restates that a market is interdependent (*i.e.*, that the profitability of a firm's decisions regarding pricing depends on competitors' reactions)."). "[E]vidence of a motive to conspire means the market is conducive to price fixing, and evidence of actions against self-interest means there is evidence of behavior inconsistent with a competitive market," the *Valspar* court explained, and "[s]ince those qualities are *intrinsic to oligopolies*, we instead focus on the third plus factor: 'evidence implying a traditional conspiracy.'" 873 F.3d at 193 (quoting *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398 (3d Cir. 2015) and *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004)) (emphasis added).

With respect to Defendants' motive, the IPPs allege that before the Class Period, "prices for the most common types of DRAM—DDR3 and DDR—declined steadily and precipitously," Compl. ¶ 63, allegedly giving Defendants "a strong motive to collude" to raise prices going forward. *Id.* ¶ 61. In short, the IPPs allege that Defendants had an interest in increasing profits. A desire to increase profits is not illegal, exists in every industry, and is not a basis from which a conspiracy can be inferred. Moreover, the shift from declining prices to increasing prices is perfectly consistent with competition, because raising prices instead of playing for market share is a legitimate way to pursue profits. *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1314–15 (11th Cir. 2003) (raising prices is no less legitimate than expanding market share as a

---

*Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 443–444 (9th Cir. 1990) (describing market interdependence and conscious parallelism in oligopolistic markets); *Valspar*, 873 F.3d at 195 ("[I]n an oligopoly, any rational decision *must* take into account the anticipated reaction of the other . . . firms.") (citations and quotations omitted). While these conditions might lead to similar results as would coordinated conduct, courts recognize that mere oligopolistic conditions do not establish conspiratorial behavior. *See, e.g.*, *White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) ("High barriers to entry and inelastic demand are two hallmarks of oligopolistic markets susceptible to successful parallel pricing practices, but neither helps to distinguish between agreement and mere conscious parallelism as the root cause of those practices. . . . [I]t is also likely that conscious parallelism would be sufficient to maintain stable relative market shares in a stable market for a basic commodity protected from new entry.").

means of boosting profits, and is "likely a more direct means of accomplishing" that goal).[10]

Likewise, allegations that Defendants acted against their economic interest simply "restate the phenomenon of interdependence." *Valspar*, 873 F.3d at 193 (quoting *Flat Glass*, 385 F.3d at 360). As *Twombly* recognizes, ordinary expectations as to pricing, output, and capacity dynamics in competitive markets do not map onto industries like this one, in which very few firms control nearly all of the market. *See Twombly*, 550 U.S. at 566 (in concentrated markets, "resisting competition is routine market conduct"). Accordingly, allegations of actions against interest must "account for conscious parallelism and the pressures of an interdependent market." *Musical Instruments*, 798 F.3d at 1195. The IPPs' allegations fail to do so.

Furthermore, even if the Complaint demonstrated that Defendants followed one another's pricing and supply strategies—and it does not, *see supra* Part III.B.2.a.—that would not give rise to any inference of conspiracy. The Ninth Circuit has held that follow-the-leader decision-making is not a plus factor where, as here, the relevant market is concentrated. *See Musical Instruments*, 798 F.3d at 1195 (citing follow-the-leader pricing as an example of conduct that "would seem against self-interest in a competitive market" but is rational for oligopolists); *Wilcox v. First Interstate Bank of Or., N.A.*, 815 F.2d 522, 526 (9th Cir. 1987) (same); *see also In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig*, 906 F.2d 432, 443–444 (9th Cir. 1990) (proof of follow-the-leader pricing "is generally considered insufficient to establish a violation of the Sherman Act"). The IPPs make cursory allegations that Micron publicly announced its intention to refrain from "try[ing] to take market share" by expanding wafer capacity, Compl. ¶ 90, and that Samsung and SK hynix eventually aligned their capacity management practices with Micron's proposed strategy months later. *Id.* ¶¶ 86–88, 97. This does not a conspiracy make. "Leaders" and "followers" can unilaterally copy one another without

---

[10] *See also Wash. Cty. Health Care*, 2018 WL 3313010, at *5 ("[T]he mere fact that [each defendant] restricted [its] own production . . . after learning of output reductions by the other sheds little light on the existence *vel non* of an unlawful agreement. . . . [T]he nature of an oligopoly makes it such that *there is a substantial likelihood that—even absent an agreement—[each defendant] would have tried to capitalize on output restrictions* signaled by the other, as it was in their independent interests to restrict supply and drive up prices.") (emphasis added).

running a serious risk of loss of business or goodwill if they can reverse a course of conduct promptly, and especially if "the original announcement had a future effective date that was never reached." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1425d1 (3rd and 4th eds., 2018 Cum. Supp. 2010-2017) (hereinafter "Areeda & Hovenkamp").[11]

The IPPs never tender an explanation of Defendants' conduct that is more consistent with conspiracy than with interdependent profit-maximizing behavior in a concentrated market. The IPPs merely rely on the conclusory assertion that "Defendants' Increased Prices for DRAM Cannot Be Explained by Market Factors," Compl. ¶ 171, and in so doing wholly ignore the possibility that conscious parallelism or another factor—including an unexpected and significant increase in demand—would produce the same price effects. *See Musical Instruments*, 798 F.3d at 1195 (holding that conspiracy allegations that "fail to account for conscious parallelism and the pressures of an interdependent market" flunk *Twombly*'s plausibility test).

(2) *The IPPs do not allege facts demonstrating that Defendants abruptly changed their capacity management practices in similar ways.*

The IPPs' remaining "plus factor" allegations do not sustain their claims. The IPPs first allege that Defendants' business "behavior changed abruptly and nearly simultaneously at the beginning of the Class Period" when they allegedly abandoned any effort to "gr[o]w supply at the same rate as their forecasted growth in demand," and instead "intentionally restricted supply so that it grew slower than demand." Compl. ¶¶ 64, 76. But the IPPs do not allege *facts* demonstrating that Defendants changed their capacity practices at all, nor do they tender an explanation as to why such a change, properly pleaded, would be more consistent with conspiracy than with conscious parallelism. As discussed above, the IPPs do not cite any output or capacity data that would substantiate that claim, and instead rely on misleading excerpts of public predictions of supply and demand conditions that are inconsistent with the conclusory allegations

[11] *Cf.* Compl. ¶ 69 (quoting Micron Technology, Inc. CEO Mark Durcan "*envision[ing] a future* in which no additional DRAM wafer capacity is required") (emphasis added); *id.* ¶ 91 (unidentified Samsung employee noting "[w]e don't expect there to be major increases in supply of DRAM *in the near future*") (emphasis added).

in the Complaint.

In the IPPs' telling, Micron Technology, Inc.'s CFO Ernest Maddock initiated a "nearly simultaneous" change in industry practice when he extended a public "invitation" to Samsung and SK hynix to make "'really rational decisions' involving 'lower supply growth' and no 'significant DRAM capacity expansion'" at an investor conference on November 17, 2015. Compl. ¶¶ 87–88. Then, *more than two months later*, Samsung allegedly "responded to Micron's invitation to restrict supply growth," and abandoned its previous strategy of "grow[ing] supply in an effort to take market share from competitors." *Id.* ¶ 88. The IPPs aver "DRAM prices began to accelerate upward rapidly" in May 2016, *id.* ¶ 94—two months *before* they contend that SK hynix purportedly joined the conspiracy by announcing that its bit output would grow in line with the market. *See id.* ¶ 97; *Wash. Cty. Health Care*, 2018 WL 3313010, at *10 (fact that supply shortages *preceded* alleged signals diminishes plausibility of plaintiffs' allegations).

Of course, the IPPs do not put forward a single evidentiary fact showing that Defendants' supply or capacity strategy *actually* changed during the Class Period. *See supra* Part III.B.2.a. Not one. That failure is all the more remarkable given the import that the IPPs attach to the public statements described above. And as already shown, when the public statements are considered in their entirety, it is clear that Defendants never even converged on a joint public message of capacity discipline. *Compare* Ex. B at 4 (Samsung representative predicting that Samsung would outgrow market bit growth by a substantial margin in 2016), *with* Ex. G at 7 (SK hynix representative stating "[n]ow for both DRAM and NAND, there is some capacity increases planned within this year . . . because for DRAM . . . we cannot meet the growing market demand only with technology migration, so we do need some capacity increase."). But even if the IPPs' naked assertion that Defendants abandoned market share competition in favor of "capacity and supply discipline" were credited, *see* Compl. ¶¶ 83–84, the IPPs would still come nowhere close to showing the "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors" that "would support a plausible inference of conspiracy." *Twombly*, 550 U.S. at 556 n.4; *see supra* Part III.B.2.a.(1).

Perplexingly, the IPPs assert that Defendants made serious investments in research and development *while* conspiring with each other to limit capacity. The IPPs acknowledge that, throughout the Class Period, Defendants faced "constant pressure" to (and in fact *did*) shrink die "size in order to meet increasing demand of memory density." Compl. ¶ 163 (noting Defendants' commitment to further "shrinks" notwithstanding "development costs that are increasing by 13% annually"); *see also* ¶ 180 ("The node process is expected to further decrease to 10nm by 2020."). But at no point do the IPPs reconcile what they call the "node process"—the process by which Defendants increased bit output, shrank die size, and boosted the memory density of each die, *see id.* (acknowledging that node decreases increase bit capacity at existing production facilities)—with their allegation that Defendants restricted output via an agreement to curtail capacity. The IPPs' feeble and unsupported assertion that the node process "does not explain Defendants' price increases during the Class Period" speaks to the wrong question. *Id.* The relevant question is why Defendants would continue to invest in a costly development process that *increased* bit supply and output if they had abruptly adopted a common scheme to *reduce* capacity. The IPPs' Complaint neither reckons with that tension, nor explains why Defendants would doggedly pursue technological development that *undermined* the purpose of their alleged about-face on capacity management.

At best, the IPPs allege that Defendants made a series of public statements to investors over the course of *eight months* with little overlap in the subject matter of those comments. *See* Compl. ¶¶ 87–88, 94, 97; Ex. G at 7. Regardless of whether some similar purpose or goal can be extracted from the mishmash of the IPPs' pleadings, "[a]llegations of such slow adoption of similar policies do[] not raise the specter of collusion." *Musical Instruments*, 798 F.3d at 1196; *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 543 (N.D. Tex. 2014) (holding that competitors' seriatim adoption of similar pricing strategies "is the sort of gradual pricing change rejected as unsuspicious"); *Wash. Cty. Health Care*, 2018 WL 3313010, at *8 (allegation that purportedly collusive drug recalls were undertaken months apart "tend[ed] to undermine, rather than support" conspiracy allegations).

Even if the IPPs had pleaded facts in support of their conclusory allegation that Defendants "made a near simultaneous decision in 2016 to restrict growth in the supply of DRAM," *see* Compl. ¶ 6, they fail to explain how that conduct would be more consistent with conspiracy than it is with lawful conscious parallelism. *See Musical Instruments*, 798 F.3d at 1196 ("Even assuming that the progressive adoption of similar policies across an industry constitutes simultaneity, that fact does not reveal anything more than similar reaction to similar pressures within an interdependent market, or conscious parallelism.").

Accordingly, two glaring failures undercut the IPPs' allegations with respect to their purported change-in-conduct plus factor: they do not allege facts demonstrating that Defendants abruptly and simultaneously changed their capacity practices, nor do they explain why such a change, properly pleaded, would give rise to an inference of conspiracy.

(3) *Defendants' public statements to investors and market analysts do not evince a conspiracy to suppress wafer capacity.*

The IPPs allege that Defendants "engaged in concerted signaling to each other through public statements and actions in response," and that these "signals"—the large majority of which take the form of responses to bona fide questions about business strategy—"effectuated" an underlying agreement to "delay or slow capacity, or not to expand capacity." Compl. ¶ 81. Regardless of whether the IPPs label Defendants' public statements as invitations to collude or as conspiracy "facilitating practices," their burden remains the same: they must show that those remarks were "largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Musical Instruments*, 798 F.3d at 1194. As is the case with their other plus-factor allegations, the IPPs do not account for interdependence and conscious parallelism, and attempt to recast legitimate conduct as illegal.

For obvious reasons, courts are reluctant to construe public announcements of business strategy as signals to collude. *See, e.g.*, *Nat'l Ass'n of Music Merchs.*, 2012 WL 3637291, at *5 (dismissing conspiracy claims in part because "making announcements about new practices or developments is common and doesn't imply illicit or surreptitious signaling was going on"). It is only in those rare circumstances when Defendants make indirect but "detailed communications

with no public purpose" that courts have permitted an inference of traditional agreement from purported signals. *See Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1276 (N.D. Ga. 2002), *aff'd, Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1373 (N.D. Ga. 2017) (explaining that "courts are properly reluctant" to characterize as conspiratorial statements concerning "the type of information companies legitimately convey to their shareholders"), *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018). Critically, courts reject plaintiffs' attempts to use allegations of signaling to back into an otherwise baseless conspiracy claim. *See, e.g.*, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 133 (3d Cir. 1999); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1037 (8th Cir. 2000) (assertion that "producers signaled pricing intentions to each other through advance price announcements and price lists" assumed, rather than proved, a conspiracy).

(a) *None of Defendants' public comments rises to the level of an "invitation to collude."*

Here, the IPPs allege that certain of Micron's statements to investors and analysts "represented an invitation to [] competitors to stop adding significant wafer capacity." Compl. ¶ 69. Specifically, the IPPs point to Micron Technology, Inc. CFO Ernest Maddock's comments to investors at the November 2015 UBS Global Technology Conference, and to CEO Mark Durcan's remarks on a December 2015 earnings call. *Id.* ¶¶ 68, 87. The IPPs allege that Maddock told analysts at the UBS conference that "we're in an environment where you have closely held technology by a very limited number of producers" and purportedly "forecasted that [Micron's] competitors would make some really 'rational decisions' involving 'lower supply growth' and no 'significant DRAM capacity expansion.'" *Id.* ¶ 87. A month later, Durcan allegedly "emphasized that the 'DRAM industry consist[s] of only three technology developers'" and noted that he could "'envision a future in which no additional DRAM wafer capacity is required.'" *Id.* ¶ 69. Neither statement meets the rigorous test that courts have applied when asked to construe a public statement to investors as an "invitation to collude."

Courts have all but uniformly required antitrust conspiracy plaintiffs to show unequivocal, detailed, and private competitor-to-competitor "invitations" to give rise to an inference of conspiracy. *See, e.g.*, *Baggage Fee*, 245 F. Supp. 3d at 1373 ("Significant, though not dispositive, is the fact that 'invitations to collude' in the context of antitrust conspiracy claims *have almost universally been private communications, not public disclosures like the . . . comments at issue in this case*.") (emphasis added). In *Interstate Circuit v. United States*, for example, the Supreme Court cited to private correspondence from the hub to the spokes specifically inviting compliance with two detailed requests as a means to exclude smaller movie theater operators. 306 U.S. 208, 216–17 (1939).

When alleged "invitations" are public statements that contain "precisely the type of information companies legitimately convey to their shareholders," as is the case here, courts are especially hesitant to characterize them as evidence of unlawful conspiracy.[12] *See Baggage Fee*, 245 F. Supp. 3d at 1373 (quoting *Holiday Wholesale*, 231 F. Supp. 2d at 1277) (internal quotation marks omitted). Maddock's and Durcan's statements to investors and equity analysts do not come close to the direct, unequivocal, detailed, and private communications that courts consider invitations to collude. *Compare United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1116 (5th Cir. 1984) ("I have a suggestion for you. Raise your . . . fares twenty percent. I'll raise mine the next morning"), *with* Compl. ¶ 69 ("[I can] envision a future in which no additional DRAM wafer capacity is required.").

Maddock's and Durcan's comments to the effect that Micron, Samsung, and SK hynix were the three largest DRAM manufacturers are exactly the type of thing every trade reporter, investor, or market analyst expects to hear on an earnings call or at an industry conference. *Holiday Wholesale*, 231 F. Supp. 2d at 1277; *Baggage Fee*, 245 F. Supp. 3d at 1373. The same is true of prognostications about a period of "lower supply growth" or low growth in wafer capacity.

---

[12] Furthermore, the U.S. Securities and Exchange Commission already tightly regulates and oversees comments made by publicly traded companies like Defendant Micron Technology, Inc. Thus, the IPPs are implausibly alleging that Defendant Micron Technology, Inc. made an open invitation to collude in public, in full view of the regulating agency tasked with monitoring public comments.

Given the Complaint's multiple references to instances in which analysts *asked* executives about the potential for lower supply, Maddock's and Durcan's comments clearly targeted a core area of investor concern. *See, e.g.*, Compl. ¶ 90 ("Q: Pricing is going to continue to be weak until Micron and the DRAM industry overall cuts production. So . . . what will it take for that to happen?"); *id.* ¶ 104 ("Q: you had mentioned around 15% to 20% bit supply growth in DRAM barring any additional supply from competitions. . . . [I]s there risk in your mind in terms of additional supply coming online, any thoughts on that would be helpful[?]"). These comments do not fit the profile of "detailed communications with no public purpose" from which courts have inferred a signal to collude. *See Holiday Wholesale*, 231 F. Supp. 2d at 1276.

Investors and analysts are legitimately interested in (and in some circumstances have a right to hear) executives' plans with respect to capital expenditures, the concomitant effects on earnings, and the executives' analysis of prevailing industry conditions. *See Baggage Fee*, 245 F. Supp. 3d at 1355, 1373 (executive's statement on earnings call that "we prefer to be a follower . . . rather than a leader" in imposing a baggage fee "concerned a topic that was of interest to the airline industry" and conveyed "precisely the type of information" companies legitimately impart to shareholders); *Holiday Wholesale*, 231 F. Supp. 2d at 1265, 1275–78 (sequential and publicly announced price changes were legitimate communications to the market). With their fiduciary duties in mind, Maddock and Durcan were entitled to candidly address investor concerns, "express their views[,] and perhaps [] influence business decisions before they [we]re 'locked in'" without running a risk of incurring antitrust liability. *See* Areeda & Hovenkamp ¶ 1435c.

In the end, none of the public statements referenced in the Complaint reflects an "invitation to collude"—much less an invitation that Micron's competitors accepted.

(b) *The IPPs fail to allege facts connecting Defendants' public commentary to an agreement to restrain wafer capacity.*

The IPPs allege that following Micron's purported "invitation" to restrict wafer capacity, Samsung and SK hynix responded by "engag[ing] in concerted signaling to each other through public statements and actions in response that effectuated an agreement between [all three manufacturers] to artificially restrict supply growth of DRAM." Compl. ¶ 81; *see also id.* ¶¶ 100,

107. It is not at all clear that so-called "signaling"[13] even qualifies as a plus factor in a concentrated market. *See Holiday Wholesale*, 231 F. Supp. 2d at 1274–76 (doubting that facilitating practices, specifically signals, can qualify as plus factors in oligopolistic markets); Areeda & Hovenkamp ¶ 1436j ("A strong argument can therefore be made . . . for confining the control of unilaterally adopted facilitating practices to FTC Act § 5."). Of course, even if signaling *were* cognizable as a plus factor in an antitrust conspiracy case, the IPPs have not shown how Defendants' statements "effectuated" any action, much less a conspiracy to suppress wafer capacity.

The IPPs contend that Defendants affirmed "their commitment to a common scheme to limit supply and capacity to drive up prices" when they "not only ma[d]e public statements about their own commitment to capacity and supply discipline, but also on the importance of maintaining capacity and supply discipline within the industry as a whole." Compl. ¶ 101. While the IPPs point to certain public statements by Micron executives, they do not allege that either Samsung, the market-share leader, or SK hynix *ever* made similar statements regarding supply discipline in private or in public. In fact, the IPPs do not allege that employees of Samsung or SK hynix ever mentioned the word "discipline" or commented on anything other than their respective companies' strategies for responding to market conditions in the DRAM industry.

The contrast between the facts alleged in this case and a recent decision involving signaling allegations is instructive. In *In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d 772 (N.D. Ill. 2017), plaintiffs pleaded evidentiary facts in support of two critical points: first, that *each* defendant made statements calling for industrywide action to constrain capacity,[14] and

---

[13] "[A] signal is defined as (1) *a unilateral statement*, (2) likely to be heard by a competitor, (3) that communicates intended or proposed pricing, output, customer terms, or other dimensions of competition." Paula W. Render et al., *Sending the Wrong Message? Antitrust Liability for Signaling*, 31 Antitrust 83, 83 (Fall 2016) (emphasis added). To the extent the IPPs characterize Defendants' public statements as facilitating practices, *see* Compl. ¶ 221, the same distinction applies: "[f]acilitating practices can be either collective, as illustrated by a meeting or information exchange among competitors, *or unilateral, as illustrated by individual public speeches*." Areeda & Hovenkamp ¶ 1436b2 (emphasis added).

[14] *See Broiler Chicken*, 290 F. Supp. 3d at 798 ("In January 2008, immediately after an industry convention, the large producers made public statements calling for industry-wide production cuts."); *see also In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 61–62 (D.D.C.

second, that defendants—after making public statements emphasizing the need for industrywide action to constrain capacity—each took *action* to effectuate the stated goal.[15] The IPPs fall flat on both counts. First, as discussed earlier, the IPPs do not allege that Samsung or SK hynix made statements endorsing the need for industrywide capacity discipline or in any way recommending a course of conduct to their competitors.[16] Samsung's statements regarding its plans to refrain from "increasing market share," *see* Compl. ¶ 121, or avoid "fighting on volume," *see id.*, speak only to its *individual* business strategy and are the types of banal remarks that are typical for any business. The same goes for SK hynix's statements regarding its plans to "maximize profitability." *See id.* ¶ 107. The alleged statements by Samsung and SK hynix are perfectly consistent with independent profit-seeking conduct. *See Holiday Wholesale*, 231 F. Supp. 2d at 1279–80 (finding there was "nothing ominous or collusive" about an executive's statement that his company would "focus on earnings growth and was 'willing to accept modest market share losses'"); *id.* at 1279 ("The whole objective of free enterprise is to earn a profit. This may be achieved by selling more units at a smaller profit or vice versa.").

Second, unlike the plaintiffs in *Broiler Chicken*, the IPPs do not allege facts or economic data indicating that Defendants *ever* took action, much less *immediate* action, to implement the facilitated agreement after allegedly confirming their "commitment to a common scheme." *See*

---

2016) (emphasizing that every defendant's public statements stressed "*the need for capacity discipline within the industry as a whole*") (emphasis added).

[15] *See Broiler Chicken*, 290 F. Supp. 3d at 798 (Defendants undertook an "unprecedented slaughter or export of breeder flocks" following their public statements recommending industrywide capacity discipline); *Domestic Airline Travel*, 221 F. Supp. 3d at 66, 68–69 (plaintiffs provided "economic data" illustrating capacity cuts in the wake of defendants' public statements emphasizing the need for industrywide capacity discipline).

[16] None of Defendants' executives' statements can be construed as suggesting collusion. A "hope by one company that it can create a disincentive for its competitors to engage in [] competition to the detriment of profitability is not evidence of a collusive agreement." *Holiday Wholesale*, 231 F. Supp. 2d at 1279. The IPPs' Complaint would "take unilateral action by a company . . . and deem it collusive merely because it was preceded in time by another unilateral action by a competitor . . . ." *See Baggage Fee*, 245 F. Supp. 3d at 1374; *id.* ("[O]ne company's public statements cannot 'immobilize[]' a competitor and preclude it from subsequently taking otherwise lawful actions." (quoting *United States v. Standard Oil Co.*, 316 F.2d 884, 896 (7th Cir. 1963) (alterations in original)).

Compl. ¶ 101. Whereas the *Broiler Chicken* plaintiffs pointed to an "unprecedented slaughter or export" of thousands of breeder chickens following defendants' public endorsement of industrywide capacity discipline, 290 F. Supp. 3d at 798, the IPPs do not allege any evidentiary facts or data indicating that "the immediate sequel" to any of these public statements was "a simultaneous or near-simultaneous" stabilization of capacity or bit output. *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 878 (7th Cir. 2015). In fact, the IPPs allege that Micron extended the invitation to collude in November 2015 and Samsung purportedly accepted that invitation in January 2016, and yet inexplicably, the Class Period does not begin until *six months later* in June 2016, before the date on SK hynix purportedly joined the conspiracy. The IPPs instead point to a months-long increase in the average spot price of DRAM that shares no temporal connection with any of the purported signals, *see* Compl. ¶ 179, and is more consistent with admittedly strong demand than it is with a factually unsubstantiated conspiracy to suppress capacity. *See Musical Instruments*, 798 F.3d at 1197 ("Plaintiffs do not allege any facts connecting the purported price increase to an illegal agreement among competitors. And without such a connection, there is simply no basis from which we can infer an agreement.").

In the end, the IPPs' allegations amount to no more than "a combination of statements taken out of context, as well as ominous readings of typical industry reporting on strategy." *Holiday Wholesale*, 231 F. Supp. 2d at 1275. These statements do not show that each Defendant committed to individual or industrywide "capacity discipline." As these pleading failures only further underscore, the very gravamen of the IPPs' Complaint—that Defendants conspired in plain view of investors, analysts, and members of the trade press—is deeply implausible. *See Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 841 (N.D. Ill. 2017) ("[T]he public nature of [a CEO's] speech and the likely audience make it unreasonable to think of the statement as an offer to conspire."). As the Supreme Court has put it, "a case can hardly be supposed where men concert together for crime *and advertise their purpose to the world*." *Grunewald v. United States*, 353 U.S. 391, 402 (1957) (emphasis added); *see id.* ("[E]very conspiracy is by its very nature secret."). And yet that aptly describes the IPPs' dubious theory here. The Court should reject it.

(4) *Defendants' attendance at trade association meetings does not make a conspiracy more likely than unilateral conduct.*

The IPPs next allege that Defendants' purported attendance at trade association meetings provided them with "opportunities . . . to have direct communications and collude," Compl. ¶ 182, and that four of these meetings can be loosely "correlated" with price increases during the Class Period. *Id.* ¶ 203. These vague, conclusory allegations only underscore the IPPs' failure to plead the "evidentiary facts" that *Kendall* requires.

Common attendance at trade association meetings and "opportunities to collude" do not provide a plausible basis to suggest that Defendants conspired to restrain capacity. *See Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."). As the Ninth Circuit put it, "[i]f we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action." *Citric Acid*, 191 F.3d at 1098. That court and others in this District have repeatedly rejected conclusory allegations like the IPPs' that do not specify whether Defendants met at industry conferences, discussed the object of the purported conspiracy, or otherwise used the veneer of a trade association meeting to accomplish an anticompetitive end. *See, e.g.*, *Late Fee*, 528 F. Supp. 2d at 963 (rejecting plaintiffs' bare averment that "defendants' membership . . . in industry-wide trade associations, provided opportunities for them to communicate and agree to fix prices" given that "[t]he Supreme Court rejected similar allegations in *Twombly*, and other courts have consistently refused to infer the existence of a conspiracy from these kinds of averments") (internal citations omitted); *GPU*, 527 F. Supp. 2d at 1023 ("Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy.").

The IPPs cannot rescue these allegations by asserting that "DRAM prices have on average increased after *some* of the *key* meetings held by industry associations." Compl. ¶ 204 (emphasis added). They do not allege facts supporting their characterization of the four meetings they call out as "key," do not identify other non-"key" meetings for purposes of comparison, and fail to advance facts supporting any connection between the alleged price increases and Defendants'

conduct at either set of conferences. *See Petroleum Prods.*, 906 F.2d at 445 (holding that even "sawtooth" price patterns do not give rise to an inference of conspiracy in the absence of other facts tending to suggest agreement). Given how frequently the IPPs suggest these trade association meetings took place, "it would be more of a surprise if a price increase did *not* happen sometime around one of them." *See Kleen Prods.*, 276 F. Supp. 3d at 837.

Unable to answer basic questions about these "key" trade association meetings—"who, did what, to whom (or with whom), where, and when," *see Kendall*, 518 F.3d at 1048—the IPPs instead engage in baseless speculation. *See, e.g.*, Compl. ¶ 93 (speculating that Samsung's and Micron's top executives "may have" attended a trade association meeting); 182 (suggesting that trade association meetings may have created "opportunities for Defendants to have direct communications and collude"). For the aforementioned reasons, the Court need not credit those allegations as true. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) (courts are not required to accept as true legal conclusions masquerading as facts).

(5) *Neither Defendants' alleged "prior collusion" nor the NDRC investigation brings the IPPs any closer to stating a claim of conspiracy.*

In a bid to show propensity for collusion, the IPPs devote several pages to recounting Defendants' past involvement in criminal and civil antitrust litigation, including in the DRAM industry. Compl. ¶¶ 206–233. These allegations do nothing to advance the IPPs' claims. "The law generally disfavors use of such 'historical' evidence." *Holiday Wholesale*, 231 F. Supp. 2d at 1305 (citing Areeda & Hovenkamp ¶ 1421a ("Illegal behavior elsewhere in time or place does not generally allow the inference of an immediate conspiracy.")). The IPPs do not allege that 2000s-era conspiracies are continuing today, nor do they explain why a "'history of collusion' in the industry . . . tend[s] to exclude the possibility that Defendants were engaged in lawful conduct during' the period relevant to the complaint." *Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 663 (E.D.N.C. 2003), *aff'd*, 118 F. App'x 680 (4th Cir. 2004). The IPPs' historical allegations are simply inapposite, as they do nothing to show that Defendants' past actions render plausible—or are even relevant to—the alleged conspiracy to suppress wafer capacity. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting the argument that "if it happened there,

it could have happened here" as applied to antitrust conspiracies).

The IPPs also point to cherry-picked news articles reporting that China's NDRC (now the State Administration for Market Regulation or "SAMR") opened an investigation into possible price-fixing in the DRAM market and entered into a memorandum of understanding ("MOU") with Samsung.[17] Compl. ¶¶ 134–137. But courts in the Northern District of California and elsewhere have repeatedly held that government investigations do not render conspiracy allegations any more plausible. In *In re Capacitors Antitrust Litigation*, 106 F. Supp. 3d 1051 (N.D. Cal. 2015), for instance, the court denied defendants' motion to dismiss antitrust conspiracy claims, but made clear that "the government investigations alleged by plaintiffs"—which included probes by the U.S. Department of Justice, China's NDRC, the Fair Trade Commissions of Japan, South Korea, Taiwan, and the European Commission—"*carr[ied] no weight in [its] holistic analysis*." *Id.* at 1064 (emphasis added). The court explained that "[i]t is unknown whether the[se] investigation[s] will result in indictments or nothing at all." *Id.* (quoting *GPU*, 527 F. Supp. 2d at 1024). Moreover, because "at least some, and possibly all, of these investigations are being conducted in secret," the *Capacitors* court concluded, "'the scope of the investigation is pure speculation.'" *Id.* (quoting *GPU*, 527 F. Supp. 2d at 1024).

The same is true with respect to the NDRC investigation alleged in the IPPs' Complaint, which will turn on a foreign regulator's construction of foreign law.[18] The alleged Chinese investigation is a "non-factor." *GPU*, 527 F. Supp. 2d at 1024.

---

[17] The IPPs rely on a February 1, 2018 article reporting on the Samsung/NDRC MOU, and claim that the MOU "would result in moderations to the price increases of DRAM." Compl. ¶¶ 8, 137. The IPPs notably ignore a follow-up February 6, 2018 article, in which *Reuters* quoted China's state-run media as clarifying that the MOU had "nothing to do with the price rises in storage chips." *China State Planner, Samsung Electronics in Deal for Chip Cooperation: China Daily*, Reuters, Feb. 6, 2018, https://www.reuters.com/article/us-china-samsung-elec-chips/china-state-planner-samsung-electronics-in-deal-for-chip-cooperation-china-daily-idUSKBN1FQ081?il=0.

[18] The fact that any SAMR/NDRC investigation would hinge on the application of *Chinese* law, which does not necessarily map onto the Sherman Act, further undercuts the IPPs' reliance on the alleged investigation as evidence of conspiracy. *Cf. Musical Instruments*, 798 F.3d at 1190, 1196 & n.10 (FTC investigation conducted pursuant to the FTC Act—and defendants' subsequent settlement with the FTC—did not make conspiracy allegations plausible, since the FTC Act "does not require allegation of an agreement or conspiracy").

### C. The IPPs Fail to Allege That Each Defendant Joined and Played a Role in the Purported Conspiracy.

The IPPs' claims fail for yet another independent reason. The IPPs must allege evidentiary facts that tell a plausible story about each Defendant's conscious decision to join and play a role in the alleged capacity conspiracy. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008). They fail to satisfy that requirement because their "group" pleadings never describe the affirmative step that each individual Defendant took to join and play a part in the purported capacity agreement.

To survive a motion to dismiss, the IPPs must "allege the role 'each Defendant played in the alleged harm' so that [the Court] c[an] make a plausible inference that there was unlawful agreement between the relevant parties." *Frost v. LG Elecs. Inc.*, No. 16-cv-05206-BLF, 2017 WL 1425919, at *1 (N.D. Cal. Apr. 21, 2017) (quoting *In re iPhone Application Litig.*, No. 11-md-02250-LHK, 2011 WL 4403963, at *8 (N.D. Cal. Sept. 20, 2011)). Courts have long rejected complaints that indiscriminately lump defendants together and ascribe misconduct to the undifferentiated group. *See In re iPhone Application Litig.*, 2011 WL 4403963, at *8 ("Plaintiffs' failure to allege what role each Defendant played in the alleged harm makes it exceedingly difficult, if not impossible, for individual Defendants to respond to Plaintiffs' allegations."); *Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988) (group pleadings do not satisfy the notice requirement of Fed. R. Civ. P. 8(a)(2)); *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 962 (S.D. Cal. 1996) ("Defendants may be accused of a violation only by supporting allegations that specifically refer to that defendant.").

The IPPs improperly group individual Defendants into families, Compl. ¶¶ 27–37, explain away this categorization with unsubstantiated assertions about the failure of the "participants in the conspiratorial acts" to "distinguish between the entities within a corporate family," *id.* ¶ 40, and then eschew "family" pleading altogether in favor of unparticularized statements about "Defendants'" supposed conduct.

Even with respect to Defendant "families," the IPPs fail to plead a single evidentiary fact "sufficient to draw a plausible conclusion that [an] individual defendant joined [a] conspiracy and

played some role." *See Frost*, 2017 WL 1425919, at *1 (quoting *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420-YGR, 2014 WL 4955377 at *33 (N.D. Cal. Oct. 2, 2014)); *TFT-LCD*, 586 F. Supp. 2d at 1117 (holding that "general allegations as to all defendants [are] insufficient to put specific defendants on notice of the claims against them"); *see also Kendall v. Visa U.S.A. Inc.*, 04-cv-04276-JSW, 2005 WL 2216941, at *2 (N.D. Cal. July 25, 2005) (dismissing in part because of plaintiffs' failure to allege that "[d]efendants knowingly, intentionally, and activity participated in an individual capacity" in the alleged conspiracy) (quotation marks and citation omitted), *aff'd*, 518 F.3d 1042 (9th Cir. 2008). Accordingly, the IPPs' unparticularized and unsubstantiated claims about "Defendants'" conduct must be dismissed.

**D. The IPPs Lack Standing to Assert Their Claims.**

In addition to the foregoing, the IPPs fail to establish both Article III and antitrust standing. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 & n.3 (9th Cir. 1999) ("Antitrust standing is distinct from Article III standing. A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action."). As a component of antitrust standing, the IPPs must adequately allege antitrust injury, or "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 1055. The IPPs fail on both fronts: they have not adequately pleaded Article III standing *or* antitrust standing. Their Sherman Act claim and state-law claims must be dismissed in full.

**1. The IPPs lack Article III standing because they do not allege an injury that is traceable to Defendants' alleged acts.**

To establish Article III standing, a plaintiff must plead (1) an injury-in-fact that (2) is fairly traceable to the challenged conduct and (3) has some likelihood of redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The plaintiff may not "rely on a bare legal conclusion to assert injury-in-fact, or engage in an ingenious academic exercise in the conceivable to explain how defendants' actions caused his injury." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). Because the IPPs' allegations as to injury-in-fact and

traceability amount to little more than a conglomeration of legal conclusions and an "ingenious academic exercise in the conceivable," *see id.*, they do not meet *Lujan*'s requirements.

The IPPs claim they suffered injury-in-fact because Defendants' alleged conspiracy produced an incremental "overcharge" over the hypothetical competitive price for DRAM. Compl. ¶ 234. The IPPs aver that "both theory and the published studies in this area" predict that an overcharge would pass undiminished, sale-by-sale, in "a traceable chain from Defendants to the consumer." *Id.* ¶¶ 234–243. The IPPs further allege that Defendants' conduct affected *all* products incorporating DRAM, *id.* ¶ 244, which the IPPs call "DRAM Devices." DRAM Devices—a term that presumably includes every variety of smartphone, tablet, laptop, cloud storage servicer, network server, and beyond—could very well encompass thousands of different types of end-products.

"[A]ntitrust claims based on sprawling and indefinite markets are readily dismissed by the courts for lack of Article III and antitrust standing." *Los Gatos Mercantile, Inc. v. E.I. du Pont de Nemours & Co.* (*Los Gatos II*), No. 13-cv-01180-BLF, 2015 WL 4755335, at *14 (N.D. Cal. Aug. 11, 2015) (citing *In re Magnesium Oxide Antitrust Litig.*, No. 10-cv-5943, 2011 WL 5008090, at *7 (D.N.J. Oct. 20, 2011)). Like the IPPs, the plaintiffs in *Los Gatos II* alleged that the defendants engaged in a price-fixing conspiracy, and that the resulting overcharge could be traced all the way through the supply chain to the class of indirect purchasers. *Id.* at *13–*14. The *Los Gatos* plaintiffs went so far as to estimate the cost of the allegedly price-fixed component (titanium dioxide) as a percentage of the cost of finished products (architectural coatings). *Id.* The IPPs, in contrast, say *nothing* about the percentage of the cost of finished products attributable to DRAM.

The *Los Gatos* court held that the plaintiffs' loose estimates did not "show[] that the resulting overcharges to manufacturers of [a]rchitectual [c]oatings were passed down the thousands of distribution chains at issue to [p]laintiffs," and concluded that "[p]laintiffs' allegations d[id] not give rise to even a reasonable inference of injury for the entire market of Architectural Coatings." *Id.* at *15. The court analogized plaintiffs' allegations to those that a class of indirect purchasers voluntarily dismissed in *Capacitors*, and to others that a district court

dismissed for lack of Article III standing in *Magnesium Oxide*. *See id.* at *14 (explaining that the *Magnesium Oxide* court "determined that because the plaintiffs had *failed to identify the products that they purchased*, they had not demonstrated that the alleged price increases were passed through the distribution chain.") (emphasis added). "[G]iven the breadth of the defined market and the variation in the amount of titanium dioxide found in the expansive category of [finished products]," the *Los Gatos* court concluded, plaintiffs' allegations fell short of satisfying Article III's injury-in-fact and traceability requirements. *Id.* at *4.

The IPPs' pleadings are even more paltry than those deemed inadequate in *Los Gatos*. The IPPs do not estimate the price of DRAM as a percentage of the cost of finished products; in fact, they do not even identify the "DRAM Devices" the class members allegedly purchased. *See* Compl. ¶ 244. Accordingly, neither Defendants nor the Court can gauge the extent to which the IPPs suffered an injury-in-fact traceable to Defendants' alleged conduct. *See Magnesium Oxide*, 2011 WL 5008090, at *7 ("[W]ithout knowing which specific products IP Plaintiffs purchased, it is impossible to determine whether an increase in their price is the type of injury that furthers the object of the alleged conspiracy to fix prices in and allocate shares of the domestic . . . markets."). To make matters worse, the purported market for "DRAM Devices" almost certainly "contains thousands of products, some of which have countless formulations," and yet the IPPs do not provide the Court with any means to differentiate between products for which the price of DRAM "would have a minimal foreseeable effect" and those for which the price of DRAM may have represented a major cost component. *Id.* at *14. As in *Los Gatos II*, Defendants and the Court can only speculate about how and to what extent any hypothetical overcharge could or would have passed through the "thousands of distribution chains at issue." 2015 WL 4755335 at *15.

Because the IPPs' threadbare allegations do not create a reasonable inference of traceable injury attributable to Defendants' conduct, the IPPs lack Article III standing. That elementary failure warrants dismissal of every one of their federal and state-law claims.

**2. The named plaintiffs lack Article III standing to bring claims under the laws of twenty jurisdictions.**

The IPPs' claims under the laws of 19 states and the District of Columbia should be dismissed for the additional reason that the IPPs fail to identify a named plaintiff with standing to bring each of those claims. The IPPs must allege injury in the jurisdiction whose laws they seek to enforce. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975). And in the class action context, named plaintiffs lack Article III standing to assert claims under the laws of jurisdictions in which they neither reside nor incurred injury.[19] Here, the named plaintiffs are residents of only five states: California, Florida, Kansas, Michigan, and New Hampshire. The IPPs do not identify a resident plaintiff in the 20 remaining jurisdictions under whose laws they seek to recover, nor do they plead facts suggesting that any of the named plaintiffs purchased a "DRAM Device" in those jurisdictions. The Court should dismiss the IPPs' claims under the laws of these jurisdictions.[20]

**3. The IPPs lack antitrust standing because they have not established any antitrust injury.**

Antitrust injury is a necessary element of antitrust standing. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986). To plead antitrust injury, a plaintiff must allege facts showing "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1027 (N.D. Cal. 2015) (quoting *Am. Ad Mgmt.*, 190 F.3d at 1055); *see Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 723 (1982) ("An 'antitrust injury' must be proved; that is, the type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders defendants' acts

---

[19] *See In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal 2007) (dismissing claims under the state laws in which none of the named plaintiffs resided); *Los Gatos Mercantile, Inc. v. E.I. du Pont de Nemours & Co.* (*Los Gatos I*), No. 13-cv-01180-BLF, 2014 WL 4774611, at *7–*9 (N.D. Cal. Sept. 22, 2014) (rejecting indirect purchasers' argument that standing in some states by named plaintiffs is sufficient at the pleading stage).

[20] These 20 jurisdictions are Arizona, Arkansas, the District of Columbia, Illinois, Iowa, Maine, Minnesota, Mississippi, Nebraska, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

unlawful.”). To satisfy the fourth element, plaintiffs must show that their injury occurred “in the market where competition is being restrained.” *Am. Ad Mgmt., Inc.*, 190 F.3d at 1057.[21]

The IPPs have not pleaded antitrust injury because they do not allege that they are participants in the purportedly restrained market—the supposed market for DRAM, which the IPPs do not even define. The IPPs do not put forth even conclusory allegations that they participated in the market for DRAM. To the contrary, they claim injury based on purchases of an undefined hodgepodge of end-user “DRAM Devices”—consumer products that incorporate DRAM as but one of many components. Compl. ¶¶ 22–27. Nor do the IPPs aver that the alleged market for “DRAM Devices”—to the extent it could be said to exist[22]—is “inextricably intertwined” with the DRAM market, such that the IPPs’ alleged injury was “the ‘necessary step,’ and ‘means’ by which, the conspiracy was enacted.” *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.* (*DRAM II*), 536 F. Supp. 2d 1129, 1139 (N.D. Cal. 2008) (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 483–84 (1982)); *see Lithium Ion Batteries*, 2014 WL 4955377, at *12 (plaintiffs must allege facts “plausibly suggest[ing] cross-elasticity of demand between the component and finished-product markets” in order to demonstrate “inextricably intertwined markets” at pleadings stage).

In *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation* (*DRAM I*), Judge Hamilton dismissed indirect purchasers’ claims for these very reasons. 516 F. Supp. 2d 1072 (N.D. Cal. 2007). Like the IPPs here, plaintiffs in *DRAM I* were “indirect purchasers and consumers who purchased DRAM as a component” in various “electronic products.” *Id.* at 1091. Further, in this case as in *DRAM I*, “the market that plaintiffs allege[d] as the source for the purportedly illegal [antitrust] conspiracy was the general market for DRAM, a market that is distinct from the market for electronic products that include DRAM.” *Id.* Because the IPPs

---

[21] *See In re Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d 1113, 1125–26 (N.D. Cal. 2005) (“[C]ourts interpreting the Cartwright Act’s antitrust standing requirement have consistently followed the ‘market participant’ rule[.]”).

[22] The IPPs do not and cannot plausibly allege a market for “DRAM Devices” because the hundreds if not thousands of products containing DRAM—servers, automobiles, and mobile phones, for example—are not reasonably interchangeable by consumers for the same purpose. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).

allegedly purchased "products in which DRAM is a component, rather than DRAM itself"—and cannot plead any basis for concluding that these two purported markets are one and the same or "inextricably intertwined"—they are not participants in the allegedly restrained market and have not pleaded an antitrust injury. *Id.*; *see also Los Gatos II*, 2015 WL 4755335, at *17 (indirect purchasers lacked antitrust standing where the alleged market for architectural coatings, of which titanium dioxide is a component, was "too vast and ill-defined to be considered inextricably linked to the market for titanium dioxide").

Since *DRAM I*, the law of this Circuit has not changed. While some district courts have disagreed with Judge Hamilton's application of *AGC*, the law of antitrust injury—an essential requirement in each antitrust case, and one that does not hinge on *AGC*—remains the same. Because the IPPs have not shown that their injury occurred "in the market where competition is being restrained," their federal and state-law claims must be dismissed. *Am. Ad Mgmt., Inc.*, 190 F.3d at 1057; *see Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1816 (1995) (dismissing state-law claims where "plaintiff was neither a consumer nor a competitor in the market in which trade was restrained").

**4. The IPPs lack antitrust standing under *AGC*.**

To bring an antitrust claim, a plaintiff must do more than show antitrust injury. The plaintiff must also establish that he or she is the "proper party to bring an antitrust claim." *Am. Ad Mgmt.*, 190 F.3d at 1054. Under the Supreme Court's *AGC* decision, which applies to the laws of *at least* 22 jurisdictions under which the IPPs seek relief,[23] courts evaluate several factors

---

[23] *See* App'x B. Though some have debated *AGC*'s applicability to Cartwright Act claims, both the Ninth Circuit and a California Court of Appeal have applied *AGC* to California law, and the California Supreme Court has never held otherwise. *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987–92 (9th Cir. 2000); *Vinci*, 36 Cal. App. 4th at 1814. This Court should apply *AGC* to the IPPs' California law claims, as other district courts recently have. *E.g.*, *Salveson v. JP Morgan Chase & Co.*, 166 F. Supp. 3d 242, 255–59 (E.D.N.Y. 2016); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 9 CV 3690, 2015 WL 3988488, at *7–*8 (N.D. Ill. June 29, 2015).

While the Minnesota Supreme Court has declined to apply *AGC*, it has held that antitrust standing under Minnesota law depends on "foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law." *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 631 (Minn. 2007); *see Dairy Farmers*, 2015 WL 3988488, at *11 ("some of the *AGC* factors overlap

to determine whether a plaintiff has standing, including the nature and directness of the plaintiff's alleged injury, the speculative measure of the alleged harm, the risk of duplicative recovery, and the complexity of apportioning damages. *AGC*, 459 U.S. at 535–45. These factors militate against the IPPs' assertion of antitrust standing.

*First*, far from being direct, the IPPs' claims are highly attenuated from Defendants' alleged conduct. The IPPs concede that any overcharge on DRAM would have had to trickle through numerous causal intermediaries, including "manufacturers, distributors, and retailers" before potentially impacting the IPPs. Compl. ¶ 238. That is the very definition of "attenuated." *See DRAM I*, 516 F. Supp. 2d at 1092 (indirect purchasers failed to allege facts showing that "within the final purchase price of a given product purchased by plaintiffs for 'end use,' the ultimate cost of the DRAM component is somehow directly traceable and/or distinguishable"); *Fucile v. Visa U.S.A., Inc.*, No. S1560-03 CNC, 2004 WL 3030037, at *2–*4 (Vt. Super. Ct. Dec. 27, 2004) (indirect purchasers' alleged injury was too remote to confer antitrust standing).

*Second*, the IPPs' alleged damages are inherently speculative and would be impossible to apportion. The amount and type of DRAM varies widely across the hundreds (if not thousands) of types of "DRAM Devices" the IPPs allegedly purchased. Innumerable factors affected the end prices the IPPs eventually paid for those devices. *See DRAM I*, 516 F. Supp. 2d at 1092–93. The IPPs plead no facts to assure the Court that disentangling these price effects across huge numbers of "DRAM Devices" would be anything but speculative, or that it would be possible to apportion an alleged overcharge between multiple actors in the stream of commerce. *See Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1086 (Cal. 2010) (where "multiple levels of purchasers have sued," "damages must be allocated among the various levels of injured purchasers").

*Third*, there is a substantial risk of duplicative recovery, since purported classes of direct purchasers are suing for damages based on the same conduct.[24] Because the IPPs have not

---

with Minnesota's antitrust-standing inquiry"). For reasons stated herein, any injuries the IPPs allegedly sustained were so attenuated from Defendants' alleged conspiracy that the IPPs lack antitrust standing under Minnesota law.

[24] *See Onshore Networks of Ill., L.L.C. v. Micron Tech., Inc.*, No. 3:18-cv-03905, Dkt. 1 (June 28, 2018); *Treanor v. Micron Tech., Inc.*, No. 3:18-cv-03805, Dkt. 1 (June 26, 2018).

explained how they would avoid duplicative recovery, they lack antitrust standing.

**E. Several of the IPPs' State-Law Claims Fail for Additional Reasons.**

The IPPs' claims under the laws of Arizona, California, the District of Columbia, Florida, Illinois, Kansas, Michigan, Mississippi, New York, North Carolina, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin must be dismissed for the reasons stated below.

**1. The IPPs' California UCL claim fails.**

The IPPs assert claims under the "unlawful," "unfair," and "fraudulent" prongs of the California Unfair Competition Law ("UCL"). Cal. Bus. Prof. Code. § 17200. Each theory fails.

First, a claim under the "*unlawful*" prong must plausibly allege a violation of the underlying law upon which the claim is based. *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 374 (2001). Here, the IPPs' "unlawful" theory is wholly derivative of their antitrust claims. Compl. ¶¶ 295–96. Because the IPPs' antitrust claims are deficient, the IPPs' claim based on the UCL's "unlawful" prong must be dismissed as well. *See Digital Sun v. Toro Co.*, No. 10-cv-4567-LHK, 2011 WL 1044502, at *5 (N.D. Cal. Mar. 22, 2011).

Second, a claim under the UCL's "*unfair*" prong must allege "conduct that threatens an incipient violation of an antitrust law . . . or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999). As the IPPs' UCL claims are premised on the exact same allegations as their antitrust claims, the IPPs' claims under the UCL's "unfair" prong should also be dismissed. *See Apple Inc. v. Samsung Elecs. Co., Ltd.*, No. 11-cv-01846-LHK, 2011 WL 4948567, at *8–*9 (N.D. Cal. Oct. 18, 2011); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008).

Finally, the IPPs' claim under the UCL's "*fraudulent*" prong—which is subject to Rule 9(b)'s heightened pleading requirement, *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009)—should also be dismissed because the IPPs fail to "show that members of the public [we]re likely to be deceived" by Defendants' business acts. *See Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1274 (2006).

**2. The IPPs did not comply with three states' notice requirements.**

The IPPs fail to plead compliance with notice provisions under the antitrust statutes in Arizona, New York, and Utah, which require plaintiffs to serve a copy of their antitrust claims on the states' attorneys general. Ariz. Rev. Stat. § 44-1415.A; N.Y. Gen. Bus. Law § 340.5; Utah Code § 76-10-3109(9).[25] The IPPs' claims under these states' laws must be dismissed.

**3. The IPPs do not plead intrastate effects under the laws of ten jurisdictions.**

The IPPs fail to plead intrastate effects, conduct, or conspiracies for any of their state-law antitrust claims as required under the laws of Kansas, Michigan, Mississippi, New York, North Carolina, South Dakota, Tennessee, West Virginia, Wisconsin, and the District of Columbia.[26] Accordingly, these claims should be dismissed.

**4. The Arkansas Unfair Practices Act and Illinois Antitrust Act do not provide for private rights of action.**

The IPPs allege claims under the Arkansas Unfair Practices Act ("AUPA")[27] and the Illinois Antitrust Act. Because neither statute permits private damages actions, these claims must be dismissed. *DePriest v. AstraZeneca Pharms., L.P.*, 351 S.W.3d 168, 171 (Ark. 2009); 740 Ill. Comp. Stat. 10/7(2); *see United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1084 (N.D. Cal. 2014).

---

[25] The IPPs purport to sue under "Utah Code Annotated §§ 76-10-911, *et seq*." Compl. ¶ 326. That statute no longer exists. In 2013, Utah renumbered the Utah Antitrust Act from §§ 76-10-911, *et seq.*, to Utah Code §§ 76-10-3101, *et seq*. 2013 Utah Laws Ch. 187 (H.B. 108).

[26] *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 407 n.8, 416 (S.D.N.Y. 2011) (analyzing Mich. Comp. Laws §§ 445.771–72, N.Y. Gen. Bus. Law § 340); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 540 (E.D. Pa. 2010) (analyzing N.C. Gen. Stat. §§ 75-1 *et seq.*); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 582 (M.D. Pa. 2009) (analyzing W. Va. Code §47-18-3(a)); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1157–59 (N.D. Cal. 2007 (analyzing Miss. Code Ann. §§ 75-21-1 *et seq.*, Tenn. Code Ann. §§ 47-25-101 *et seq.*, and Wis. Stat. § 133.03); *DRAM I*, 516 F. Supp. 2d at 1098–99 (analyzing S.D. Codified Laws § 37-1-3.1); *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 45 (D.D.C. 1998) (analyzing D.C. Code § 28-4503); *In re Wyo. Tight Sands Antitrust Cases*, No. 85-2349, 1990 WL 136788, at *4 (D. Kan. Aug. 2, 1990) (analyzing Kan. Stat. § 50-112).

[27] The IPPs allege that Defendants violated "Arkansas § 4-75-212-315(a)(3), *et. seq*." Compl. ¶ 306. No such statute exists. To the extent that the IPPs seek to bring a claim under Arkansas's Unfair Practices Act ("AUPA"), Ark. Code § 4-75-201 *et seq.*, the claim must be dismissed because the AUPA does not allow private actions for damages.

**5. The IPPs cannot use the Florida Deceptive and Unfair Trade Practices Act as an end-run around Florida's indirect purchaser bar.**

Indirect purchasers may not sue under Florida's antitrust laws. *See Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100, 102 (Fla. Ct. App. 1996) (following *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 728–29 (1977)). The IPPs attempt to circumvent this bar by bringing their Florida-law claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Fla. Stat. §§ 501.201 *et seq.* Courts roundly reject this theory. *E.g.*, *Dairy Farmers*, 2015 WL 3988488, at *19; *Flonase*, 692 F. Supp. 2d at 544. Moreover, FDUTPA claims must be pleaded with particularity. *Wrestlereunion, LLC v. Live Nation Television Holdings, Inc.*, No. 8:07-cv-2093-JDW-MSS, 2008 WL 3048859, at *3 (M.D. Fla. Aug. 4, 2008). Under this heightened standard, the IPPs' failure to even identify the "DRAM Devices" they purchased is fatal. *See In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1322 (S.D. Fla. 2010) (plaintiffs must plead "information about what particular products were purchased from which Defendants.").

**F. The Court Should Not Grant the IPPs Leave to Amend.**

Federal Rule of Civil Procedure 15(a)(2) directs courts to grant leave to amend "when justice so requires." In applying this principle, the Ninth Circuit has long recognized that courts' general "liberality in granting leave to amend is subject to several limitations." *Ascon Props., Inc. v. Mobile Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) (internal citations omitted). Specifically, courts deny leave to amend where amendment would be futile. *Sonoma Cty. Ass'n of Retired Emps. v. Sonoma Cty.*, 708 F.3d 1109, 1117 (9th Cir. 2013). Nor must courts grant leave to amend where the "complaint, as amended [would be] subject to dismissal." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 538 (9th Cir. 1989).

Here, any amendment to the IPPs' Complaint would be an exercise in futility, and the Court should therefore deny leave to amend. *See Allen v. Beverly Hills*, 911 F.2d 367, 373–74 (9th Cir. 1990). The IPPs have not put forward any plausible allegations of conspiracy, nor could they; indeed it is precisely because they lack evidentiary facts that the IPPs have alleged "an implausibly complex and outlandish scheme to restrict output." *See Wash. Cty. Health Care*, 2018 WL 3313010, at *13. Any amended complaint is likely to repackage the same set of legal

conclusions under a different theory or pile on more of the same with additional examples of public statements that the IPPs believe comprise a conspiracy. Because amendment would waste the Court's and Defendants' time and resources, Defendants respectfully request that the Court deny the IPPs leave to amend their complaint should it grant the motion to dismiss. *See Ascon Props.*, 866 F.2d at 1161 (additional cost of "continued litigation on a new theory . . . would cause undue prejudice" to defendants).

## IV. CONCLUSION

The IPPs would infer a conspiracy to restrain industrywide supply on the thinnest of reeds. They do not allege direct evidence of that agreement, facts showing that Defendants stabilized or reduced capacity in parallel, or plus factors that—accounting for lawful conscious parallelism—nevertheless place Defendants' conduct in a context that suggests advance agreement. It is clear that the IPPs' allegations fail to raise a plausible inference of conspiracy and do not warrant a costly and futile trip into antitrust discovery. The Court should dismiss their Complaint with prejudice.

Dated: July 30, 2018

Respectfully submitted,

By: */s/ Ian Simmons*
Ian Simmons

IAN SIMMONS (*pro hac vice*)
isimmons@omm.com
BRIAN P. QUINN (*pro hac vice*)
bquinn@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone: +1 202 383 5300
Facsimile: +1 202 383 5414

STEPHEN J. MCINTYRE (S.B. #274481)
smcintyre@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: +1 213 430 6000
Facsimile: +1 213 430 6407

*Attorneys for Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.*

By: */s/ Harrison Frahn*
Harrison (Buzz) Frahn

HARRISON (BUZZ) FRAHN (S.B. #206822)
hfrahn@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California 94304
Telephone: +1 650 251 5065

JOHN TERZAKEN (*pro hac vice*)
jterzaken@stblaw.com
ABRAM J. ELLIS (*pro hac vice*)
aellis@stblaw.com
SIMPSON THACHER & BARTLETT LLP
900 G Street N.W.
Washington, DC 20001
Telephone: +1 202 636 5500

*Attorneys for Defendants Micron Technology, Inc. and Micron Semiconductor Products, Inc.*

By: */s/ Nathan P. Eimer*
Nathan P. Eimer

NATHAN P. EIMER (*pro hac vice*)
neimer@eimerstahl.com
VANESSA G. JACOBSEN (*pro hac vice*)
vjacobsen@eimerstahl.com
JACOB M. HAMANN (*pro hac vice*)
jhamann@eimerstahl.com
BRIAN Y. CHANG (S.B. #287757)
bchang@eimerstahl.com
JUNGMIN LEE (*pro hac vice*)
jlee@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: +1 312 660 7600

*Attorneys for Defendants SK hynix, Inc. and SK hynix America, Inc.*

**ATTESTATION OF CONCURRENCE IN FILING**

Pursuant to Civil Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of this Joint Notice of Motion and Joint Motion to Dismiss and the accompanying appendices, declaration, and exhibits has been obtained from each of the signatories.

Dated: July 30, 2018

Respectfully submitted,

By: */s/ Ian Simmons*
Ian Simmons

IAN SIMMONS (*pro hac vice*)
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone: +1 202 383 5300
Facsimile: +1 202 383 5414

*Attorney for Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.*

cc: All Counsel of Record (via ECF)

## Appendix A: Application of Dismissal Grounds by State

| | Basis for Dismissal | | |
|---|---|---|---|
| **Antitrust Violations Alleged Under:** | **Failure to Adequately Plead Unlawful Agreement** | **Lack of Constitutional Standing** | **Lack of Antitrust Standing** |
| AZ | X | X* | X |
| AR | X | X* | X |
| CA | X | X | X |
| DC | X | X* | X |
| FL | X | X | |
| IL | X | X* | X |
| IA | X | X* | X |
| KS | X | X | X |
| ME | X | X* | X |
| MI | X | X | X |
| MN | X | X* | |
| MS | X | X* | |
| NE | X | X* | X |
| NH | X | X | X |
| NM | X | X* | X |
| NY | X | X* | X |
| NC | X | X* | X |
| ND | X | X* | X |
| OR | X | X* | X |
| SD | X | X* | X |
| TN | X | X* | X |
| UT | X | X* | X |
| VT | X | X* | X |
| WV | X | X* | X |
| WI | X | X* | X |

* The IPPs lack Article III standing for the additional reason that they fail to identify a named plaintiff with standing to bring claims in these states.

**Appendix B: Application of the *AGC* Test for Antitrust Standing by State**

| | |
|---|---|
| ***AGC* Adopted By Highest State Court** | |
| Iowa | *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 198–99 (Iowa 2007) |
| Nebraska | *Kanne v. Visa U.S.A. Inc.*, 272 Neb. 489, 496 (Nebraska 2006) |
| ***AGC* Adopted by Lower State Court of Competent Jurisdiction** | |
| California | *Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814–15 (1995) |
| Washington, D.C. | *Peterson v. Visa U.S.A., Inc.*, No. 03-8080, 2005 WL 1403761, at *4-*6 (D.C. Super. Ct. Apr. 22, 2005) |
| Illinois | *Cty. of Cook v. Philip Morris, Inc.*, 353 Ill. App. 3d 55, 64–65 (2004) |
| Kansas | *Wrobel v. Avery Dennison Corp.*, No. 05-cv-1296, 2006 WL 7130617, at *2–*4 (Kan. Dist. Ct. Feb. 1, 2006) |
| Maine | *Knowles v. Visa U.S.A., Inc.*, No. 03-cv-707, 2004 WL 2475284, at *8 (Me. Super. Ct. Oct. 20, 2004) |
| Michigan | *Stark v. Visa U.S.A. Inc.*, No. 03-055030-CZ, 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23, 2004) |
| New Mexico | *Nass-Romero v. Visa U.S.A., Inc.*, 279 P.3d 772, 778 (N.M. Ct. App. 2012) |
| New York | *Ho v. Visa U.S.A. Inc.*, 787 N.Y.S.2d 677 (Sup. Ct. 2004), aff'd, 793 N.Y.S.2d 8 (2005) |
| North Dakota | *Beckler v. Visa U.S.A., Inc.*, No. 09-04-C-00030, 2004 WL 2115144, at *4–*6 (N.D. Dist. Ct. Aug. 23, 2004) |
| South Dakota | *Cornelison v. Visa U.S.A., Inc.*, No. 03-1350, 2004 WL 6331252, at *1 (S.D. Cir. Ct. Sept. 29, 2004) |
| Vermont | *Fucile v. Visa U.S.A., Inc.*, No. S1560-03 CNC, 2004 WL 3030037, at *2–*4 (Vt. Super. Dec. 27, 2004) |
| Wisconsin | *Strang v. Visa U.S.A., Inc.*, No. 03-cv-011323, 2005 WL 1403769, at *3 (Wis. Cir. Ct. Feb. 8, 2005) |
| ***AGC* Adopted Implicitly Through State Harmonization Statute** | |
| Arizona | Ariz. Rev. Stat. Ann. § 44-1412 |
| Oregon | Or. Rev. Stat. § 646.715(2) |
| Utah | Utah Code Ann. § 76-10-926 |
| West Virginia | W. Va. Code § 47-18-16 |
| ***AGC* Adopted Implicitly By Lower State Court of Competent Jurisdiction** | |
| North Carolina | *Johnson v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610, 620 (N.C. 1980), *overruled on other grounds*, *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 374 S.E.2d 385 (N.C. 1988) |
| Tennessee | *Tennessee ex rel. Leech v. Levi Strauss & Co.*, 1980-2 Trade Cas. (CCH) ¶ 63,558 at 76,972 n.2 (Tenn. Ch. Ct. 1980) |

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2018, I electronically filed the foregoing Joint Notice of Motion and Joint Motion to Dismiss the IPPs' Complaint with the Clerk of the Court using the CM/ECF system, which distributed notification to all counsel of record.

Dated: July 30, 2018

Respectfully submitted,

By: */s/ Ian Simmons*
Ian Simmons

IAN SIMMONS (*pro hac vice*)
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone: +1 202 383 5300
Facsimile: +1 202 383 5414

*Attorney for Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.*