Jeff D. Friedman (173886)
Benjamin J. Siegel (256260)
Rio S. Pierce (298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000
jefff@hbsslaw.com
bens@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Anthony Shapiro (*pro hac vice*)
Ronnie Spiegel (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Ave, Suite 2000
Seattle, WA 98101
(206) 623-7292
steve@hbsslaw.com
tony@hbsslaw.com
ronnie@hbsslaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| MICHELE JONES, DAVID LAIETTA, KIMBERLY YORK, BENJAMIN MURRAY, WANDA DUREYA, individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., SAMSUNG ELECTRONICS CO., LTD., SAMSUNG SEMICONDUCTOR, INC., SK HYNIX, INC. (F/K/A HYNIX SEMICONDUCTOR, INC.), SK HYNIX AMERICA, INC. (F/K/A HYNIX SEMICONDUCTOR AMERICA, INC.),<br><br>                              Defendants. | Case No. 4:18-cv-02518-JSW<br><br>**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS INDIRECT PURCHASER COMPLAINT**<br><br>Hearing Date: TBD<br>Time: TBD<br>Place: Courtroom 5 - 2nd Floor<br>Judge: Hon. Jeffrey S. White |

**TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ...................................................................................... xii

ARGUMENT ........................................................................................................... 1

I.   IPPs' detailed factual allegations of a tacit agreement to restrain supply
     and raise prices satisfies Twombly's "plausible standard" based on
     circumstantial evidence. ............................................................................... 1

II.  Allegations of facially coordinated conduct and various plus factors—
     taken together—support the plausibility of a price-fixing conspiracy here. ......... 3

     A.   Market conditions general to the industry and specific to the time
          period are conducive to collusion. ......................................................... 5

     B.   Trade associations provided opportunity for price collusion and
          conferences preceded price hikes. ......................................................... 6

     C.   Defendants' public statements reveal anti-competitive invitations
          to competitors followed by responsive assurances and conduct. ................ 8

     D.   Defendants' public statements show ample and ongoing
          communications to coordinate capacity discipline. ................................ 13

     E.   Statements addressing the industry as a whole are particularly
          indicative of a plausible conspiracy. .................................................... 17

     F.   Deviation from past market behavior is also particularly
          significant. ...................................................................................... 18

     G.   The facially coordinated supply restraint was against each
          defendant's self-interest in the absence of conspiracy. ........................... 22

     H.   Defendants have been guilty of price-fixing before—and Samsung
          entered into a memorandum of understanding with the Chinese
          antitrust authorities to end this round. ................................................ 25

III. IPPs' allegations plausibly suggest that each individual defendant joined
     the conspiracy and played some role in it. ...................................................... 26

IV.  The Court may consider only IPPs' allegations—not the extraneous
     documents cited by defendants to dispute the allegations in IPPs' well-
     pled complaint. ......................................................................................... 27

V.   The IPPs have standing to assert their claims. ............................................... 30

     A.   The IPPs have Article III standing because they allege an
          economic injury in fact that is traceable to defendants' conspiracy
          to fix prices. ...................................................................................... 30

B. Because IPPs have standing to assert their own claims, whether they can assert claims on behalf of absent class members is determined at class certification. ................................................................. 33

C. *ACG* applies in only three class states: Iowa, Nebraska, and New Mexico. ........................................................................................................ 34

D. The *AGC* factors—including antitrust injury—each favor a finding of antitrust standing. ........................................................................ 36

    1. The first *AGC* factor: IPPs have suffered antitrust injury. ......................... 38

    2. The second *AGC* factor: the directness factor favors standing because IPPs' injury can be traced to defendants. ........................ 40

    3. The third *AGC* factor: the overcharges are not speculative and will be measured at trial. ................................................................. 40

    4. The fourth *AGC* factor: the risk of duplicative recovery does not weigh against standing given repealer statutes permit indirect suits. ......................................................................... 41

    5. The fifth *AGC* factor: there is no more complexity here than is usual. ................................................................................ 41

VI. The IPPs' state-law claims do not fail for additional reasons. .................................. 41

A. The IPP's California Unfair Competition Law claim is well pled. ....................... 41

B. The IPPs have complied with all notice requirements. .......................................... 42

C. By alleging price effects throughout the United States IPPs have also alleged intrastate effects in each of the ten class states requiring it. ......................................................................................... 42

D. The Illinois and Arkansas statutes permit private rights of action. .......................... 43

E. IPPs are permitted to sue for price-fixing under Florida's DUTPA. ........................ 43

CONCLUSION ............................................................................................................. 44

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
175 F. Supp. 3d 44 (S.D.N.Y. 2016) ..................................................................3, 26

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ....................................36, 37, 38, 40, 41

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
367 F.3d 212 (4th Cir. 2004) ..................................................................1

*Aryeh v. Canon Bus. Solutions, Inc.*,
55 Cal. 4th 1185 (2013) ..................................................................36

*Associated General Contractors*,
103 S. Ct. 897 (1983) ..................................................................34

*In re Auto. Parts Antitrust Litig.*,
29 F. Supp. 3d 982 (E.D. Mich. 2014) ..................................................30, 31

*Beckler v. Visa U.S.A., Inc.*,
No. 09-04-C-00030, 2004 WL 2115144
(N.D. Dist. Ct. Aug. 23, 2004) ..................................................................35

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................1, 2, 3, 5, 7, 8, 19, 25, 26, 29

*In re Blood Reagents Antitrust Litig.*,
756 F. Supp. 2d 623 (E.D. Pa. 2010) ..................................3, 4, 5, 6, 13, 19

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ................2, 5, 7, 10, 12, 13, 14, 17, 18, 23, 24, 43, 44

*Brooke Grp. Ltd. v. Brown & Williamson
Tobacco Corp.*,
509 U.S. 209 (1993) ..................................................................22

*C-O-Two Fire Equip. Co. v. United States*,
197 F.2d 489 (9th Cir. 1952) ..................................................................25

*California v. Infineon Techs. AG*,
531 F. Supp. 2d 1124 (N.D. Cal. 2007) ..................................................42

*California v. Infineon Techs. AG*,
   No. C 06-4333 PJH, 2008 WL 4225459
   (N.D. Cal. Sept. 11, 2008) ......................................................................44

*In re Capacitors Antitrust Litig.*,
   106 F. Supp. 3d 1051 (N.D. Cal. 2015) ..........................................2, 35, 36

*In re Capacitors Antitrust Litig.*,
   154 F. Supp. 3d 918 (N.D. Cal. 2015) ..................................................26, 27

*In re Carbon Black Antitrust Trust Litig.*,
   No. 03-cv-10191-DPW, 2005 WL 102966
   (D. Mass. Jan. 18, 2005) ......................................................................10

*Cargill, Inc. v. Monfort of Colo., Inc.*,
   479 U.S. 104 (1986) ..............................................................................37

*Carl Wagner & Sons v. Appendagez, Inc.*,
   485 F. Supp. 762 (S.D.N.Y. 1980) ........................................................42

*In re Carrier IQ Inc., Consumers Privacy Litig.*,
   78 F. Supp. 3d 1051 (N.D. Cal. 2015) ..................................................34

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   738 F. Supp. 2d 1011 (N.D. Cal. 2010) ..............................27, 34, 35, 37, 38

*In re Chocolate Confectionary Antitrust Litig.*,
   602 F. Supp. 2d 538 (M.D. Pa. 2009) ..................................................42

*In re Chrysler-Dodge-Jeep Ecodiesel Litig.*,
   295 F. Supp. 3d 927 (N.D. Cal. 2018) ..................................................34

*In re Citric Acid Litig.*,
   191 F.3d 1090 (9th Cir. 1999) ..........................................................6, 7

*Cornelison v. Visa U.S.A.*,
   No. 03-1350, 2004 WL 6331252
   (S.D. Cir. Ct. Sept. 29, 2004) ..............................................................35

*Cnty. of Cook v. Philip Morris, Inc.*,
   817 N.E.2d 1039 (Ill. App. Ct. 2004) ..................................................35

*Columbia Gas of N.Y., Inc. v. N.Y. State Electric & Gas Corp.*,
   268 N.E.2d 790 (1970) ........................................................................42

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ..............................................................................2

*In re Coordinated Pretrial Proceedings in*
    *Petroleum Prod. Antitrust Litig.*,
    906 F.2d 432 (9th Cir. 1990) ...................................................................11, 12, 13, 23

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    No. 9 CV 3690, 2015 WL 3988488
    (N.D. Ill. June 29, 2015) ........................................................................................44

*De Jong Packing Co. v. U.S. Dep't of Agric.*,
    618 F.2d 1329 (9th Cir. 1980) ...............................................................................11

*In re Delta/Air Tran Baggage Fee Antitrust Litig.*,
    733 F. Supp. 2d 1348 (N.D. Ga. 2010) ...............................................................8, 9

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011) ..................................................................42

*In re Ditropan XL Antitrust Litig.*,
    529 F. Supp. 2d 1098 (N.D. Cal 2007) .............................................................33, 34

*In re Domestic Airline Travel Antitrust Litig.*,
    221 F. Supp. 3d 46 (D.D.C. 2016)..............1, 3, 4, 5, 9, 14, 15, 17, 18, 19, 29

*D.R. Ward Const. Co. v. Rohm & Haas Co.*,
    470 F. Supp. 2d 485 (E.D. Pa. 2006) ....................................................................31

*In re Dynamic Random Access Memory Antitrust Litig.*,
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) ...........................................................34, 42

*In re Dynamic Random Access Memory Antitrust Litig.*,
    536 F. Supp. 2d 1129 (N.D. Cal. 2008) ...........................................................37, 39

*Easter v. Am. W. Fin.*,
    381 F.3d 948 (9th Cir. 2004) .................................................................................34

*Esco Corp. v. United States*,
    340 F.2d 1000 (9th Cir. 1965) .................................................................................8

*In re Fla. Microsoft Antitrust Litig.*,
    No. 99-27340, 2002 WL 31423620
    (Fla. Cir. Ct. Aug. 26, 2002)..................................................................................43

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009).....................4, 5, 6, 7, 13, 22, 25, 34, 35, 37, 38, 40, 41

*In re Flonase Antitrust Litig.*,
    692 F. Supp. 2d 524 (E.D. Pa. 2010) ...............................................................42, 44

*Fucile v. Visa U.S.A., Inc.*,
    S1560-03 CNC, 2004 WL 3030037
    (Vt. Super. Dec. 27, 2004) ...................................................................35

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016) ..................................................................2

*Gonzalez v. Planned Parenthood of Los Angeles*,
    759 F.3d 1112 (9th Cir. 2014) ..............................................................29

*In re Graphics Processing Units Antirust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007)..................................................7

*In re Graphics Processing Units Antitrust Litig.*
    540 F. Supp. 2d 1085 (N.D. Cal. 2007)..............................4, 19, 37, 40

*Grunewald v. United States*,
    353 U.S. 391 (1957) .............................................................................11

*GTE New Media Servs., Inc. v. Ameritech Corp.*,
    21 F. Supp. 2d 27 (D.D.C. 1998)..........................................................42

*Harrison v. E.I. du Pont de Nemours & Co.*,
    No. 13-cv-01180-BLF, 2016 WL 3231535
    (N.D. Cal. June 13, 2016)..............................................................32, 37

*Ho v. Visa U.S.A., Inc.*,
    787 N.Y.S.2d 677 (N.Y. Sup. Ct. 2004), *aff'd*,
    793 N.Y.S.2d 8 (N.Y. App. Div. 2005)...........................................35, 36

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*,
    231 F. Supp. 2d 1253 (N.D. Ga. 2002)..................................................8

*Interstate Circuit v. United States*,
    306 U.S. 208 (1939) .............................................................................13

*In re iPhone Application Litig.*,
    No. 11-md-02250-LHK, 2011 WL 4403963
    (N.D. Cal. Sept. 20, 2011) ....................................................................27

*Johnson v. Phoenix Mut. Life Ins. Co.*,
    266 S.E.2d 610 (N.C. 1980) .................................................................36

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008)................................................................7

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018)....................................................27, 28, 29

*Kleen Prods. LLC v. Int'l Paper*,
  276 F. Supp. 3d 811 (N.D. Ill. 2017) ....................................................7, 11

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ..................................................................35

*Knowles v. Visa U.S.A., Inc.*,
  CIV.A. CV 03-707, 2004 WL 247584
  (Me. Super. Oct. 20, 2014) ......................................................................35

*In re Late Fee and Over–Limit Fee Litig.*,
  528 F. Supp. 2d 953 (N.D. Cal. 2007) ....................................................5, 6

*Tennessee ex rel. Leech v. Levi Strauss & Co.*,
  1980-2 Trade Cas. (CCH) ¶ 63,558
  (Tenn. Ch. Ct. 1980) ................................................................................36

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-md-2420 YGR, 2014 WL 4955377
  (N.D. Cal. Oct. 2, 2014) .........................25, 26, 27, 34, 35, 36, 37, 38, 39, 40, 41, 43

*Los Gatos Mercantile, Inc. v. E.I. du Pont de
  Nemours & Co.*,
  No. 13-cv-01180-BLF, 2014 WL 4774611
  (N.D. Sept. 22, 2014) ..............................................................................44

*Los Gatos Mercantile, Inc. v. E.I. du Pont de
  Nemours & Co.*,
  No. 13-cv-01180-BLF, 2015 WL 4755335
  (N.D. Aug. 11, 2015) .............................................................32, 37, 38, 43, 44

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .................................................................................30

*Mack v. Bristol-Myers Squibb Co.*,
  673 So. 2d 100 (Fla. Dist. Ct. App. 1996) ...........................................43, 44

*In re Magnesium Oxide Antitrust Litig.*,
  No. 10-cv-5943, 2011 WL 5008090
  (D.N.J. Oct. 20, 2011) ..........................................................................31, 32

*Matsushita Elec. Indus. Co v. Zenith Radio*,
  475 U.S. 574 (1986) .................................................................................16

*Melendres v. Arpaio*,
  784 F.3d 1254 (9th Cir. 2015) ..............................................................33, 34

*Mendoza v. Zirkle Fruit Co.*,
  301 F.3d 1163 (9th Cir. 2002) ..................................................................40

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ...................................................................................................1

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .............................................................7, 8, 16, 23, 24

*In re Napster, Inc. Copyright Litig.*,
    354 F. Supp. 2d 1113 (N.D. Cal. 2005).................................................................37

*Nass-Romero v. Visa U.S.A., Inc.*,
    279 P.3d 772 (N.M. Ct. App. 2012) .......................................................................34

*National Wildlife Fed'n v. Burford*,
    871 F.2d 849 (9th Cir. 1989) .................................................................................30

*Oliver v. SD-3C LLC*,
    No. 11-CV-01260-JSW, 2016 WL 5950345
    (N.D. Cal. Sept. 30, 2016)...............................................................................22, 44

*In re Opana ER Antitrust Litig.*,
    162 F. Supp. 3d 704 (N.D. Ill. 2016).....................................................................31

*In re Optical Disk Drive Antitrust Litig.*,
    No. 10-md-2143 RS, 2011 WL 3894376
    (N.D. Cal. Aug. 3, 2011) ........................................................................................37

*In re Optical Disk Drive Antitrust Litig.*,
    No. 3:10-md-2143 RS, 2012 WL 1366718
    (N.D. Cal. Apr. 19, 2012)................................................................................25, 37

*Osborn v. Visa Inc.*,
    797 F.3d 1057 (D.C. Cir. 2015)................................................................................8

*Pecanha v. The Hain Celestial Grp., Inc.*,
    No. 17-CV-04517-EMC, 2018 WL 534299
    (N.D. Cal. Jan. 24, 2018).......................................................................................33

*Peterson v. Visa U.S.A., Inc.*,
    CIV.A. 03-8080, 2005 WL 1403761
    (D.C. Super. Apr. 22, 2005) ...................................................................................35

*In re Processed Egg Prods. Antitrust Litig.*,
    821 F. Supp. 2d 709 (E.D. Pa. 2011).....................................................................29

*In re Propranolol Antitrust Litig.*,
    249 F. Supp. 3d 712 (S.D.N.Y. 2017) ................................................................6, 24

*In re Qualcomm Antitrust Litig.*,
    292 F. Supp. 3d 948 (N.D. Cal. 2017)..............................................................37, 39

*Samsung Electronics Co., Ltd. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ................................................................36

*Siegel v. Shell Oil Co.*,
   480 F. Supp. 2d 1034 (N.D. Ill. 2007) ....................................................43

*Smith v. State Farm Mut. Auto. Ins. Co.*,
   93 Cal. App. 4th 700 (2001) ....................................................................42

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ............................................................................30

*Standard Iron Works v. ArcelorMittal*,
   639 F. Supp. 2d 877 (N.D. Ill. 2009) ......................................4, 9, 13, 19

*In re Static Random Access Memory (SRAM)*
   *Antitrust Litig.*,
   580 F. Supp. 2d 896 (N.D. Cal. 2008) ............................................5, 6, 25

*Strang v. Visa U.S.A., Inc.*,
   03 CV 011323, 2005 WL 1403769
   (Wis. Cir. Ct. Feb. 8, 2005) ....................................................................35

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ....................................................................1

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   586 F. Supp. 2d 1109 (N.D. Cal. 2008) ................3, 8, 9, 19, 25, 27, 34, 35, 37, 38, 39, 40, 41

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*,
   873 F.3d 185 (3d Cir. 2017) ....................................................................23

*Vinci v. Waste Mgmt., Inc.*,
   36 Cal. App. 4th 1811 (1995) ..................................................................35

*Warth v. Seldin*,
   422 U.S. 490 (1975) ................................................................................34

*Wash. Cty. Heath Care Auth. Inc. v. Baxter Int'l, Inc*,
   No. 16-cv-10324, 2018 WL 3313010
   (N.D. Ill. Jul. 5, 2018) ............................................................................16

*Wilcox v. First Interstate Bank of Or., N.A.*,
   815 F.2d 522 (9th Cir. 1987) ..................................................................23

*William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*,
   588 F.3d 659 (9th Cir. 2009) ....................................................................3

*Wrobel v. Avery Dennison Corp.*,
No. 05-cv-1296, 2006 WL 7130617
(Kan. Dist. Ct. Feb. 1, 2006) ............................................................................35

*In re Wyo. Tight Sands Antitrust Cases*,
No. 85-2349, 1990 WL 136788
(D. Kan. Aug. 2, 1990) ......................................................................................42

**Statutes**

Ariz. Rev. Stat. § 44-1412 ......................................................................................36

Ark. Code § 4-88-113(f)(1)(A) ...............................................................................43

Ark. Code § 4-88-113(f)(1)(B) ...............................................................................43

Cal. Bus. & Prof. Code § 17200 ..............................................................................42

740 Ill. Comp. Stat. 10/7(2) ....................................................................................43

815 Ill. Comp. Stat. 505/2 .......................................................................................43

815 Ill. Comp. Stat. 505/1 ..............................................................................41, 43

Or. Rev. Stat. § 646.715(2) ......................................................................................36

Utah Code § 76-10-926 ............................................................................................36

W.Va. Code § 47-18-16 ............................................................................................36

**Other Authorities**

Fed. R. Civ. P. 9 .........................................................................................................2

Fed. R. Civ. P. 12(b)(6) .......................................................................................2, 27

Fed. R. Civ. P. 23 .............................................................................................33, 43

Fed. R. Evid. 201 .....................................................................................................27

Richard A. Posner, Antitrust Law, 79-93 (2d. ed. 2001) ................................20, 21

## SUMMARY OF ARGUMENT

Looking at the complaint as a whole and considering the facially coordinated output restrictions and plus factors together, as *Twombly* requires, IPPs have alleged a plausible price-fixing conspiracy. Concentrated markets with high barriers to entry are conducive to price fixing and this one in particular had experienced years of declining prices. The reason for this was simple: defendants had been aggressively competing for DRAM market share, with Micron and Hynix trying to fend off further capture of market share by Samsung, the market leader. In late 2015 and early 2016, Micron changed tack, with a public invitation *for the industry* to restrain its cutthroat competitive behavior and do an about face. Micron called for its two competitors to engage in capacity discipline rather than continue their competition for market share. If Micron alone had reduced its capacity plans, it would have been against its economic interests and would have resulted in loss of sales. The following month Samsung signaled its acceptance, and Hynix too modified its behavior—and 18 months of ongoing supply restraint ensued. The result: an abrupt departure from historic prices, with the years of decline stabilizing and then prices tripling by the end of the conspiracy (and with trade association meetings preceding notable price hikes). Micron publicly confirmed defendants' united departure from past competition for market share, which was against each defendant's individual self-interest in the absence of collusion. This behavior is consistent with past behavior: defendants have been found guilty of price-fixing before. And this particular conspiracy ended when Samsung agreed to moderate price increases for DRAM in response to a Chinese government investigation. These allegations satisfy *Twombly* and then some. *See* sections II (A)-(I) & III.

Switching gears, defendants then argue that even if IPPs have plausibly alleged their price-fixing conspiracy, they still do not have standing to assert their claims. This argument has been made and rejected repeatedly in this district (and elsewhere). IPPs have Article III standing because they allege an economic injury in fact that is traceable to defendants' conspiracy. And the *Associated General Contractor* factors—including antitrust injury—each favor a finding of antitrust standing, in the three class states where *AGC* applies. *See* section V (A)-(D)(5).

Finally, defendants' scattershot of arguments as to IPPs' state-law claims fares no better. The California UCL claim is well pled. The IPPs have complied with all notice requirements. By alleging price effects throughout the United States, IPPs have also alleged intrastate effects in each of the ten class states requiring it. The Illinois and Arkansas statutes permit private rights of action. And IPPs are permitted to sue for price-fixing under Florida's DUTPA. *See* VI (A)-(E).

Defendants' motion should be denied in its entirety.

**ARGUMENT**

I.     **IPPs' detailed factual allegations of a tacit agreement to restrain supply and raise prices satisfies Twombly's "plausible standard" based on circumstantial evidence.**

Ultimately, an antitrust plaintiff must present *either* "direct or circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective"[1]  But because "[d]irect evidence is extremely rare in antitrust cases,"[2] circumstantial evidence alone "can establish an antitrust conspiracy."[3]  The "crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."[4]

At the pleading stage, *Twombly* instructs that an antitrust plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face"—just enough to "nudge[] their claims across the line from conceivable to plausible."[5]  "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage."[6]  Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."[7]

Moreover, a "showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," but "it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense."[8]  Instead, parallel conduct "needs some setting suggesting the agreement necessary to make out a § 1 claim."[9]  So the term "plus factors" refers to "circumstances demonstrating that the wrongful conduct was conscious and not the result of independent business decisions of the competitors."[10]

---

[1] *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).  Internal citations and quotations omitted and emphasis added unless otherwise indicated.

[2] *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004).

[3] *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010).

[4] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007).

[5] *Id.* at 570.

[6] *Id.* at 556.

[7] *Id.*

[8] *Id.* at 553.

[9] *Id.* at 556.

[10] *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 58 (D.D.C. 2016).

"Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible."[11]  But the "choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."[12]  "That would be equivalent to imposing a probability requirement at the pleading stage, which *Twombly* expressly does not do."[13]  So a court's task is simply "to determine whether the facts alleged in the complaint rise above mere speculation, even if the Court has doubts about them."[14]  "Skepticism of a conspiracy's existence is insufficient to warrant dismissal."[15]

Further, the Supreme Court reiterated multiple times in *Twombly* that it does "not require heightened fact pleading of specifics" and does "not apply any heightened pleading standard."[16]  The Court does not "seek to broaden the scope of Federal Rule of Civil Procedure 9," as its concern was "not that the allegations in the complaint were insufficiently particularized."[17]

Finally, the Supreme Court determined that the complaint in *Twombly* warranted dismissal "because it failed *in toto* to render plaintiffs' entitlement to relief plausible."[18]  Indeed, the Court has long held that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."[19]  Rather, the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."[20]

Thus, courts in this judicial district have found that the plaintiffs' antitrust complaint "met the bar set by *Twombly* after considering, as it must, the DPPs' complaint as a whole."[21]  So this

---

[11] *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016), *cert. denied.*
[12] *Id.*
[13] *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 801 (N.D. Ill. 2017).
[14] *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1063 (N.D. Cal. 2015) (*Capacitors I*).
[15] *Gelboim*, 823 F.3d at 781.
[16] *Twombly*, 550 U.S. at 569-70 & n.14.
[17] *Id.*
[18] *Id.* (emphasis in original).
[19] *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).
[20] *Id.*
[21] *E.g.*, *Capacitors I*, 106 F. Supp. 3d at 1064.

Court should reject defendants' "attempts to dismember plaintiffs' Complaint in order to show how each allegation, in isolation, fails to sufficiently aver plausibility."[22]  Instead, the Court "must take the factual allegations in the complaint as a whole."[23]  And in determining whether an antitrust claim is plausible, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the non-moving party."[24]

## II.  Allegations of facially coordinated conduct and various plus factors—taken together—support the plausibility of a price-fixing conspiracy here.

Looking at the complaint as a whole, as *Twombly* requires, IPPs have alleged a plausible price-fixing conspiracy based on the following allegations: (1) conducive market conditions; (2) public invitations for *industry-wide* restraint followed by responsive assurances and conduct; (3) ongoing communications to coordinate capacity discipline; (4) sudden and sustained increase in prices following years of decline; (5) notable price hikes subsequent to trade association meetings; (6) abrupt departure from past competition for market share—which was against each defendant's interest in the absence of collusion; and (7) a history of price-fixing, with a foreign government investigation leading to the end of this round.  This more than satisfies *Twombly*.

Indeed, this case is like others before it where the court pointed to similar allegations in finding *Twombly* satisfied, including:

- *Domestic Airline* – conducive nature of the industry, participation in trade groups, statements of defendants regarding industry capacity discipline, and deviation from historical patterns supported plausibility of conspiracy;[25]

- *Flat Panel* – unusual pricing practices and public invitations to collude and responses supported plausibility of conspiracy;[26]

---

[22] *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010).

[23] *Domestic Airline Travel*, 221 F. Supp. 3d at 58; *see also Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55-56 (S.D.N.Y. 2016).

[24] *William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009).

[25] 221 F. Supp. 3d at 59-66.

[26] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1115-1116 (N.D. Cal. 2008).

- *GPU II* – "marked change in defendants' behavior … around the time the conspiracy allegedly started" supported plausibility of conspiracy;[27]

- *Flash* – high market concentration, common trade associations, output reduction following meetings, unnatural price stability, and "openly communicat[ing] with one another to coordinate pricing" supported plausibility of conspiracy;[28]

- *Standard Iron Works* – public invitation to collude followed by continued signaling, opportunities to collude, and departure from previous behavior supported plausibility of conspiracy;[29] and

- *Blood Reagents* – concentrated market, common trade associations, and abrupt change in pricing supported plausibility of conspiracy.[30]

In *Domestic Airline Travel,* for example, the district court held that the plaintiffs "pled parallel conduct on the part of Defendants coupled with sufficient circumstantial evidence to raise a suggestion of a preceding agreement" where:

> Plaintiffs allege that starting in the first quarter of 2009, Defendants colluded to limit capacity on their respective airlines and, as a result, the airfares rose during that period. Plaintiffs provide economic data that demonstrates this trend and at least tends to support their claim that Defendants' capacity decisions and the increase in airfares are not otherwise explained by other factors absent collusion. Moreover, Plaintiffs further demonstrate that this trend in limiting capacity was a departure from prior practice within the industry. Plaintiffs also point to specific statements made by specific executives of each of the companies that they assert were made as a result of and in furtherance of this agreement among Defendants. Plaintiffs also point to specific characteristics of the industry that render it conducive to collusion. The Court finds that the facts as alleged are sufficient to meet Plaintiffs' pleading requirement.[31]

---

[27] *In re Graphics Processing Units Antitrust Litig.* 540 F. Supp. 2d 1085, 1091-1096 (N.D. Cal. 2007) (*GPU II*).

[28] *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1142-1150 (N.D. Cal. 2009).

[29] *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 893-900 (N.D. Ill. 2009).

[30] 756 F. Supp. 2d at 630-32.

[31] 221 F. Supp. 3d at 66.

As aptly stated by another district court, "[t]here is simply too much unusual market movement, unusual public statements … and a coincidence of business strategies that make dismissal of Plaintiffs' claims at this point in the case inappropriate."[32]

## A. Market conditions general to the industry and specific to the time period are conducive to collusion.

Plausibility under *Twombly* is supported where "the marketplace is alleged to have been conducive to coordinated pricing, as demonstrated by the existence of a concentrated market dominated by a few entities, with significant barriers to entry."[33] In *Flash*, the defendants argued, as here, that the "plaintiffs' market concentration allegations demonstrate that any alleged parallel conduct is at least as consistent with independent decision-making and vigorous competition as with conspiracy."[34] While acknowledging that "market concentration and market shares are insufficient, standing alone, to establish a Sherman Act violation,"[35] the district court explained that "[s]ignificant market concentration makes it easier for firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level."[36] So when "considered in tandem" with other allegations, pleading "high market concentration can appropriately be relied upon as a factor to suggest price collusion."[37] Other courts have held the same.[38]

Here, IPPs allege an extraordinarily high market concentration—three firms own this market. The three defendants "collectively account[] for 96% of worldwide DRAM market share."[39] DRAM is a commodity product with "industry-standard product specifications," such

---

[32] *Broiler Chicken*, 290 F. Supp. 3d at 788.

[33] *Flash*, 643 F. Supp. 2d at 1142.

[34] *Id.* at 1144. *See* Mot. at 9-12. All "Mot." references are to Defendants' Joint Motion to Dismiss IPP Complaint, ECF 52.

[35] *Flash*, 643 F. Supp. 2d at 1144. Judge Armstrong distinguished her earlier decision in *In re Late Fee and Over–Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) (*Late Fee*), on this basis. *See* Mot. at 14, *citing Late Fee*.

[36] *Flash*, 643 F. Supp. 2d at 1144.

[37] *Id.* at 1144-45.

[38] *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008); *Domestic Airline Travel*, 221 F. Supp. 3d at 60 (that the domestic airline industry "is an oligopoly with high barriers to entry" where the four defendant airlines "control approximately 80% of the market" is a pertinent consideration); *Blood Reagents*, 756 F. Supp. 2d at 631.

[39] ¶¶ 145-151.

that "competition is based principally on price."[40]  The DRAM market has high barriers to entry, because defendants own the intellectual property for DRAM and benefit from economies of scale.[41] And demand for DRAM is inelastic due to lack of close substitutes, such that an "increase in the price of a product results in only a small decline in the quantity sold of that product, if any."[42] These conditions enable collusive conduct.

Moreover, prior to the start of the conspiracy defendants had been competing for market share and experiencing declining prices as a result.  From August 2014 to May 2016, prices decreased by about 60% from $2.50 to $1.00 per chip.[43]  So while defendants "are correct that the bare allegation that defendants operate in an oligopolistic market is insufficient," facts "specific to the market at issue, suggesting that the defendants had an incentive to manipulate prices" can be telling—such as "prior to the alleged conspiracies" prices "were falling."[44]  In sum, market conditions general to the industry and specific to the time period support the plausibility of collusion here.

### B.  Trade associations provided opportunity for price collusion and conferences preceded price hikes.

As to this plus factor, *SRAM* is instructive.  There the defendants argued, as here, that allegations regarding their "participation in various trade organizations cannot properly be viewed as support for their antitrust conspiracy claims."[45]  Judge Wilken disagreed.  Again, although these allegations "cannot alone support" the plaintiffs' claims, "such participation demonstrates how and when [d]efendants had opportunities to exchange information or make agreements."[46]  And Judge Armstrong held the same in *Flash*[47]—subsequent to her ruling cited by defendants in *Late Fee*.[48]

---

[40] ¶¶ 141-44.  All "¶" references are to the operative complaint, ECF 1.

[41] ¶¶ 153-165.

[42] ¶¶ 166-170.

[43] ¶¶ 60-63.

[44] *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 719 (S.D.N.Y. 2017).

[45] *SRAM*, 580 F. Supp. at 903.

[46] *Id.* (plaintiffs adequately alleged price-fixing conspiracy).

[47] 643 F. Supp. 2d at 1148, *citing In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999); *see also Blood Reagents*, 756 F. Supp. 2d at 632.  *See* ¶¶ 182-202.

[48] *See* Mot. at 27.

Defendants' other cases stand for the unremarkable proposition that such participation, standing alone, is insufficient to support a conspiracy.[49] Yet in their quotation of *GPU I*, defendants elide that very point: "Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, *without more*."[50] And Judge Armstrong also disagreed with another argument advanced by the very defendants before this Court—"that Plaintiffs fail to identify who attended these meetings, what was discussed at them, or how they purportedly related to the conspiracy other than providing an opportunity for the parties to talk to one another"—because it was "inconsistent with the Supreme Court's holding that specific facts are not necessary at the pleading stage."[51]

Moreover, when industry conferences are followed by unusual market movements, "those meetings plausibly help to fill-out the picture of Defendants' alleged conspiratorial agreement."[52] Here, significant upward price movements, different from the historical trend, "coincides with four trade association meetings"[53] as depicted:



---

[49] *See id.*, *citing In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015), *Citric Acid*, 191 F. 3d at 1098, and *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) (*GPU I*).

[50] 527 F. Supp. 2d at 1023.

[51] *Flash*, 643 F. Supp. 2d at 1148; *see also Twombly*, 550 U.S. at 569-70 & n.14. *See* Mot. at 27-28, *citing Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("*Even after the depositions taken*, the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?").

[52] *Broiler Chicken*, 290 F. Supp. 3d at 799-800; *see also Flash*, 643 F. Supp. 2d at 1142 ("allegations of specific instances where output was reduced following meetings" supported inference of conspiracy). Defendants' citation to *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 837 (N.D. Ill. 2017), *see* Mot. at 28, is inapposite because the case proceeded on summary judgment, and there was a trade association "meeting every 10 days."

[53] ¶ 203; *see also* ¶ 204.

This provides ample basis for defendants' participation in trade associations to contribute to the plausibility of the alleged conspiracy. Further specifics are not required at this stage.[54]

### C. Defendants' public statements reveal anti-competitive invitations to competitors followed by responsive assurances and conduct.

In *Flat Panel*, Judge Illston found that allegations of a price-fixing conspiracy satisfied *Twombly* where "a number of public statements by defendants" allegedly constituted "instances of invitations to agree and subsequent agreements."[55] For example, the complaint quoted "a keynote address" given by the CEO of Samsung, which the "plaintiffs characterize[d] as an effort to get other manufacturers in the industry to limit production," as well as "statements by an executive from Samsung that the company would raise prices and restrict production."[56] In addition, another defendant "boast[ed] that it had succeeded in convincing its competitors to cut capacity."[57] Accordingly, "[c]ourts have held that a conspiracy to fix prices can be inferred from an invitation, followed by responsive assurances and conduct."[58]

Defendants rely primarily on two district court cases from outside the Ninth Circuit—and **decided on summary judgment**.[59] But dismissals of antitrust complaints have been reversed where lower courts "relied on cases that had been decided at summary judgment."[60] The Court should not accept defendants' invitation to do the same here. Unlike a motion to dismiss, "[o]n a motion for summary judgment … the question is not whether the plaintiff has asserted a plausible theory of harm, but rather whether the plaintiff has offered sufficient evidence for a reasonable jury to conclude that its theory is correct."[61] Indeed, in ruling on the motion to dismiss in *Baggage Fee*,

---

[54] *See also Twombly*, 550 U.S. at 569-70 & n.14.

[55] *Flat Panel*, 586 F. Supp. 2d at 1115.

[56] *Id.* at 1116.

[57] *Id.*

[58] *Id.*; *see also Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965).

[59] Mot. at 21-26, *citing Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253 (N.D. Ga. 2002), and *In re Delta/Air Tran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348 (N.D. Ga. 2010) (*Baggage Fee*). *Musical Instruments*, 798 F.3d 1186, did not address public statements by defendant manufacturers as here. *Id.* at 1194-97. And it was decided after the plaintiffs were allowed discovery prior to filing an amended complaint. *Id.* at 1191 & n.2. *See* Mot. at 20, 26.

[60] *Osborn v. Visa Inc.*, 797 F.3d 1057, 1065-66 (D.C. Cir. 2015).

[61] *Id.*

the district court held that "changed business practices—combined with the preceding communications—support[ed] a plausible inference of a conspiracy to restrain trade."[62] So IPPs focus here—as should this Court—on cases decided at the pleading stage.

For example, in *Domestic Airline Travel*, the plaintiffs alleged that the four major airlines fixed prices for domestic airline tickets by coordinating activities to keep capacity artificially low.[63] "The alleged conspiracy was carried out, *inter alia*, by repeated assurances by the executives of Defendants to each other that: (a) each of their companies is engaging in 'capacity discipline' (*i.e.*, reduction or relative stabilization of airline capacity); (b) this is a practice that has to be utilized by the industry as a whole; (c) it is good for the industry as a whole; and (d) it reflects the collective commitment of the Defendants' airline managers."[64] Specifically, the plaintiffs there—as IPPs do here—relied on "statements made during earning calls with analysts" and "at airline industry conferences."[65] The district court found that these bolstered the plausibility of the conspiracy.

Likewise, in *Standard Iron Works*, the plaintiffs "alleged the specific content of statements made in public by Defendants' executives which endorsed an industry strategy to reduce the output of steel."[66] And the plaintiffs "alleged concerted and unprecedented production curtailments that occurred on the heels of those statements at specific intervals in 2005, 2006, and 2007."[67] The "types of statements alleged" included the defendants' "repeated reference to collective industry action and specifically to industry 'discipline' in connection with production cuts."[68] And the statements took place periodically in 2005 through 2007.[69] So the district court stated that "a conspiracy to fix prices can be inferred from an invitation followed by responsive assurances and conduct."[70]

---

[62] 733 F. Supp. 2d at 1361. Defendants do not mention this earlier decision.

[63] 221 F. Supp. 3d at 52.

[64] *Id.*

[65] *Id.*

[66] 639 F. Supp. 2d at 897.

[67] *Id.*

[68] *Id.* at 895.

[69] *Id.*

[70] *Id.* (denying motion to dismiss), *quoting Flat Panel,* 586 F. Supp. 2d at 1116. Defendants ignore these cases in wrongly claiming that courts "have all but uniformly" required "private"

There is no economically meaningful distinction in these cases from what IPPs allege here. On November 17, 2015, at the UBS Global Technology Conference, defendant **Micron's CFO** told investors that Micron's **competitors** would make some "really rational decisions" involving "lower supply growth" and no "significant DRAM capacity expansion."[71] Then again on a December 22, 2015, quarterly earnings call, **Micron's CEO** emphasized that the "DRAM industry consist[s] of only three technology developers" and suggested "a future in which no additional DRAM wafer capacity is required."[72] These statements were describing a departure from the recent highly competitive behavior (and price war), representing an invitation to its competitors to stop adding significant wafer capacity. And Micron also disclosed its internal strategic direction and willingness to comply with a competitive détente throughout the conspiracy[73]—"as long as nobody adds any incremental DRAM wafers"[74]—because it would "provide maximum benefit to the Company" to be "public about the fact that we have no current plans to add wafer capacity."[75]

Samsung responded to this invitation to restrain supply by tamping down its competitive behavior and ceasing to take market share. The next month, on a January 29, 2016 earnings call, Samsung told its two competitors publicly that it would limit bit growth "at market growth levels," because "[t]his year our main focus will be on profitability rather than increasing volume."[76] This was a clear message to Micron and Hynix that it would agree to stop the price war and focus on increasing industry margins. Samsung repeated this message giving its competitors assurances

---

invitations to collude. *See* Mot. at 22 (citing one case as an example). *See also Broiler Chicken*, 290 F. Supp. 3d at 788 (holding that "public statements of intent to cut production are indicative of an agreement"); *In re Carbon Black Antitrust Trust Litig.*, No. 03-cv-10191-DPW, 2005 WL 102966, *7, *8 (D. Mass. Jan. 18, 2005) (finding plausible allegations of conspiracy involving "signaling to maintain the pricing agreements").

[71] ¶ 68.

[72] ¶ 69.

[73] ¶¶ 90 (March 2016), 91 (same), 92 (May 2016), 98 (September 2016), 99 (October 2016), 102 (November 2016), 103 (December 2016), 104 (same), 105 (January 2017), 109 (March 2017), 111 (same), 79 (April 2017), 115 (May 2017), 116 (June 2017), 119 (same), 122 (August 2017), 124 (September 2017), 132 (November 2017).

[74] ¶ 92.

[75] ¶ 109.

[76] ¶ 70. It was not "more than two months later," as defendants contend. *See* Mot. at 18.

throughout 2016[77] and 2017.[78]  Hynix also committed to bit growth in line with market growth, recognizing that because "supply is not going to meet the demand" Hynix could "maximize profitability."[79]  And it confirmed this capacity discipline in line with its competitors periodically in 2016 and 2017.[80]  So an anticompetitive tacit agreement can be plausibly inferred from Micron's invitation and Samsung's and Hynix's responsive assurances and conduct.[81]

Defendants contend that the "public nature" of their statements makes "it unreasonable to think of the statements as an offer to conspire."[82]  But the Ninth Circuit has held otherwise.  In *Petroleum Products*, the plaintiffs alleged that the defendant oil companies "engaged in a conspiracy to raise and stabilize the retail price of gasoline at the pump."[83]  In opposition to the defendants' **motion for summary judgment**, the plaintiffs' evidence included publicly disseminated pricing information.  The defendants argued that "no inference of conspiracy may be drawn" from public statements, because the release of such information was an "ordinary business practice."[84]  The district court agreed, granting the defendants' motions for summary judgment.  But the Ninth Circuit reversed.  It held that "the evidence concerning the purpose and effect of price announcements, when considered together with the evidence concerning the parallel pattern of price restorations, is sufficient to support a reasonable and permissible inference of agreement, whether express or tacit, to raise or stabilize prices."[85]

---

[77] ¶¶ 91 (April 2016), 97 (July 2016), 100 (October 2016).

[78] ¶¶ 106 (January 2017), 113 (April 2017), 121 (July 2017), 127 (October 2017).

[79] ¶ 107.

[80] ¶¶ 97 (July 2016), 107 (January 2017), 112 (April 2017), 120 (July 2017), 125 (October 2017).

[81] *De Jong Packing Co. v. U.S. Dep't of Agric.*, 618 F.2d 1329, 1334 (9th Cir. 1980) ("express agreement" is not "required" to demonstrate conspiracy; rather, "it is enough" that "concerted action was contemplated or invited" and "defendants gave their adherence to the scheme and participated in it").

[82] Mot. at 26, *citing Kleen*, 276 F. Supp. 3d at 841.  Defendants also cite dicta from *Grunewald v. United States*, 353 U.S. 391 (1957), which held that "acts of concealment done after the central objectives have been attained, for the purpose only of covering up after the crime," are not part of the principal conspiracy or "it would wipe out the statute of limitations in conspiracy cases."  *Id.* at 402, 405.

[83] *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 906 F.2d 432, 437 (9th Cir. 1990).

[84] *Id.* at 445.

[85] *Id.* at 446-47.

In so holding, *Petroleum Products* rejected the defendants "circular argument that the publication" of information "cannot support an inference of conspiracy" because it was "publicly available."[86]  Instead, the Court explained that the "information was publicly available only because the appellees chose to make it so; without such dissemination, price moves were not always readily and easily detected."[87]  And the Ninth Circuit stated that "the form of the exchange" should "not be determinative of its legality."[88]  Reiterating that parallel conduct alone is insufficient, the Court explained that the plaintiffs had offered evidence indicating that the defendants "did more than simply price interdependently."[89]  Rather, a jury "could conclude that the oil companies agreed, either implicitly or explicitly, to create market conditions that would facilitate tacit or express price coordination."[90]  So too here.

Moreover, the Ninth Circuit explained that from a policy perspective, courts "may reluctantly tolerate interdependent pricing behavior as such and still condemn those agreements involving practices which unjustifiably facilitate interdependent pricing and which can be readily identified and enjoined."[91]  Public signaling of an initial proposal—and ongoing commitment—to facilitate an *industry-wide* supply restraint is just such a practice.  To hold otherwise would inoculate companies to engage in anticompetitive behavior as long as they did so in public.

Similarly, in *Broiler Chicken*, the defendants argued that the public statements on which the plaintiffs relied "had purposes wholly apart from conspiracy, such as responses to questions from shareholders and the press."[92]  But the district court stated that it "is certainly possible for a statement to have multiple purposes or meanings directed at different audiences," and what was important to the court's analysis was "not so much the immediate context in which the statements were made, but the larger context of the market and industry actions."[93]  In that case, as here,

---

[86] *Id.* at 447.
[87] *Id.*
[88] *Id.*
[89] *Id.* at 448.
[90] *Id.*
[91] *Id.*
[92] 290 F. Supp. 3d at 799.
[93] *Id.*

"public statements of intent to cut production [we]re indicative of an agreement."[94]

Finally, *Broiler Chicken* acknowledged that in *Petroleum Products*, the "Ninth Circuit expressed concern with a court potentially finding that communications that are otherwise beneficial to consumers (such as communication of *retail* prices) to be an aspect of a conspiracy."[95] But the court did not perceive such a threat. Nor is one alleged here.

### D. Defendants' public statements show ample and ongoing communications to coordinate capacity discipline.

In *Flash*, the defendants (also Samsung and Hynix) argued that the plaintiffs' allegations concerning conspiratorial communications were too "sporadic" to suggest an existence of an agreement to fix prices, with "only three discrete episodes" pleaded over a multi-year period.[96] But the district court disagreed. Instead, the court inferred the defendants' ongoing exchange of information from the communications alleged in the complaint—and deemed it sufficient to "facilitate and monitor their alleged price-fixing conspiracy."[97]

Likewise, in *Broiler Chicken*, the defendants contended that the plaintiffs had "alleged only that some defendants decreased production, at various points over many years, in varying amounts, and by various methods, and that this kind of varied action cannot be described as parallel."[98] But again the district court disagreed. "Indeed, the Supreme Court has long held that simultaneous action is a not a requirement to demonstrate parallel conduct."[99] So the district court concluded that "two periods of production cuts of approximately one-two years each, in 2008–09 and 2011–

---

[94] *Id.*; *see also Standard Iron Works*, 639 F. Supp. 2d at 897 ("Defendants cannot rely on the public or semi-public nature of trade meetings to immunize their statements from antitrust scrutiny.").

[95] *Broiler Chicken,* 290 F. Supp. 3d at 799, *citing* 906 F.2d at 448 n.14 ("permitting an inference of conspiracy from such evidence would make it more difficult *for retail consumers* to get the information they need to make efficient market decisions").

[96] 643 F. Supp. 2d at 1143.

[97] *Id.* at 1144; *see also Blood Reagents*, 756 F. Supp. 2d at 630 ("Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct.").

[98] 290 F. Supp. 3d at 790.

[99] *Id.*, *citing Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939) ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators.").

12" were "sufficient to allege conduct that took place at the same time."[100]

Similarly, in *Domestic Airline Travel*, the plaintiffs pointed "to a series of statements made by Defendants' executives regarding 'capacity discipline' from 2009 through 2015 in support of their conspiracy claim," including "during earnings calls, industry summits, industry conferences, and investment conferences."[101]  The district court determined that the plaintiffs had "sufficiently pled parallel conduct":

> Plaintiffs alleged that various executives from Defendant airlines made statements close in time regarding the exercise of capacity discipline and, in concert, with these statements a new trend of limited capacity growth occurred within the industry…. Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct…. Rather, Plaintiffs demonstrate that Defendants' executives made statements not only about their own exercise of capacity discipline but also about the importance of the practice within the industry starting in 2009.  Starting in 2009, the industry experienced limited capacity growth.  Notably, as Defendants' executives acknowledged, this restriction on growing capacity was a marked change within the industry. The Court is satisfied that at this stage, Plaintiffs sufficiently pled parallel conduct.[102]

IPPs' allegations here likewise support the plausibility of the conspiracy.  Its onset marked a departure from the intense competition for market share in the period of significantly declining prices prior to the conspiracy.[103]  Defendants all made public statements throughout 2016 and 2017 declaring their continuing commitment to capacity discipline.[104]  And each also confirmed repeatedly that it was in fact limiting growth in line with industry growth—and lower than demand.

Samsung, the market leader, repeatedly stated, beginning in January of 2016, that its "bit growth is expected to grow aligned with the market."[105]  And, in October of 2016, it explicitly

---

[100] *Broiler Chicken*, 290 F. Supp. 3d at 791; *see also id.* (rejecting argument that the "Plaintiffs' allegations do not demonstrate parallel conduct because the alleged production cuts are too varied in methods and amounts").

[101] 221 F. Supp. 3d at 61-62.

[102] *Id.* at 68-69.

[103] *See* section II (F), below.

[104] *See* section II (C), above.

[105] ¶ 70; *see also* ¶¶ 91 (April 2016); 100 (October 2016); 113 (April 2017), 121 (July 2017), 75 (October 2017).

acknowledged its reversal in course: "given the fact that we haven't done much investments in DRAM this year, we are expecting our growth rates to come down, and be in line with market bit growth."[106]  It reiterated in April of 2017, "we have no plans of additional capacity."[107]  And again in July 2017: "we will refrain from, for example, increasing market share, fighting on volume."[108]  Similarly, Hynix repeatedly stated that its DRAM bit growth would be "on par with the market."[109]

The defendants also told each other the bit growth rate against which to benchmark their behavior.  Micron signaled the range within which its competitors should limit themselves—repeatedly indicating that defendants' market bit growth should be less than demand growth.[110]  For example, in November of 2016, Micron predicted supply growing "at something less than 20%" with demand "north of 20%."[111]  In December of 2016, Micron forecasted bit supply growth "somewhat between 15% and 20%," even as demand grew "somewhere in the range of 20% to 25%."[112]  And again in January of 2017, Micron stated: "Our review of the DRAM business is that there will be somewhere between 15% and 20% bit supply from Micron and all the other partici-pants in the industry" while "demand is going to be … somewhere between 20% and 25%."[113]

By October of 2017, Samsung confirmed for its co-conspirators' consumption that it had effectuated a bit growth *below* that of the industry when it described "2017 market DRAM bit growth to be approximately 20%" and its bit growth to be in the "mid-teens."[114]  Near time, Micron

---

[106] ¶ 100.

[107] ¶ 113.

[108] ¶ 121.

[109] ¶¶ 97 (July 2016); 107 (January 2017), 120 (July 2017), 125 (October 2017); *see also id.* (acknowledging that the DRAM market was in a state of undersupply).

[110] ¶¶ 92 (May 2016), 98 (September 2016), 99 (October 2016), 102 (November 2016), 103 (December 2016), 104 (same), 105 (January 2017), 79 (March 2017), 111 (same), 79 (April 2017), 115 (May 2017), 116 (June 2017), 119 (June 2017), 122 (August 2017), 123 (September 2017), 132 (November 2017).

[111] ¶ 102.

[112] ¶ 103.

[113] ¶ 105.

[114] ¶ 75.  While the defendants agreed to align their supply with each other (and below demand), Samsung came in higher at the end of 2016, which it apparently made up for at the end of 2017, coming in lower.  Thus, one of defendants' oft-cited (and improper) pieces of extrinsic evidence, *see* Mot. at 10 & 18, fits, in any event, with the allegations of the complaint.  The other, a July 2017 indication that Hynix planned a capacity increase, *see id.*, does not indicate that it would

confirmed that the industry would "remain moderately undersupplied for the rest of 2017"[115]— despite the available "white space" in two of its fabrication plants.[116] And Micron summed up: "if you look at the industry in aggregate even at the end of 2018 it's altogether possible for DRAM that the number of wafers the industry produces is the same or slightly less than it was some years ago."[117] Put differently, defendants in fact effectively coordinated industry capacity discipline, restraining supply compared to normal-market competitive conditions.

Quoting *Musical Instruments*, defendants assert that "such slow adoption of similar policies does not raise the specter of collusion."[118] But that statement supports, rather than undermines, IPPs' allegations—as it was referring to the adoption of "policies over a period of several years"— not months, as here. Likewise, *Wash. Cty. Heath Care Auth. Inc. v. Baxter Int'l, Inc* involved a "16-month delay" between purportedly collusive recalls, which for one defendant were eight times that of the other "despite roughly equal market share," and the plaintiffs failed to allege that the reasons for the recalls (potential leakage and contamination) were false, such that "the complaint alleg[ed] an implausibly complex and outlandish scheme to restrict output."[119] Finally, defendants find it "perplexing" that the complaint alleges that they continue to engage in "node decreases" while conspiring to limit capacity.[120] But node decreases are part of ongoing technology advancement and did not compromise defendants' ability to restrain output and raise prices.[121]

---

cause Hynix to exceed industry bit growth.

[115] ¶ 124.

[116] ¶ 111.

[117] ¶ 133.

[118] Mot. at 19, *quoting* 798 F. 3d at 1196; *see also* Mot. at 26.

[119] Mot. at 19, *citing* No. 16-cv-10324, 2018 WL 3313010, at *5, 8, 13 (N.D. Ill. Jul. 5, 2018); *see also Matsushita Elec. Indus. Co v. Zenith Radio,* 475 U.S. 574, 587 (1986) (on summary judgment, "if the factual context renders [the plaintiff's] claim implausible–if the claim is one that simply makes no economic sense–[a plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary").

[120] Mot. at 19.

[121] ¶ 180.

**E.      Statements addressing the industry as a whole are particularly indicative of a plausible conspiracy.**

*Domestic Airline Travel* found "the inference that [d]efendants' conduct was the result of an agreement" plausible, because the defendants "made public statements about their own commitment to capacity discipline as well as the importance of maintaining the capacity discipline within the industry."[122]   The district court stated that the defendants' "discussion of the need for capacity discipline within the industry as a whole is notable because it involves more than a mere announcement of Defendant's own planned course of conduct."[123]   Specifically, one defendant airline CEO stated, "there are hopeful signs that the industry has learned its lesson about keeping capacity growth in line with demand—and will continue to apply that lesson even as the economy comes back."[124] And another defendant airline president stated, "[t]he industry, by and large, has CEOs with different views than the CEOs of yesteryear. They are much more focused on returns and financial performance than they are on empire building."[125]  He added, "things can change in a hurry, but I don't think rapid capacity growth is going to become a problem in this industry, at least for the foreseeable future."[126]

These are remarkably similar allegations to those here.  Just as market leader Samsung continued to reiterate that it had "no plans of additional capacity"[127] and ultimately acknowledged lost market share,[128] Micron repeatedly called for *industry-wide* discipline.  In addition to the invitations to conspire in 2015,[129] in May of 2016, Micron's CEO Mark Durcan stated, "we all are going to either benefit or be hurt by excess supply in the marketplace."[130]  When asked in June of 2016, whether he was concerned that Samsung would disrupt the industry discipline, Micron CFO

---

[122] 221 F. Supp. 3d at 62.

[123] *Id.* at 62-63.

[124] *Id.* at 62.

[125] *Id.*

[126] *Id.*; *see also Broiler Chicken*, 290 F. Supp. 3d at 798.

[127] ¶ 113.

[128] ¶ 127.

[129] *See* section II (C), above.

[130] ¶ 92.

Ernie Maddock responded, "am I concerned? We're always concerned. Do we believe that that disruptive behavior is a high likelihood? It just doesn't feel as if that's the case right now."[131]  In November 2016, Maddock stated that he was confident that the "industry will do pretty well … until we see announcements of new wafers," but that Micron's objective was not to do "anything that would be potentially disruptive" to the "industry's performance."[132]  And in December 2016, Maddock reiterated that the "longer term supply demand trends" look healthy "in the absence of wafer additions by Micron or one of the other industry participants."[133]

In June of 2017, Maddock confirmed "there has actually been much more disciplined behavior on the part of the remaining industry participants, of which there are now only 3, it's Micron, Samsung and Hynix."[134]  And "there's great consistency between suppliers relative to our view of market growth opportunities on the demand side."[135]  So "what you see being exercised today is disciplined investment around expansion of capacity relative to expansion of demand."[136]  In September of 2017, he stated that "consolidation has been very instrumental in having a disciplined and orderly expansion of supply" and that "[w]e have certainly seen that now over period of a couple of years.[137]  And in December of 2017, Maddock stated that the "industry participants are keenly aware of the fact that the DRAM market is relatively inelastic and the way you serve that market is by making sure there is adequate, but not excess supply."[138]

Thus, Micron's calls for industry-wide discipline support the plausibility of the conspiracy.

F.     Deviation from past market behavior is also particularly significant.

*Domestic Airline Travel* also found the defendants' public statements regarding capacity discipline notable, because they "were a deviation from past business practices" and thus indicative

---

[131] ¶ 95.
[132] ¶ 102.
[133] ¶ 103.
[134] ¶ 117.
[135] *Id.*
[136] *Id.*
[137] ¶ 123.
[138] ¶ 133.

of agreement.[139]  District courts in this judicial district have concluded the same.

In *GPU*, for example, Judge Alsup initially dismissed the complaint, because the plaintiffs failed to plead "allegations of defendants' behavior *before* the alleged conspiracy started," such that they failed to plead "historically unprecedented change in behavior" under *Twombly*.[140]  In other words, the "[i]ndirect purchasers provided no baseline of earlier behavior by which to judge defendants' behavior during the alleged conspiracy."[141]  But following amendment, Judge Alsup determined that the plaintiffs plausibly alleged a conspiracy with allegations showing that "there was a marked change in defendants' behavior in the market around the time the conspiracy allegedly started."[142]

Likewise, in *Flat Panel*, Judge Illston found that "the complaint meets the standard articulated by *Twombly*" by alleging "unusual pricing practices" marking a departure from the past.[143]  As the district court described it, the "complaint allege[d] that in the pre-conspiracy market, the industry faced declining TFT-LCD panel prices," but at the onset of the conspiracy the TFT-LCD product market became "characterized by unnatural and sustained price stability, as well as certain periods of substantial increases in prices."[144]  And the plaintiffs alleged that the defendants controlled prices by "manipulating the capacity of various generations of fabrication plants, as well as the timing of bringing new capacity on line."[145]  Based on these allegations, and those described in section II (C), above, Judge Illston found *Twombly* satisfied.[146]

---

[139] 221 F. Supp. 3d at 63.

[140] *GPU II*, 540 F. Supp. 2d at 1092-93 (emphasis in original) (discussing his order in *GPU I*).

[141] *Id.* at 1092.

[142] *Id.* at 1096 ("Before the conspiracy, ATI and Nvidia released products at different times and at different price points.  After the conspiracy, ATI and Nvidia started releasing products at the same time and at the same prices."); *see also Standard Iron Works*, 639 F. Supp. 2d at 896, *citing GPU II*.  Defendants rely on Judge Alsup's earlier decision without mentioning the later one.  *See* Mot. at 10.

[143] 586 F. Supp. 2d at 1115.

[144] *Id.* at 1115-16.

[145] *Id.* at 1116.

[146] *Id.* at 1115-16, *see also Blood Reagents*, 756 F. Supp. 2d at 631-32 (plausibility of conspiracy bolstered by "allegations concerning the nature of the blood reagents market before and after the conspiracy allegedly began in the year 2000" when years of declining prices suddenly converted into years of rising prices).

Here, IPPs provide two types of information regarding change in behavior after the onset of the conspiracy. First, *before* the onset of the conspiracy, defendants competed to capture market share. For example, on July 31, 2014, during an earnings call, Samsung stated, "we expect the DRAM market bit growth for 2014 to be low 30%s and we expect our bit growth for the year to be high 40%s," such that it was "in a very good position to capture" opportunity to expand market share.[147] Likewise, on October 30, 2014, during its third quarter 2014 earnings call, Samsung announced that its "basic policy is that our bit growth rate next year should or would have to be higher than the industry. That is our goal."[148]

Again, on January 29, 2015, during a quarterly earnings call, Samsung stated that, "our bit growth we believe will outgrow that of the market growth" and "we will find a way of capturing any shortage opportunities," because, the market leader boasted, "we have better productivity."[149] And later, on October 29, 2015, during another quarterly earnings call, Samsung confirmed that "for 2015 DRAM, we expect the market growth to be low to mid 20% and our bit growth for the year will low 30%."[150]

As discussed above in section II (D), *after* the onset of the conspiracy, defendants changed course. They signaled through public statements that they would align their bit growth and refrain from taking each other's market share. That is, independent, self-interested competition would no longer occur—or would occur less intensely. And defendants' own statements confirm that they did in fact curtail supply (and competition) in this manner. So, not surprisingly, fluctuations in defendants' market shares decreased by 50% after the onset of the conspiracy[151]—with the market leader ceding market share,[152] which itself is a plus factor.[153]

---

[147] ¶ 64.
[148] ¶ 65.
[149] ¶ 66.
[150] ¶ 67.
[151] ¶ 152.
[152] ¶ 75.
[153] *See* Richard A. Posner, Antitrust Law, 79-93 (2d. ed. 2001) ("declining market share of leaders" is a plus factor potentially indicative of cartel conduct).

Indeed, Micron explicitly acknowledged the difference in fundamental business behavior. At a December 2016 trade conference, it spoke of the "pricing pressure" formerly created by Samsung's added DRAM capacity in 2014, but said that the environment was different now "with the absence of capacity additions."[154] In January of 2017, Micron stated that "the world is very different today than it was a few years ago" due to a "rational approach to addressing the supply/demand constraints of the DRAM market."[155] And in March of 2017, Micron again repeated that "all of the statements and all of the actions thus far suggest the things may indeed different in terms of how the participants are thinking about, the balance of profitability versus market share."[156]

The plural "participants" is important: Micron is acknowledging a competitive behavioral change with respect to all three remaining industry participants.[157] This refutes defendants' incorrect assertion that there are no "facts or statements from which the Court could infer that Micron or SK hynix ever adjusted their wafer capacity strategy."[158] And so does Micron's statement that it would "be foolish to be the first ones to take capacity off" because "it's a really ill-advised move to be unilaterally cutting production."[159] This certainly implies that it had not before and would only do so if the industry acted in unison. Indeed, Micron and Hynix could not ease off production before, because Samsung was aggressively seeking market share. That is why industry bit growth was 20-30% prior to the conspiracy[160] and 15-20% in 2017.[161] Thus, Micron and Hynix's hands were tied until all three reached an understanding (agreement) to change course.

The second type of information regarding change in behavior after the onset of the conspiracy is pricing data. As depicted below, after years of steep price declines,[162] the price of DRAM reversed course in May of 2016 despite stable costs—tripling by the end of the

---

[154] ¶ 73.
[155] ¶ 105.
[156] ¶ 109.
[157] *Id.*; *see also* ¶ 117.
[158] Mot. at 10; *see also id.* at 18.
[159] ¶¶ 6, 90.
[160] ¶¶ 64, 67.
[161] *E.g.,* ¶ 105.
[162] ¶ 171 ("while prices for DRAM soared, the prices of silicon wafers – the primary ingredient in DRAM – declined or remained stable"); *see also* ¶¶ 172-73.

conspiracy—and abruptly reverted back to decline when the Chinese antitrust authorities began

investigating at the end of 2017:[163]



Defendants' cases do not undercut the significance of this pricing data.  In *Oliver v. SD-3C*

*LLC*, the complaint described a "large disparity in alleged United States and global market shares,"

such that the global pricing data presented in the complaint was not indicative of the U.S.[164]

Moreover, the pricing data was "aggregated by year" (instead of monthly, as here).  And the data

picked up mid-way through the conspiracy (instead of before it began, as here).  Defendants'

reliance on *Brooke* is also misplaced.[165]  Quoting that case, *Flash* acknowledged that "the

occurrence of a price increase does not *in itself* permit a rational inference of conscious parallelism

or supracompetitive pricing."[166]  But the court found that allegations of "unnatural price stability"

and allegations that the defendants "openly communicated with one another to coordinate pricing"

supported the plausibility of the alleged price-fixing conspiracy, as here.[167]

> **G.    The facially coordinated supply restraint was against each defendant's self-interest in the absence of conspiracy.**

In *Petroleum Products*, the Ninth Circuit determined that the plaintiffs had "offered a

plausible conspiracy theory," and contributing "most significantly" to that conclusion was supply

---

[163] ¶ 7; *see also* ¶ 58.

[164] No. 11-CV-01260-JSW, 2016 WL 5950345, at *6 (N.D. Cal. Sept. 30, 2016).

[165] Mot. at 13, *citing Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993).

[166] *Flash*, 643 F. Supp. 2d at 1145, *quoting Brooke,* 509 U.S. at 237.  *See* Mot. at 13.

[167] *Flash*, 643 F. Supp. 2d at 1146.

restriction against the self-interest of each defendant.[168]  The Court recognized that the "mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws,"[169] but each defendant oil company chose to limit refinery capacity despite forecasts that supply would not meet demand.[170]  And, according to the Ninth Circuit, this was indicative of conspiracy.

The reason is straightforward: "A single company reducing output would lose market share and sales.  Only if all the companies reduced supply would the price rise enough to increase profits."[171]  So the "risk involved in leading a supply reduction suggests that purely interdependent supply decisions are unlikely."[172]  Unlike a price hike that can be readily walked back, "[o]nce a company is committed to reducing its capacity it cannot easily recover if the other companies do not follow its lead."[173]  And, of course, this distinguishes *Musical Instruments* and *Wilcox*, which involved only price hikes, not supply reductions.[174]

Thus, the Ninth Circuit in *Petroleum Products* concluded that "it is unlikely that a firm would undertake a reduction in its refinery capacity without some advance agreement from competitors"—and it "is in this context that the exchange of supply and demand forecasts must be considered."[175]  And the Court held that "a rational jury could conclude" that the defendants "had agreed to exchange supply and demand forecasts in order to facilitate mutual decelerations of increases in production capacity."[176]  Again, so too here.

Other courts have come to the same conclusion.  In *Broiler Chicken*, for example, the district court stated that "in an industry in which unilateral production cuts expose a company to

---

[168]  906 F.2d at 463. Defendants' heavy reliance on Third Circuit authority for this point of law is misplaced given controlling precedent in the Ninth Circuit.  *See* Mot. at 15 &16, *citing Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 873 F.3d 185, 193, 195 (3d Cir. 2017).

[169]  *Petroleum Products*, 906 F.2d at 444.

[170]  *Id.* at 462.

[171]  *Id.* at 463.

[172]  *Id.*

[173]  *Id.*

[174]  *Musical Instruments*, 798 F.3d 1186; *Wilcox v. First Interstate Bank of Or., N.A.*, 815 F.2d 522 (9th Cir. 1987).  *See* Mot. at 16-17.

[175]  906 F. 2d at 463.

[176]  *Id.*

loss of market share, a publicly announced production cut makes it more likely that the producer has an agreement from other producers to either cut production as well, or at least to forebear from assuming the vacated market share."[177] The court concluded that such "conduct without an agreement makes little economic sense."[178]

*Musical Instruments* is not inconsistent with these holdings.[179] There, "the complaint itself, perhaps maladroitly, provide[d] ample independent business reasons why each of the manufacturers adopted and enforced MAP policies even absent an agreement among the defendant manufacturers."[180] The plaintiffs alleged that "each manufacturer was pressured by Guitar Center to adopt MAP policies that were advantageous to Guitar Center, and the complaint concedes that each manufacturer responded to Guitar Center's pressure and coercion by adopting MAP policies in exchange for Guitar Center's agreement to purchase large volumes of the manufacturer's product stock."[181] The Ninth Circuit held that the "[m]anufacturers' decisions to heed similar demands made by a common, important customer d[o] not suggest conspiracy or collusion."[182]

Here, the complaint does not allege an independent business reason so compelling for each defendant to restrain supply on its own that conspiracy is rendered implausible. First, unlike *Musical Instruments*, defendants' assertion of "unexpected and significant increase in demand" is not supported by the complaint.[183] Second, it is implausible that the imbalance between supply and demand was "unexpected," because it was repeatedly forecast across the three defendants

---

[177] *Broiler Chicken*, 290 F. Supp. 3d at 798.

[178] *Id.*

[179] Mot. at 16-17 & 20, *citing* 798 F.3d at 1194-96.

[180] *Musical Instruments*, 798 F.3d at 1195.

[181] *Id.*

[182] *Id.*; *see also Propranolol*, 249 F. Supp. 3d at 720 ("In *Musical Instruments*, the Ninth Circuit (in a split decision) affirmed the dismissal of the case because the complaint itself provided ample independent business reasons why each of the defendants adopted and enforced the minimum prices even absent an agreement. In particular, each defendant was responding to similar demands made by a common, important customer.").

[183] *See* Mot. at 17. Based on exhibits they improperly seek to introduce, *see* section IV, defendants assert, for example, that in October 2017 there was "higher-than-expected growth in demand for server DRAM." Mot. at 11 n.7, *citing* Ex. C at 4. But defendants leave out the preceding sentence, which states that the growth forecast had been adjusted from low 20% to mid-20%—which was still within the 20-25% "longer term" growth previously predicted. *See, e.g.*, ¶ 103 (December 2016).

throughout the course of the conspiracy.[184]  That was their anticompetitive goal—to tighten supply relative to demand in order to increase prices.  Moreover, it is pretextual to argue that "unexpected demand" was to blame for the soaring prices—as if they could have manufactured more DRAM had they known—when defendants admit to knowing of the imbalance all along and to having available "white space" in their fabrication plants.[185]  And "pretextual reasons for price increases … also support an inference of concerted action."[186]

## H. Defendants have been guilty of price-fixing before—and Samsung entered into a memorandum of understanding with the Chinese antitrust authorities to end this round.

The Ninth Circuit has held that a history of illegal behavior constitutes a plus factor.[187]  As noted in *Flash*, in the previous "DRAM matter, Samsung and Hynix, who also are Defendants in this case, [] pleaded guilty to price fixing, and [] paid fines in the amount of $300 million and $185 million, respectively."[188]  Micron, for its part, was given immunity from prosecution because it agreed to cooperate with the DOJ and acknowledged that at least 31 of its executives and other employees had conspiratorial contacts with other DRAM manufacturers, including Samsung and Hynix.[189]  And one executive—Micron's current Chief Strategy Officer—testified that he participated in a "worldwide tour" to invite "other manufacturers to restrict production."[190]  Indeed, in five subsequent cases in this very district, one or more of the same defendants named here was alleged to have engaged in a price fixing conspiracy that the district court determined satisfied *Twombly*.[191]

---

[184] *See* section II (D), above.

[185] *E.g.*, ¶ 111.

[186] *Flat Panel*, 586 F. Supp. 2d at 1116.

[187] *C-O-Two Fire Equip. Co. v. United States*, 197 F.2d 489, 497 (9th Cir. 1952) ("plus factors …. include a background of illegal licensing agreements" in violation of antitrust law). Defendants' contrary authorities are from outside the Ninth Circuit.  *See* Mot. at 28.

[188] 643 F. Supp. 2d at 1139.  *See also* ¶¶ 206-217.

[189] ¶¶ 218-19.

[190] ¶¶ 220-221.

[191] *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420 YGR, 2014 WL 4955377, at *5 (N.D. Cal. Oct. 2, 2014) (Samsung); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2012 WL 1366718, *4 (N.D. Cal. Apr. 19, 2012) (Samsung); *Flash*, 643 F. Supp. 2d at 1142 (Samsung, Micron, and Hynix); *Flat Panel*, 586 F. Supp. 2d at 1116 (Samsung); *SRAM,* 580 F. Supp. 2d at 903 (Samsung, Micron, and Hynix).

Moreover, here the conspiracy was interrupted after China's antitrust regulator, the NDRC, announced an investigation into the sharp rise in DRAM prices over the preceding 18-month period.[192] Shortly thereafter, on February 1, 2018, NDRC and Samsung entered into a memorandum of understanding that would result in moderations to the price increases of DRAM in 2018.[193] And, in April of 2018, contrary to its recent behavior, Hynix publicly announced that it was adding wafer capacity by 6-7% per year to meet demand growth, which was a change in practice from the conspiracy period when defendants restrained supply growth below market demand.[194]

Defendants argue that an investigation does not constitute a plus factor.[195] But here defendants are also alleged to have changed their behavior *in response to* an investigation. As stated in *Alaska Elec.*, when the defendants are alleged to have "abruptly and simultaneously ceased engaging in parallel conduct when they were served with subpoenas in connection with government investigations" this "strengthen[s] substantially the inference that a conspiracy existed."[196] So too here.

## III. IPPs' allegations plausibly suggest that each individual defendant joined the conspiracy and played some role in it.

*Twombly* does not require a complaint to "contain detailed 'defendant by defendant' allegations."[197] Rather, it need only contain facts that "plausibly suggest" that "each individual defendant joined the conspiracy and played some role in it."[198] As set forth above, and in opposition to Hynix's separate motion to dismiss, IPPs allege just this. Micron, Samsung, and Hynix each participated in the conspiracy to restrain supply and raise the prices of DRAM.

Moreover, IPPs plausibly allege that employees of each of the three defendant families

---

[192] ¶¶ 134-136.

[193] ¶ 137. Defendants provide no legal basis for relying on an article completely outside the pleadings to factually dispute them. *See* Mot. at 29 n.17.

[194] ¶ 138.

[195] Mot. at 28-29.

[196] 175 F. Supp. 3d at 55-56.

[197] *Batteries*, 2014 WL 4955377, at *30-*31 (plaintiffs are "not required to identify exactly how, when, and through whom each Defendant joined the conspiracy").

[198] *Id.; see also, e.g.*, *In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d 918, 928-32 (N.D. Cal. 2015) (*Capacitors II*) (denying several defendants' individual motions to dismiss because plaintiffs plausibly alleged that each participated in the conspiracy).

engaged in collusive acts in furtherance of the conspiracy "on behalf of every company in that family."[199]  Recent decisions from this district have upheld the sufficiency of a complaint alleging, *inter alia*, that: (1) the individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish among the entities within a corporate family; (2) the individual participants entered into agreements on behalf of their respective corporate families; and (3) as a result, the whole corporate family was party to the agreements that those agents reached.[200]  IPPs allege the same here.[201]

Additionally, the IPPs allege that (1) the parent company of each defendant family wholly owned and controlled its subsidiaries;[202] (2) the U.S. subsidiaries of foreign parents acted as their U.S. agents, which applies to the Samsung and Hynix corporate families;[203] and (3) the conspirators themselves referred to the defendant corporate families as such.[204]  Thus, IPPs have plausibly alleged that defendants' agents engaged in collusive conduct on behalf of the corporate families.[205]

## IV.    The Court may consider only IPPs' allegations—not the extraneous documents cited by defendants to dispute the allegations in IPPs' well-pled complaint.

Generally, district courts should only consider the allegations in a plaintiff's complaint and "may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6)."[206]  There are two exceptions to this rule: judicial notice under FRE 201 and the incorporation-by-reference doctrine.  Defendants' motion relies on the latter to append a number of exhibits, which defendants use to dispute facts in IPPs' complaint and to assert

---

[199] ¶ 40.

[200] *See, e.g., Capacitors II*, 154 F. Supp. 3d at 928-32; *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010); *Flat Panel*, 599 F. Supp. at 1184-85.

[201] ¶ 40.

[202] ¶¶ 28, 31, 34.

[203] ¶ 41.

[204] *E.g.,* ¶ 130.

[205] *See Capacitors II*, 154 F. Supp. 3d at 928-29; *Batteries*, 2014 WL 4955377, at *32, *40; *CRT*, 738 F. Supp. 2d at 1020-21. Defendants' cases are not apposite to IPPs' allegations. For example, in *In re iPhone Application Litig.*, No. 11-md-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011), the case relied on most heavily by defendants, plaintiffs lumped all eight of the "mobile industry defendants"—members of separate corporate families—together. *Id.* at *8.  But IPPs make distinct allegations with respect to Samsung, Micron, and Hynix.

[206] *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

additional facts that purportedly render IPPs' allegations implausible.[207]  This is improper.

As the Ninth Circuit recently held in *Khoja v. Orexigen Therapeutics, Inc.*, a "district court abuse[s] its discretion by incorporating [] documents for th[e] improper purpose" of entering "the realm of factual disputes."[208]  The Court made clear that "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint."[209]  And this "admonition is, of course, consistent with the prohibition against resolving factual disputes at the pleading stage."[210] *Khoja* also held that "if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint.  Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims."[211]  Indeed, *Khoja* decried "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint" as it "risks premature dismissals of plausible claims that may turn out to be valid after discovery."[212]

Defendants attempt to use the content of referenced documents in contravention of these rules.  For example, defendants scour the many and lengthy earnings call transcripts cited by IPPs to find several self-serving statements by defendants' own executives that, at particular points within the class period, in narrow market segments, growth in server DRAM demand was "higher-than-expected," or that within the graphic client segment demand "exceeded our expectations."[213]  This attempt to offer a competing explanation for the widespread surge in class period DRAM prices—*i.e.*, that it was due to unexpected demand, rather than collusion as IPPs' factual allegations plausibly allege—contravenes *Khoja*.

Similarly, defendants cherry-pick other statements from their own executives that they argue indicate independent, supposedly market-driven decision-making for significant capacity

---

[207] *See* Mot. at 4 n.4.  Defendants did not submit a request for judicial notice in support of the joint motion, as Hynix did in support of its separate motion.

[208] 899 F.3d 988, 1006 (9th Cir. 2018).

[209] *Khoja*, 899 F.3d at 1003.

[210] *Id.*

[211] *Id.* at 1002.

[212] *Id.* at 998.

[213] *See* Mot. at 4 n.5, 11 n.7.

growth, rather than coordination to keep capacity growth parallel, and, inconsistently, defendants offer alternative explanations (other than collusion) for low capacity growth.[214]  This provides unconvincing riposte to the well-pled factual allegations demonstrating facially coordinated capacity discipline among defendants.[215]  And, more importantly at the pleading stage, it provides a disputed version of the facts alleged.  In *Khoja*, the Ninth Circuit—reversing the district court's decision to grant a motion to dismiss—cautioned against "the danger in incorporating documents en masse into complaints," because "[o]nce documents are incorporated into a complaint, a district court faces competing, often inconsistent versions of the facts."[216]  But the "incorporation-by-reference doctrine does not override the fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage."[217]

Finally, defendants cite *Twombly* for the proposition that courts are "entitled to take notice of the full contents of the published articles references in the complaint, from which truncated quotations were drawn."[218]  Recent decisions, however, have explained that in *Twombly* the plaintiffs chose to selectively excerpt a quote from an article, even though the full quote revealed the opposite meaning from the one offered by plaintiffs.[219]  That is not the case here.[220]  Rather, as in *Domestic Airline*, defendants only provide the quotes "in order to present new factual allegations to counter the factual allegations underlying Plaintiffs' claims as set forth in the Complaint."[221]

---

[214] *See* Mot. at 10-12. For example, defendants argue that Micron executive Mark Durcan publicly stated that bit growth would be low "given the ROI on incremental wafers," *i.e.*, it would not be worth the investment to grow capacity.  *Id.* at 10.

[215] *See* section II (D), above.

[216] *Khoja*, 899 F.3d at 1014.

[217] *Id.*

[218] Mot. at 4 n. 4, *citing* 550 U.S. at 569 n.13.

[219] *See In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 740 n.31 (E.D. Pa. 2011) (suggestion in *Twombly* "appears in that case in relation to a narrow factual context where a *Chicago Tribune* article reported on a defendant-speaker's thoughts on a matter that were only selectively excerpted in the complaint"); *accord Domestic Airline Travel*, 221 F. Supp. 3d at 71.

[220] For example, IPPs cite Micron CEO Durcan's statement just prior to the class period that he predicted growth for the next year would be around 20% "as long as nobody adds any incremental DRAM wafers." ¶ 92.  That quote is 100% accurate, and yet, as explained, defendants accuse IPPs of improperly omitting Durcan also stating that more growth was unlikely "given the ROI on incremental wafers."  Mot. at 10.  That does not undermine the accuracy of IPPs' citation.

[221] 221 F. Supp. 3d at 71; *compare Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112, 1115 (9th Cir. 2014) (inapposite decision cited by defendants where letters attached to

## V. The IPPs have standing to assert their claims.

### A. The IPPs have Article III standing because they allege an economic injury in fact that is traceable to defendants' conspiracy to fix prices.

For Article III standing, a plaintiff must allege an "injury in fact" that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable judicial decision."[222] The alleged injury must be "concrete and particularized,"[223] such that it "must actually exist" and "affect the plaintiff in a personal and individual way."[224] But, as the Ninth Circuit has stated, "the injury itself need be nothing more than a trifle."[225] And, at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice."[226]

Here, IPPs allege they were overcharged for DRAM products due to defendants' price-fixing conspiracy.[227] The injury in fact is the overcharge. And pass-through analysis can trace the overcharge resulting from defendants' conspiracy from direct purchasers to IPPs.[228] Moreover, this overcharge is anticipated due to the "vigorous price competition" in the OEM and retail markets for devices containing DRAM, such that increases in component costs "will lead to corresponding price raises at the OEM and retailer levels for DRAM devices."[229] Indeed, "pass through in excess of 100 percent," or overshifting, is expected for mass market computer and consumer electronics equipment.[230]

Courts have found that such allegations meet the requirements of Article III standing. *In re Auto. Parts Antitrust Litig.*, the district court explained that in order to satisfy Article III, indirect purchaser complaints "must include two allegations: (1) Defendants overcharged the direct

---

complaint "contradicted" facts alleged in complaint).
[222] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).
[223] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).
[224] *Spokeo*, 136 S. Ct. at 1548.
[225] *National Wildlife Fed'n v. Burford*, 871 F.2d 849, 854 (9th Cir. 1989).
[226] *Lujan*, 504 U.S. at 561.
[227] ¶¶ 13, 234, 243, 281, 291, 304.
[228] ¶ 241.
[229] ¶¶ 236-238.
[230] ¶ 242; *see also* ¶ 240.

purchasers; and (2) some or all of the overcharge was passed on to them through each of the various intermediate levels of the distribution chain."[231]

Likewise, in *D.R. Ward Const. Co. v. Rohm & Haas Co.*, the district court held that the indirect purchaser plaintiffs had satisfied Article III standing based on the following allegations: "that they paid inflated prices for products with plastics additives due to an overcharge on plastics additives which was passed on to them from the intervening links within the distribution chain, that plaintiffs' overpayment for products containing plastics additives was caused by the conspiracy among defendants to charge inflated prices for plastics additives, and that judicial relief will compensate plaintiffs for these injuries, restoring plaintiffs to the position they were in prior to the price-fixing scheme."[232]  IPPs allege the equivalent here.[233]

Indeed, each of the six judges in this district who have presided over antitrust cases involving indirect purchases of computer component parts—and determined that such plaintiffs have antitrust standing under *AGC*[234]—have necessarily also determined that the plaintiffs satisfied Article III in permitting those cases to proceed.

Defendants' cases do not compel a different result.[235]  In *In re Magnesium Oxide Antitrust Litig.*, the indirect purchaser plaintiffs alleged that the defendants fixed the price of magnesium oxide, a white mineral "used in producing a wide variety of products, including refractory products, animal feeds, fertilizers, electrical insulation, and pharmaceuticals."[236]  But the district court decided that the price of magnesium oxide "would have a minimal foreseeable effect on the price of products containing traces amounts" and a "significant foreseeable effect on the price of

---

[231] 29 F. Supp. 3d 982, 997 (E.D. Mich. 2014) (finding that the "allegations in the complaints satisfy IPP's pleading burden").

[232] 470 F. Supp. 2d 485, 492-93 (E.D. Pa. 2006); *see also In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 722 (N.D. Ill. 2016) (holding that end-payor purchaser plaintiffs satisfied Article III by alleging that the defendants' anticompetitive conduct "forc[ed] plaintiffs to pay supracompetitive prices").

[233] ¶¶ 60-133 (conspiracy causes overcharge), 234-38 (pass through), 291 & 299 (redressability).

[234] *See* section V (D), below.

[235] *See* Mot. at 32-33.

[236] No. 10-cv-5943, 2011 WL 5008090, at *1 (D.N.J. Oct. 20, 2011).

products in which they are a major ingredient."[237]  So the court granted the defendants' motion to dismiss because the plaintiffs failed to allege the "specific products" that they purchased.[238]  Here, IPPs allege the specific products that they purchased.[239]  And common sense tells us that DRAM forms a more consistently significant and traceable share of computers and other consumer electronics than magnesium oxide does in the multifarious products at issue in *Magnesium Oxide*.

Likewise, in *Los Gatos*, the plaintiff alleged price fixing of titanium dioxide, a white pigment used for "whiteness, brightness, and masking of colors in paints and coatings."[240]  And—relying on *Magnesium Oxide*—the court raised concern based on the "variation in the amount of titanium dioxide found in the expansive category of Architectural Coating products," which was a "term that encompasse[d] house paint, deck finishes, and other organic coatings intended for on-site application to interior or exterior surfaces."[241]  But defendants here fail to note that the district court permitted leave to amend—and denied a subsequent motion to dismiss.

In that subsequent motion, the defendants argued that "Architectural Paint" was "still too broad for tracing to be possible."[242]  But, while the district court agreed that the definition of Architectural Paint "could be read to include products besides paint," the plaintiffs had "alleged facts showing that they purchased *paint* containing significant quantities of titanium dioxide."[243]  And the "relevant question is whether the requisite case or controversy has been established between the named plaintiffs and the defendants, not between unidentified putative class members and the defendants."[244]  So the court denied the motion to dismiss.  Likewise, here IPPs allege the purchase of laptops and smartphones, in which DRAM is a significant, traceable component.[245]

---

[237] *Id.* at *7.

[238] *Id.*

[239] ¶¶ 22-26 (listing specific products purchased).

[240] *Los Gatos Mercantile, Inc. v. E.I. du Pont de Nemours & Co.*, No. 13-cv-01180-BLF, 2015 WL 4755335, at *2 (N.D. Aug. 11, 2015) (*Los Gatos II*).

[241] *Id.* at *2, *14.

[242] *Harrison v. E.I. du Pont de Nemours & Co.*, No. 13-cv-01180-BLF, 2016 WL 3231535, at *3 (N.D. Cal. June 13, 2016) (*Los Gatos III*).

[243] *Id.* (emphasis in original).

[244] *Id.*

[245] ¶¶ 22-26.

**B.**     **Because IPPs have standing to assert their own claims, whether they can assert claims on behalf of absent class members is determined at class certification.**

Defendants argue that the "named plaintiffs lack Article III standing to assert claims under the laws of jurisdictions in which they neither reside nor incurred injury" and cite this Court's decision in *Ditropan* in support of their argument.[246]  Since this Court decided *Ditropan*, however, the Ninth Circuit has held that "*any issues* regarding the relationship between the class representative and the passive class members—such as dissimilarity in injuries suffered—are relevant only to class certification, not to standing."[247]

In *Melendres v. Arpaio*, the Ninth Circuit explained that "when courts have found a disjuncture between the claims of named plaintiffs and those of absent class members, they have not always classified the disjuncture consistently, some referring to it as an issue of standing, and others as an issue of class certification."[248]  The "standing approach" treats "dissimilarities between the claims of named and unnamed plaintiffs as affecting the standing of the named plaintiff to represent the class."[249]  The "class certification approach," conversely, "holds that once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met."[250]  The Ninth Circuit "adopt[ed] the class certification approach."[251]  Thus, whether the named IPPs here can represent the absent class members is determined at class certification.

---

[246] Mot. at 34, *citing In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal 2007).

[247] *Melendres v. Arpaio*, 784 F.3d 1254, 1263 (9th Cir. 2015) (rejecting argument that named plaintiffs stopped only during saturation patrols—when the defendant officers would saturate a particular area for the purpose of enforcing immigration laws—lacked standing to bring constitutional claims on behalf of class members stopped during nonsaturation patrols); *see also Pecanha v. The Hain Celestial Grp., Inc.*, No. 17-CV-04517-EMC, 2018 WL 534299, at *8–9 (N.D. Cal. Jan. 24, 2018) (rejecting argument that "*Melendres* is distinguishable because the case involved a dissimilarity in injuries suffered" as opposed to "named plaintiffs who cannot bring legal claims pursuant to state laws for states where they do not reside" because "the distinction is not material for purposes of taking the class certification approach").

[248] 784 F.3d at 1261.

[249] *Id.*

[250] *Id.* at 1262.

[251] *Id.*

Judge Chen recently followed *Melendres* in *In re Chrysler-Dodge-Jeep Ecodiesel Litig.*[252] There the defendants argued that the plaintiffs lacked standing to assert claims under state laws from states in which they did not reside, and defendants relied on Judge Chen's earlier decision in *In re Carrier IQ*.[253] But Judge Chen changed course. After analyzing the new precedent, he concluded that when "there is a disjuncture between the claims of the named plaintiffs and absent class members," as here, "*Melendres* requires courts in the Ninth Circuit to apply the class certification approach."[254] So Judge Chen denied the defendants' motion to dismiss for lack of standing. This Court should now do the same.[255]

### C. *ACG* applies in only three class states: Iowa, Nebraska, and New Mexico.[256]

Courts in this federal district have consistently held that the antitrust standing requirements of *Associated General Contractors* apply to claims brought under Iowa and Nebraska state law.[257] And these courts have recently held that *AGC* applies to claims brought under New Mexico law.[258] But since *DRAM I*[259] courts over the past decade have determined that *AGC* does *not* apply to claims brought under Arizona, California, District of Columbia, Illinois, Kansas, Maine, Michigan,

---

[252] 295 F. Supp. 3d 927, 953-56 (N.D. Cal. 2018).

[253] *Id.* at 954, *citing In re Carrier IQ Inc., Consumers Privacy Litig.*, 78 F. Supp. 3d 1051, 1065 (N.D. Cal. 2015).

[254] *Id.* at 955.

[255] *Easter v. Am. W. Fin.*, 381 F.3d 948, 962 (9th Cir. 2004), on which this Court relied in *Ditropan*, is inapposite because there was no named plaintiff with standing to assert *any* claims against the subset of trust defendants at issue. Here, each named "plaintiff has made out a case or controversy between himself and the defendant," as required for standing. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). *See also* Mot. at 34, *citing Warth.*

[256] *Associated General Contractors*, 103 S. Ct. 897 (1983) *(AGC)*. Defendants do not assert lack of antitrust standing in Florida, Minnesota, or Mississippi. *See* Mot. at App'x A. And defendants do not cite any authority to support application of *AGC* in Arkansas or New Hampshire. *See* Mot. at App'x B.

[257] *Batteries*, 2014 WL 4955377, at * 9-11 (Nebraska); *CRT*, 738 F. Supp. 2d at 1023-24 (Iowa and Nebraska); *Flash*, 643 F. Supp. 2d at 1153-56 (Iowa and Nebraska); *Flat Panel*, 586 F. Supp. 2d at 1122-24 (Iowa and Nebraska).

[258] *Batteries*, 2014 WL 4955377, at *11 (based on a state case decided after *CRT*, *Flash*, and *Flat Panel*, which had held otherwise), *citing Nass-Romero v. Visa U.S.A., Inc.*, 279 P.3d 772, 778-81 (N.M. Ct. App. 2012).

[259] *In re Dynamic Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072 (N.D. Cal. 2007) *(DRAM I)*.

New Hampshire, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee,

Vermont, West Virginia, and Wisconsin law:

| Does *AGC* apply? | *Capacitors I*, 106 F. Supp. 3d at 1072-73 | *Batteries*, 2014 WL 4955377, at *7-11 | *CRT*, 738 F. Supp. 2d at 1023-24 | *Flash*, 643 F. Supp. 2d at 1153-56 | *Flat Panel*, 586 F. Supp. 2d at 1122-24 |
|---|---|---|---|---|---|
| Ariz. | | No | No | No | No |
| Cal. | No | No | Yes | Yes | No |
| D.C. | | No | | | |
| Ill. | | No | | | |
| Kan. | | No | No | | |
| Me. | | No | | No | No |
| Mich. | | No | No | No | No |
| N.H. | | No | | | |
| N.Y. | | No | | | No |
| N.C. | | | No | No | No |
| N.D. | | No | No | | No |
| Or. | | No | | | |
| S.D. | | | No | No | No |
| Tenn. | | No | No | | |
| Vt. | | No | No | | |
| W. Va. | | No | No | No | No |
| Wis. | | No | No | No | No |

Indeed, Judge Rogers recently rejected authorities that defendants cite here.[260] And while

*Flash* and *CRT* held in 2009 and 2010 that *AGC* applied in California, *Batteries* and *Capacitors I*

[260] *Compare* Mot. at App'x B, *with Batteries*, 2014 WL 4955377, at *9-11 & n.11 (citing *Vinci v. Waste Mgmt., Inc.,* 36 Cal. App. 4th 1811 (1995)*; Peterson v. Visa U.S.A., Inc.,* CIV.A. 03-8080, 2005 WL 1403761 (D.C. Super. Apr. 22, 2005)*; Cnty. of Cook v. Philip Morris, Inc.,* 817 N.E.2d 1039 (Ill. App. Ct. 2004); *Wrobel v. Avery Dennison Corp.,* No. 05-cv-1296, 2006 WL 7130617 (Kan. Dist. Ct. Feb. 1, 2006)*; Knowles v. Visa U.S.A., Inc.,* CIV.A. CV 03-707, 2004 WL 247584 (Me. Super. Oct. 20, 2014); *Ho v. Visa U.S.A., Inc.,* 787 N.Y.S.2d 677 (N.Y. Sup. Ct. 2004), *aff'd,* 793 N.Y.S.2d 8 (N.Y. App. Div. 2005); *Fucile v. Visa U.S.A., Inc.,* S1560-03 CNC, 2004 WL 3030037 (Vt. Super. Dec. 27, 2004); *Strang v. Visa U.S.A., Inc.*, 03 CV 011323, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005)). *Compare also* Mot. at n. 23, *with Capacitors I*, 106 F. Supp. 3d at 1072-73 (citing *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000), and *Vinci*, 36 Cal. 4th 1811). Other unpublished, state trial court decisions cited by defendants are likewise unpersuasive. The Westlaw citation defendants provide to *Cornelison v. Visa U.S.A.*, No. 03-1350, 2004 WL 6331252 (S.D. Cir. Ct. Sept. 29, 2004), has no substantive discussion whatsoever. And the page citations defendants provide for *Beckler v. Visa U.S.A., Inc.*, No. 09-04-

decided otherwise in 2014 and 2015, based on more recent precedent.[261]  And though none of these courts have addressed the applicability of *AGC* under Utah law, the rationale defendants provide here was also rejected by Judge Rogers: "simply because a state statute encourages reference to federal law does not impose a mandate on state courts to conform in fact to federal law."[262]  To be sure, each class state at issue here permits indirect purchaser suits, which is a prime example of significant deviation from federal law—notwithstanding so-called harmonization provisions.  In sum, *AGC* applies in only three class states.

### D. The *AGC* factors—including antitrust injury—each favor a finding of antitrust standing.

Here again defendants raise worn out arguments that have been repeatedly rejected in this exact context.  But as a preliminary matter, defendants set up a flawed analytical framework in treating antitrust injury as distinct from antitrust standing under *AGC*.[263]  Rather, antitrust injury is among the factors courts balance when determining antitrust standing under *AGC*, as set forth in *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*[264]

In that case, the Ninth Circuit identified the five *AGC* factors as follows: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages."[265]  Then, in turn, the Court identified the four requirements for establishing antitrust injury, *i.e.*, the first factor, which "is

---

C-00030, 2004 WL 2115144, at *4-*6 (N.D. Dist. Ct. Aug. 23, 2004), are actually to another case attached as an exhibit to *Beckler—Ho*, 787 N.Y.S.2d 677—which Judge Rogers rejects as a basis for applying *AGC* in New York.  *See Batteries*, 2014 WL 4955377, at *9.

[261] *See Capacitors I*, 106 F. Supp. 3d at 1072-73, and *Batteries*, 2014 WL 4955377, at *10, citing *Samsung Electronics Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014), and *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013).

[262] *Batteries*, 2014 WL 4955377, at *10.  *See also* Mot. at App'x B (citing harmonization provisions found or discussed in Ariz. Rev. Stat. § 44-1412; Or. Rev. Stat. § 646.715(2); Utah Code § 76-10-926; W.Va. Code § 47-18-16; *Johnson v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610, 620 (N.C. 1980), *overruled on other grounds*, *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 374 S.E.2d 385 (N.C. 1988); *Tennessee ex rel. Leech v. Levi Strauss & Co.*, 1980-2 Trade Cas. (CCH) ¶ 63,558 at 76,972 n.2 (Tenn. Ch. Ct. 1980)).

[263] *Compare* Mot. at 34, *with* Mot. at 36.

[264] 190 F.3d 1051, 1054 (9th Cir. 1999).

[265] *Id.* at 1054.

necessary but not always sufficient to establish standing."[266]  They are: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."[267]  And the last requirement includes a corollary that the injured party "be a participant in the same market as the alleged malefactors" or have injuries "inextricably intertwined with the injuries of market participants."[268]  Thus, antitrust injury can be examined in isolation when antitrust standing under *AGC* is inapplicable,[269] but when both are at issue the former is subsumed in analysis of the latter.[270]

In arguing that IPPs lack *AGC* standing (including antitrust injury), defendants rely heavily on *DRAM I & II*, while ignoring the evolution of the case law over the past decade.[271]  Since Judge Hamilton decided the issue—which she recognized was "not without controversy or uncertainty"[272]—at least six other judges in this district have determined that indirect purchasers of computer components, like IPPs here, have antitrust standing under *AGC*.[273]  This Court should

---

[266] *Id*. at 1055, *citing Cargill, Inc. v. Monfort of Colo., Inc*., 479 U.S. 104, 110 n.5 (1986).

[267] *Id*. at 1055.

[268] *Id*. at 1057 & n.5; *see also id*. at 1057 ("The Supreme Court has never imposed a consumer or competitor test but has instead held the antitrust laws are not so limited.").

[269] *E.g., In re Qualcomm Antitrust Litig*., 292 F. Supp. 3d 948, 965-66 (N.D. Cal. 2017) (declining to decide whether California's Cartwright Act requires plaintiffs to satisfy the Clayton Act's "market participant" test because it was, in any event, satisfied).  With respect to California only, defendants provide authority that antitrust injury, including market participation, is required under the state's antitrust act.  Mot. at 34-35.  But one of the cases they cite acknowledges that "under California law, an indirect purchaser of goods or services is deemed to participate as a customer in the relevant market and thus may suffer a cognizable antitrust injury."  *In re Napster, Inc. Copyright Litig*., 354 F. Supp. 2d 1113, 1125 (N.D. Cal. 2005).

[270] *Am. Ad Mgmt.*, 190 F.3d at 1056-58.

[271] Mot. at 34-36 (section III.D.3), 36-38 (section III.D.4).  They also ignore a more recent ruling in *Los Gatos*—refusing to dismiss based on lack of antitrust standing.  *Los Gatos III*, 2016 WL 3231535, at *3.  *See* Mot. at 36.

[272] *In re Dynamic Random Access Memory Antitrust Litig*., 536 F. Supp. 2d 1129, 1142 (N.D. Cal. 2008) (*DRAM II*).

[273] *Batteries*, 2014 WL 4955377, at *11-16 (J. Rogers); *In re Optical Disk Drive Antitrust Litig*., 2012 WL 1366718, at *6 (J. Seeborg); *In re Optical Disk Drive Antitrust Litig.*, No. 10-md-2143 RS, 2011 WL 3894376, at *12  (N.D. Cal. Aug. 3, 2011) (same); *CRT*, 738 F. Supp. 2d at 1023-24 (J. Conti); *Flash*, 643 F. Supp. 2d at 1153-56 (J. Armstrong); *Flat Panel*, 586 F. Supp. 2d at 1123-24 (J. Ilston); *GPU II*, 540 F. Supp. 2d at 1097-98 (J. Alsup).  *Cf. Los Gatos II*, 2015 WL 4755335, at *17 (recognizing that "demonstrating the existence of an inextricably linked market might be easier when tracing a distinct, physical component through the chain of distribution," as opposed to a fully integrated pigment).

decide the same.  Indeed, a case relied on by defendants acknowledges that "*DRAM II* is an outlier that has not been adopted generally either inside or outside the district."[274]

### 1.    The first *AGC* factor: IPPs have suffered antitrust injury.

Focusing on the corollary to the fourth requirement of antitrust injury, defendants argue that IPPs "do not allege that they are participants in the purportedly restrained market."[275]  But IPPs do allege injuries "inextricably intertwined with the injuries of market participants."[276]  And this was sufficient to establish antitrust injury in many other IPP cases involving computer components since *DRAM II*.

In *Batteries*, for example, the defendants allegedly fixed the prices of lithium ion battery cells, which were in turn used to make batteries, which were sold to IPPs as either stand-alone products or as component parts in consumer electronics, such as laptops, smart phones, and camcorders.[277]  Judge Rogers concluded that "battery cells, batteries, and battery products" resided in "inextricably linked markets," in line with "multiple opinions" finding that other "component and finished-product markets" satisfied *AGC*'s market participation requirement.[278]

Judge Rogers determined that the series of computer-component cases "hinge[d] on the plausibility of the markets alleged being linked in light of the nature of the components and finished products alleged."[279]  And the court found that the linkage in *Batteries* was plausible based on allegations, like those here,[280] that "direct purchaser manufacturers of battery products are subject to vigorous price competition and thin net margins such that any increase in the price of components, such as batteries, leads to corresponding increases in prices for products at the

---

[274] *Los Gatos II*, 2015 WL 4755335, at *16.  *See* Mot. at 36.
[275] Mot. at 35-36.
[276] *Am. Ad Mgmt.*, 190 F.3d at 1057 & n.5.
[277] 2014 WL 4955377, at *1, 3.
[278] *Id.* at *12, *citing CRT*, 738 F. Supp. 2d at 1023-24; *Flash*, 643 F. Supp. 2d at 1153-56; *Flat Panel*, 586 F. Supp. 2d at 1123-24.
[279] *Id.*
[280] ¶¶ 236-38.

consumer level."[281]  The court declined to follow *DRAM II* as it was the "sole computer-component case from this District to reject *AGC* standing for purchasers of finished products."[282]

Likewise, in *Flat Panel*, the defendants argued, as here,[283] that the indirect plaintiffs were not participants in the market for TFT-LCD, because "they purchased finished products containing TFT-LCD panels."[284]  The indirect plaintiffs in turn argued, as here, that the "market for LCD panels and the market for the products into which they are placed are inextricably linked and intertwined."[285]  Judge Illston agreed.  She found the complaint "sufficient at this stage" based on allegations that "LCD panels have no independent utility, and have value only as components of other products, such as TVs, computer monitors, and laptops" and that the "demand for LCD panels thus directly derives from the demand for such products."[286]  Again, IPPs make these same allegations here.[287]

Moreover, Judge Illston alternatively held that, "even if plaintiffs [we]re not participants in the relevant market," there were allegations sufficient to favor standing under *AGC* for indirect purchasers in *Illinois Brick* repealer states (as *AGC* addresses standing for direct purchasers under federal law).[288]  Thus, these allegations were sufficient to show antitrust injury for indirect purchasers under state law: (1) "TFT-LCD panels are identifiable, discrete physical objects that do not change form or become an indistinguishable part of the TVs, computer monitors, laptops, or other products in which they are contained"; (2) "LCD panels follow a traceable physical chain

---

[281] *Batteries*, 2014 WL 4955377, at *13; *see also Qualcomm*, 292 F. Supp. 3d at 968 (finding inextricably linked markets where, *inter alia*, "vigorous price competition" resulted in "corresponding price increases at all levels of the distribution chain").

[282] *Batteries*, 2014 WL 4955377, at *13.  Defendants try to salvage *DRAM I* by asserting that "while some district courts have disagreed" with its "application of *AGC*," antitrust injury "does not hinge on *AGC*" and "remains the same."  Mot. at 36.  But *DRAM II* itself describes the issue before it as "whether the *AGC* factors support a finding of antitrust standing."  536 F. Supp. 2d at 1135.

[283] Mot. at 35.

[284] *Flat Panel*, 586 F. Supp. 2d at 1123.

[285] *Id.*

[286] *Id.*; *see also Qualcomm*, 292 F. Supp. 3d at 968 (finding inextricably linked markets where, inter alia, modem chips "must be incorporated into a handset to serve any purpose," such that end purchasers of cellphone handsets "drive demand in the modem chip market").

[287] ¶ 47.

[288] *Flat Panel*, 586 F. Supp. 2d at 1123.

from the defendants to the OEMs to the purchasers of the finished products incorporating LCD panels"; and (3) "changes in the prices paid by direct purchasers of LCD panels affect prices paid by indirect purchasers of products containing LCD panels."[289]  Again, IPPs make similar allegations here.[290]  In short, their antitrust injury is well pled.

    **2.**    **The second *AGC* factor: the directness factor favors standing because IPPs' injury can be traced to defendants.**

To assess the directness of injury, the Ninth Circuit directs courts to "look to the chain of causation between" the "injury and the alleged restraint in the market."[291]  As stated in *Batteries*, "discrete injuries traceable through a distribution chain tilt this factor in favor of antitrust standing."[292]  There, the plaintiffs paid a "supracompetitive overcharge on the price of lithium ion battery products they purchased," which was "passed on to them by direct purchaser manufacturers, distributors and retailers," who faced "vigorous price competition and thin net margins at successive layers of distribution" and thus could not themselves absorb the overcharge.[293]  So too here.[294]

    **3.**    **The third *AGC* factor: the overcharges are not speculative and will be measured at trial.**

This factor considers whether the claimed damages "may have been produced by independent factors."[295]  But "Ninth Circuit precedent requires courts inquiring into this factor to avoid substituting defendants' speculation for the complaint's allegations of causation."[296]  In *Batteries*, as here, the defendants argued that it would "be difficult to disentangle the alleged overcharge from other pricing factors."[297]  Judge Rogers was not impressed.  "Merely to say that

---

[289] *Id.*; *see also GPU II*, 540 F. Supp. 2d at 1097-98.

[290] ¶¶ 46, 236.

[291] *Am. Ad. Mgmt.*, 190 F.3d at 1058.

[292] *Batteries*, 2014 WL 4955377, at *14; *see also Flash*, 643 F. Supp. 2d at 1155; *GPU II*, 540 F. Supp. 2d at 1098.

[293] *Batteries*, 2014 WL 4955377, at *14.

[294] ¶¶ 236-238.  These allegations also provide standing under MN law.  *See* Mot. at 36 n.23.

[295] *Am. Ad Mgmt.*, 190 F.3d at 1059.

[296] *Batteries*, 2014 WL 4955377, at *15, *citing Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002).

[297] *Id.*  *See* Mot. at 37.

complicated questions are presented here," without articulating with specificity "why this Court would lack the capacity" to resolve them, "is to raise an artificial impediment to adjudication on the merits."[298]  In addition, it is important to distinguish between uncertainty in the fact of damage and in the amount of damage," such that allegations of "some damage" is sufficient at the pleading stage.[299]  Likewise, Judge Illston held in *Flat Panel* that it would be "inappropriate to determine complex and intensely factual damages issues without a more fully developed factual record."[300]

### 4. The fourth *AGC* factor: the risk of duplicative recovery does not weigh against standing given repealer statutes permit indirect suits.

Defendants argue there is "a substantial risk of duplicative recovery."[301]  But such a concern "is inapposite in the context of indirect purchaser state law antitrust claims," because *Illinois Brick* repealer states "have necessarily made the policy decision that duplicative recovery may permissibly occur."[302]  So this factor "does not weigh against standing."[303]

### 5. The fifth *AGC* factor: there is no more complexity here than is usual.

As the Ninth Circuit has stated, complex antitrust cases "invariably involve complicated questions of causation and damages."[304]  And "defendants do not explain why damages could not be apportioned in this case, as they have been in other[s]."[305]  So all the *AGC* factors favor a finding of antitrust standing here.

## VI. The IPPs' state-law claims do not fail for additional reasons.

### A. The IPP's California Unfair Competition Law claim is well pled.

First, because IPPs' violations of the Sherman and Cartwright acts are well pled,[306] so is

---

[298] *Batteries*, 2014 WL 4955377, *15.

[299] *Id.*; ¶ 239 (a zero-pass-through scenario "is at odds with the nature of the device industries").

[300] *Flat Panel*, 586 F. Supp. 2d at 1124.

[301] Mot. at 37.

[302] *Flash*, 643 F. Supp. 2d at 1156.

[303] *Id.*

[304] *Am. Ad Mgmt.*, 190 F.3d at 1059.

[305] *Batteries*, 2014 WL 4955377, at *16; *see also Flat Panel*, 586 F. Supp. 2d at 1124.

[306] *See* section II, above.

their violation of the unlawful prong of the UCL.[307]  And even if IPPs failed to plead a violation of these acts, an incipient violation of an antitrust law will also suffice, as defendants acknowledge.[308]

## B.    The IPPs have complied with all notice requirements.

IPPs have now served a copy of their complaint on the Arizona, New York, and Utah attorneys general.  Defendants cite no case in support of their argument that antitrust claims in these states should be dismissed for failure to allege notice.  Indeed, a federal district court in New York, relying on state law, has specifically held that it "does not render the complaint deficient," because the AG notice is "not considered a condition precedent to the plaintiffs' causes of action."[309]  And, even were it necessary, IPPs could amend to allege notice.

## C.    By alleging price effects throughout the United States IPPs have also alleged intrastate effects in each of the ten class states requiring it.

Defendants contend that IPPs have failed to allege intrastate effects.[310]  But the cases they rely on recognize that plaintiffs may state a claim under a given state's law "by alleging a national conspiracy that produced increased prices" in that state.[311]  Here, IPPs allege that defendants "engaged in a conspiracy *affecting all states*" and thereby "substantially affected commerce

---

[307] *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 718 (2001) ("Virtually any law federal, state or local-can serve as a predicate for an action under Business and Professions Code, section 17200.").

[308] Mot. at 38.

[309] *Carl Wagner & Sons v. Appendagez, Inc.*, 485 F. Supp. 762, 773 (S.D.N.Y. 1980), *citing Columbia Gas of N.Y., Inc. v. N.Y. State Electric & Gas Corp.*, 268 N.E.2d 790, 797 (1970).

[310] Mot. at 39.

[311] *See In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 580-82 (M.D. Pa. 2009) (allegations of "national price-fixing conspiracy" sufficient to allege intrastate conduct in South Dakota, Tennessee, West Virginia, and Wisconsin); *see also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 407-08, 416-17 (S.D.N.Y. 2011) (intrastate conduct alleged where the defendants sold internet music in all class states, including District of Columbia, Michigan, New York, South Dakota, Tennessee, West Virginia, and Wisconsin); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 541 (E.D. Pa. 2010) (intrastate conduct alleged for North Carolina where the defendant "sold large amounts of Flonase within the state," among others); *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 45 (D.D.C. 1998) (permitting claims to proceed in D.C. where the plaintiff alleged purchases there); *In re Wyo. Tight Sands Antitrust Cases*, No. 85-2349, 1990 WL 136788, at *4 (D. Kan. Aug. 2, 1990) (denying summary judgment under Kansas law).

And in the cases cited by defendants where the intrastate allegations were deemed insufficient, the court permitted leave to amend to cure the "technical pleading deficiency."  *DRAM I*, 516 F. Supp. 2d at 1099 (South Carolina law); *see also California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1158, 1160 (N.D. Cal. 2007) (granting motion to dismiss with leave to amend where plaintiffs failed to allege purchases by Mississippi and Tennessee residents).

throughout the U.S., causing injury to Plaintiffs and members of the Class."[312]  This is sufficient.

**D.    The Illinois and Arkansas statutes permit private rights of action.**

Defendants' contention that the Illinois and Arkansas claims "do not provide for private rights of action" is mistaken.[313]  First, IPPs may proceed under the Illinois Consumer Fraud and Deceptive Business Practices Act.[314]  Section 2 prohibits "unfair methods of competition,"[315] and section 10a permits private actions for damages, without prohibition on class actions.[316]  IPPs may also proceed under the Illinois Antitrust Act, which states that "[n]o provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages."[317]  While the act does not authorize the maintenance of "a class action in any court of this State," that provision has been held not to apply in federal court.[318]  Likewise, the Arkansas Deceptive Trade Practices Act permits private actions for consumers "to recover his or her actual financial loss,"[319] and the recently enacted class-action ban[320] should be held inapplicable in federal court.[321]

**E.    IPPs are permitted to sue for price-fixing under Florida's DUTPA.**

As Florida state courts have repeatedly held, "[i]ndirect purchasers of a monopolist's or price fixer's products, such as Plaintiffs here, may bring suit under the Florida DTPA."[322]

---

[312] ¶ 20; *see also* ¶¶ 2, 44, 301 (defendants account for 96% of sales for DRAM, which is widely used in consumer digital electronics, and price was artificially inflated throughout the U.S.).

[313] Mot. at 39.

[314] 815 Ill. Comp. Stat. 505/1, *et. seq.*  To the extent any of these provisions were not cited in the complaint and must be, IPPs request leave to amend to do so.

[315] 815 Ill. Comp. Stat. 505/2.

[316] *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1048-49 (N.D. Ill. 2007) (permitting indirect purchaser plaintiffs' damages claim for "concerted, artificial price inflation" under the Illinois consumer fraud act).

[317] 740 Ill. Comp. Stat. 10/7(2).

[318] *Batteries*, 2014 WL 4955377, at *20 n.19, 21 (holding that Illinois class-action ban is procedural and "Rule 23 therefore governs and the challenged claims may be asserted on a representative basis in this federal court"); *Broiler Chicken*, 290 F. Supp. 3d at 818.

[319] Ark. Code § 4-88-113(f)(1)(A).  *See also Los Gatos II*, 2015 WL 4755335, at *23 (permitting price fixing claims to go forward under the Arkansas DTPA given the statute's use of the broad term unconscionable).

[320] Ark. Code § 4-88-113(f)(1)(B) (eff. Aug. 1, 2017).

[321] *See, e.g., Los Gatos II*, 2015 WL 4755335, at *21 (applying the reasoning of *In re Lithium Ion Batteries* to another state's class action ban) (collecting cases).

[322] *In re Fla. Microsoft Antitrust Litig.*, No. 99-27340, 2002 WL 31423620, at *2 (Fla. Cir. Ct. Aug. 26, 2002); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 109 (Fla. Dist. Ct. App. 1996).

Defendants rely on two cases for the mistaken proposition that IPPs cannot sue under Florida's DTPA.[323] But rather than "roundly reject" such a claim, *Flonase* allowed it: "while indirect purchasers are not permitted to sue under Florida's antitrust act, they may state claims under the FDUTPA."[324] And *Flonase* relied on a Florida state court decision, *Mack*, which reversed a trial court's dismissal of the indirect purchaser plaintiffs' FDUPTA claim.[325] *Dairy Farmers*—the second case cited by defendants—overlooks the holding of *Mack* in relying on it for the proposition that indirect purchasers may not sue under Florida's antitrust laws and extrapolating that they may not therefore pursue a FDUPTA claim.[326] Other cases do not similarly err. According to a court in this district, for example: "*Mack* holds that indirect purchasers have standing to pursue claims under [] FDUTPA," and "*Mack* is controlling."[327] So too here. And IPPs have specified which products they purchased,[328] contrary to defendants' assertion.[329]

## CONCLUSION

For the reasons set forth above, IPPs respectfully request that defendants' motion be denied it its entirety. Should the Court determine that IPPs' allegations require further factual development, however, IPPs request leave to amend.[330]

---

[323] Mot. at 40, *citing In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 9 CV 3690, 2015 WL 3988488, at *19 (N.D. Ill. June 29, 2015), and *Flonase*, 692 F. Supp. 2d at 544.

[324] *Flonase*, 692 F. Supp. 2d at 538, 544.

[325] *Id., citing Mack*, 673 So. 2d 103, 107-08.

[326] *Dairy Farmers*, 2015 WL 3988488, at *19.

[327] *California v. Infineon Techs. AG*, No. C 06-4333 PJH, 2008 WL 4225459, at *1 (N.D. Cal. Sept. 11, 2008); *see also Los Gatos I*, 2014 WL 4774611, at *10 ("The Florida DTPA clearly expresses the legislative policy to authorize consumers (that is, indirect purchasers) to bring actions under the Florida DTPA for price-fixing conduct."), *quoting Mack*, 673 So. 2d at 109; *Broiler Chicken*, 290 F. Supp. 3d at 819 (the Florida appellate court held that the FDUTPA "reveals no intention by the legislature to limit suits for price-fixing to direct purchasers only"), *quoting Mack*, 673 So. 2d at 105.

[328] ¶¶ 22-26.

[329] Mot. at 40.

[330] *Oliver*, 2016 WL 5950345, at *3 (J. White) ("If the allegations are insufficient to state a claim, the Court should grant leave to amend, unless amendment would be futile.").

DATED: November 1, 2018

HAGENS BERMAN SOBOL SHAPIRO LLP

By:     /s/ Jeff D. Friedman
        Jeff D. Friedman
Benjamin J. Siegel (256260)
Rio S. Pierce (298297)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000
jefff@hbsslaw.com
bens@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Anthony Shapiro (*pro hac vice*)
Ronnie Spiegel (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Ave, Suite 2000
Seattle, WA 98101
(206) 623-7292
steve@hbsslaw.com
tony@hbsslaw.com
ronnie@hbsslaw.com

Elaine T. Byszewski (222304)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA  91101
(213) 330-7150
elaine@hbsslaw.com

*Attorneys for Plaintiffs*