1    IAN SIMMONS (*pro hac vice*)
     isimmons@omm.com
2    O'MELVENY & MYERS LLP
     1625 Eye Street, NW
3    Washington, DC 20006
     Telephone:     202 383 5300
4    Facsimile:     202 383 5414

5    *Attorney for Defendants Samsung Electronics Co.,*
     *Ltd. and Samsung Semiconductor, Inc.*
6

7    HARRISON (BUZZ) FRAHN (S.B. #206822)
     hfrahn@stblaw.com
8    SIMPSON THACHER & BARTLETT LLP
     2475 Hanover Street
9    Palo Alto, California 94304
     Telephone:     650 251 5065
10   Facsimile:     650 251 5002

11   *Attorney for Defendants Micron Technology, Inc.*
     *and Micron Semiconductor Products, Inc.*
12
     [Additional Counsel Listed on Signature Page]
13

     NATHAN P. EIMER (*pro hac vice*)
     neimer@eimerstahl.com
     EIMER STAHL LLP
     224 South Michigan Avenue, Suite 1100
     Chicago, Illinois 60604
     Telephone:     312 660 7601
     Facsimile:     312 692 1718

     *Attorney for Defendants SK hynix Inc.,*
     *and SK hynix America, Inc.*

14                       **UNITED STATES DISTRICT COURT**

15                       **NORTHERN DISTRICT OF CALIFORNIA**

16                              **OAKLAND DIVISION**

17

18   MICHELE JONES, DAVID LAIETTA,            Case No. 4:18-cv-02518-JSW
     KIMBERLY YORK, BENJAMIN MURRAY,
19   and WANDA DUREYA, individually and on    **DEFENDANTS' REPLY IN SUPPORT**
     behalf of all others similarly situated,  **OF JOINT MOTION TO DISMISS**
20                                             **INDIRECT PURCHASER**
                    Plaintiffs,                **PLAINTIFFS' COMPLAINT AND**
21                                             **MEMORANDUM OF SUPPORTING**
            v.                                 **POINTS AND AUTHORITIES**
22
     MICRON TECHNOLOGY, INC., MICRON           **ORAL ARGUMENT REQUESTED**
23   SEMICONDUCTOR PRODUCTS, INC.,
     SAMSUNG ELECTRONICS CO., LTD.,            Hearing Date: 9:00 a.m.
24   SAMSUNG SEMICONDUCTOR, INC., SK           Time: To be determined
     HYNIX, INC., and SK HYNIX AMERICA,        Place: Courtroom 5 - 2nd Floor
25   INC.,                                     Judge: Hon. Jeffrey S. White

26                  Defendants.

27

28

## SUMMARY OF ARGUMENT

The indirect purchaser plaintiffs (the "IPPs") claim to have divined an industrywide conspiracy to stabilize or reduce dynamic random-access memory ("DRAM") production capacity from diverse public statements in response to investors' and analysts' bona fide questions. The IPPs implore the Court to accept charts depicting average spot market prices as evidence of a "historically unprecedented change in [Defendants'] behavior," despite their failure to (i) provide any comparison to past periods of increasing spot market prices, (ii) explain why average spot market prices offer any insight into Defendants' individual pricing or capacity decisions, or (iii) demonstrate any connection—temporal or otherwise—between spot market pricing trends and Defendants' alleged public statements. And the IPPs fail to allege a single fact, as they must, to suggest that Defendants' capacity management was more consistent with conspiracy than with obvious and benign alternative explanations, including a spike in demand or lawful conscious parallelism. *GreenCycle Paint, Inc. v. PaintCare, Inc.*, 250 F. Supp. 3d 438, 446–47 (N.D. Cal. 2017) (quoting *In re Century Aluminum Co. Secs. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013)) (antitrust plaintiffs must plead facts "tending to exclude the possibility that [an] alternative explanation is true" to render "allegations plausible" under *Twombly*).

The IPPs would have this Court ignore bedrock Supreme Court and Ninth Circuit pleading standards, find a conspiracy based solely on neutral public interactions with investors and analysts, and overlook the Complaint's remarkable factual concessions confirming there was no parallel conduct among Defendants. That way lies error. Analyzed individually or collectively, the IPPs' evidentiary facts are no match for the sweeping, public, and deeply implausible antitrust conspiracy they allege. None of the IPPs' allegations satisfies the plausibility standard that was set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); explicated in *In re Musical Instruments and Equipment Antitrust Litigation*, 798 F.3d 1186 (9th Cir. 2015); and recently reapplied in *Prosterman v. American Airlines, Inc.*, __ F. App'x __, 2018 WL 4018147 (9th Cir. Aug. 23, 2018). Moreover, the IPPs have not established Article III or antitrust standing, and many of their state law claims fail for numerous independent reasons. These fatal pleading failures permeate the Complaint, root and branch. It should be dismissed.

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ................................................................................................. i

I.    INTRODUCTION ........................................................................................................ 1

II.   ARGUMENT ............................................................................................................... 2

      A.    Defendants' statements to investors and analysts during earnings calls and
            public events are neither direct nor circumstantial evidence of a conspiracy......... 2

            1.    The IPPs concede that their excerpts of Defendants' public
                  statements are not direct evidence of conspiracy. ...................................... 2

            2.    Defendants' public statements do not give rise to a plausible
                  suggestion of an agreement. ........................................................................ 3

                  a.    The IPPs fail to meet their own legal test for a "public
                        statements" plus factor. .................................................... 4

                  b.    *Petroleum Products*, a direct evidence case, does not
                        support the IPPs' tortured interpretation of Defendants'
                        public statements. .............................................................. 7

                  c.    The IPPs misread *Musical Instruments* as accommodating
                        "near simultaneous" statements that unfolded over the
                        course of eight months. .................................................... 9

      B.    The IPPs fail to plead any parallel conduct in the first instance, much less
            abrupt, concurrent, and complex deviations from past behavior that would
            suggest the existence of a conspiracy...................................................................... 10

            1.    The key "capacity discipline" cases underscore the inadequacies of
                  the IPPs' parallel conduct and "unprecedented change" plus-factor
                  pleadings. .................................................................................................... 11

            2.    The IPPs' average spot market price chart undermines their
                  signaling theory, and reveals nothing about each Defendant's
                  management of its own production capacity............................................... 12

      C.    The IPPs' factual allegations are more consistent with a spike in demand or
            lawful conscious parallelism than with a conspiracy in plain view. ...................... 15

      D.    The IPPs have not demonstrated Article III or antitrust standing........................... 19

            1.    The IPPs fail to allege a traceable injury as required under Article
                  III.................................................................................................................. 19

            2.    The IPPs lack standing to bring claims under the laws in states
                  where they neither reside nor were injured. ............................................... 21

            3.    The IPPs lack antitrust standing under *AGC*............................................. 22

      E.    The IPPs have no claims under fourteen state and District of Columbia
            laws. ......................................................................................................................... 24

III.  CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Associated General Contractors of California v. California State Council of*
*Carpenters (AGC)*,
459 U.S. 519 (1983) ........................................................................................ 22

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................. *passim*

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011) ........................................................................... 12

*California v. Infineon Techs. AG*,
531 F. Supp. 2d 1124 (N.D. Cal. 2007) ......................................................... 24

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984) ....................................................................... 15

*Contant v. Bank of Am. Corp.*,
No. 17-cv-3139, 2018 WL 1353290 (S.D.N.Y. Mar. 15, 2018) .................... 23

*D.R. Ward Construction Co. v. Rohm & Haas Co.*,
470 F. Supp. 2d 485 (E.D. Pa. 2006) ............................................................. 20

*DePriest v. AstraZeneca Pharms., L.P.*,
351 S.W.3d 168 (Ark. 2009) ........................................................................... 25

*Digital Sun v. Toro Co.*,
No. 10-cv-4567-LHK, 2011 WL 1044502 (N.D. Cal. Mar. 22, 2011) ........... 24

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ......................................................................... 15

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) ............................................................................. 5

*GreenCycle Paint, Inc. v. PaintCare, Inc.*,
250 F. Supp. 3d 438 (N.D. Cal. 2017) .................................................. i, 4, 15

*Grunewald v. United States*,
353 U.S. 391 (1957) .......................................................................................... 1

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*,
231 F. Supp. 2d 1253 (N.D. Ga. 2002) ............................................................ 5

*In re Automotive Parts Antitrust Litigation*,
29 F. Supp. 3d 982 (E.D. Mich. 2014) ........................................................... 20

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999) ................................................................... 14

*In re Broiler Chicken Antitrust Litig.*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ..................................... 6, 12, 14, 18

*In re Century Aluminum Co. Secs. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) ........................................................ *passim*

*In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales Practices, and Products*
    *Liability Litigation*,
    295 F. Supp. 3d 927 (N.D. Cal. 2018) ............................................ 21, 22

*In re Citric Acid Litigation*,
    191 F.3d 1090 (9th Cir. 1999) .............................................................. 5, 7

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*,
    906 F.2d 432 (9th Cir. 1990) .......................................................... *passim*

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    MDL No. 2031, 2015 WL 3988488 (N.D. Ill. June 29, 2015) ............... 25

*In re Ditropan XL Antitrust Litig.*,
    529 F. Supp. 2d 1098 (N.D. Cal 2007) .................................................. 21

*In re Domestic Airline Travel Antitrust Litigation*,
    221 F. Supp. 3d 46 (D.D.C. 2016) .......................................... 3, 6, 11, 12

*In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*,
    No. 12-cv-169, 2013 WL 5503308 (D.N.J. Oct. 2, 2013) ...................... 23

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig. (DRAM I)*,
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) .................................... 20, 23, 24

*In re Fla. Cement & Concrete Antitrust Litig.*,
    746 F. Supp. 2d 1291 (S.D. Fla. 2010) .................................................. 25

*In re Flonase Antitrust Litig.*,
    692 F. Supp. 2d 524 (E.D. Pa. 2010) .................................................... 25

*In re Gilead Scis. Secs. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ............................................................... 21

*In re Lidoderm Antitrust Litig.*,
    103 F. Supp. 3d 1155 (N.D. Cal. 2015) ................................................. 24

*In re Lithium Ion Batteries Antitrust Litig.*,
    No. 13-MD-2420, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014)............... 22

*In re Magnesium Oxide Antitrust Litigation*,
    No. 10-cv-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) ..................................... 20

*In re McCormick & Co., Pepper Prods. Mktg. & Sales Practices Litig.*,
    275 F. Supp. 3d 218 (D.D.C. 2017) ..................................................................... 17

*In re Musical Instruments and Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015)...........................................................................*passim*

*In re Nat'l Ass'n of Music Merchs., Musical Instruments & Equip. Antitrust Litig.*,
    No. 09-cv-2002, 2012 WL 3637291 (S.D. Cal. Aug. 20, 2012)................................ 3

*In re Opana ER Antitrust Litig.*,
    162 F. Supp. 3d 704 (N.D. Ill. 2016) .................................................................. 25

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
    764 F. Supp. 2d 991 (N.D. Ill. 2011) .................................................................... 7

*In re Refrigerant Compressors Antitrust Litig.*,
    No. 2:09-MD-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9 2013)................................ 23, 24

*In re Text Messaging Antitrust Litig.*,
    782 F.3d 867 (7th Cir. 2015)............................................................................... 4

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ................................................... 5, 6, 22, 23

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009).............................................................................. 9

*In re Wellbutrin XL Antitrust Litig.*,
    756 F. Supp. 2d 670 (E.D. Pa. 2010) ................................................................. 25

*IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*,
    304 F. Supp. 3d 746 (N.D. Ill. 2018) .................................................................. 24

*Kendall v. Visa U.S.A. Inc.*,
    04-cv-04276-JSW, 2005 WL 2216941 (N.D. Cal. July 25, 2005)........................... 10

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018)............................................................................. 15

*Kleen Prods. LLC v. Int'l Paper*,
    276 F. Supp. 3d 811 (N.D. Ill. 2017) ........................................................... 4, 7, 11

*Los Gatos Mercantile, Inc. v. E.I. du Pont de Nemours & Co. (Los Gatos I)*,
    No. 13-cv-01180-BLF, 2014 WL 4774611 (N.D. Cal. Sept. 22, 2014) ............................ 21, 24

*Los Gatos Mercantile, Inc. v. E.I. du Pont de Nemours & Co. (Los Gatos II)*,
    No. 13-cv-01180-BLF, 2015 WL 4755335 (N.D. Cal. Aug. 11, 2015)............................. 19, 20

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

*Marsh v. Anesthesia Servs. Med. Grp.*,
   200 Cal. App. 4th 480 (2011) .................................................................................................. 3

*Melendres v. Arpaio*,
   784 F.3d 1254 (9th Cir. 2015) ................................................................................................ 21

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ................................................................................................................ 4

*Name.Space, Inc. v. ICANN*,
   795 F.3d 1124 (9th Cir. 2015) ...................................................................................... 5, 15, 17

*Oliver v. SD-3C LLC*,
   No. 11-cv-01260-JSW, 2015 WL 10890656 (N.D. Cal. Sept. 30, 2015) ................................ 3

*Prosterman v. Am. Airlines, Inc.*,
   No. 16-cv-02017-MMC, 2016 WL 7157667 (N.D. Cal. Dec. 8, 2016) .................................. 16

*Prosterman v. Am. Airlines, Inc.*
   __ F. App'x__, 2018 WL 4018147 (9th Cir. Aug. 23, 2018) ......................................... *passim*

*Standard Iron Works v. ArcelorMittal*,
   639 F. Supp. 2d 877 (N.D. Ill. 2009) ................................................................................. 8, 12

*Supreme Auto Transp. LLC v. Arcelor Mittal*,
   238 F. Supp. 3d 1032 (N.D. Ill. 2017) .................................................................................. 23

*Tietsworth v. Sears*,
   720 F. Supp. 2d 1123 (N.D. Cal. 2010) ................................................................................ 24

*United Food & Comm'l Workers Local 1776 v. Teikoku Pharma USA, Inc.*,
   74 F. Supp. 3d 1052 (N.D. Cal. 2014) .................................................................................. 25

*Wash. Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
   328 F. Supp. 3d 824 (N.D. Ill. 2018) .............................................................................. 12, 13

*Wilcox v. First Interstate Bank of Oregon, N.A.*,
   815 F.2d 522 (9th Cir. 1987) ................................................................................................. 17

*Wrestlereunion, LLC v. Live Nation Television Holdings, Inc.*,
   No. 8:07-cv-2093-JDW-MSS, 2008 WL 3048859 (M.D. Fla. Aug. 4, 2008) ....................... 25

**Statutes**

Ariz. Rev. Stat. 44-1415.A ......................................................................................................... 24

New York Gen. Bus. Law 340.5 .................................................................................................. 24

**Other Authorities**

David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in* REFERENCE
   MANUAL ON SCIENTIFIC EVIDENCE 211 (Fed. Judicial Ctr., 3d ed. 2011) .............................. 14

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
   Principles and Their Application*  (3rd & 4th eds., 2018 Cum. Supp. 2010–2017) ................ 18

1 **I.   INTRODUCTION**

2        Six decades ago, Justice John Marshall Harlan II wrote for a unanimous Supreme Court:

3 "[E]very conspiracy is by its very nature secret; a case can hardly be supposed where men concert

4 together for crime and advertise their purpose to the world." *Grunewald v. United States*, 353

5 U.S. 391, 402 (1957).  Yet in their Opposition to Defendants' Motion to Dismiss, the IPPs

6 confirm that this is exactly what they allege happened here.  They claim Defendants reached an

7 industrywide conspiracy to stabilize or reduce DRAM production capacity through a handful of

8 differing *public* statements made on earnings calls and at investor relations events—often in

9 specific response to analysts' questions—over the course of eight months.  As their Opposition

10 makes clear, the IPPs do not allege that these ordinary-course public remarks reflected some

11 "preceding agreement" or "advance understanding among the parties."  *Bell Atl. Corp. v.*

12 *Twombly*, 550 U.S. 544, 557 & n.4 (2007).  Rather, the IPPs contend that Defendants' public

13 statements *are* the conspiracy.  Opp. at 8–22.  Subjecting Defendants to litigation on the basis of

14 these implausible and factually unsupported allegations would countenance an unprecedented—

15 and unjustified—extension of the antitrust laws.  The Court should not indulge the IPPs'

16 untenable theory.  It should dismiss the Complaint with prejudice.

17        The IPPs insist that they have sufficiently alleged a conspiracy in plain view, and urge the

18 Court to greenlight a massive fact investigation.  They have not.  Among a set of stark pleading

19 failures, a few stand out:

20   •   The IPPs do not allege that any Defendant directly communicated with or otherwise

21       privately exchanged information with its competitors;

22   •   They do not allege facts showing that Defendants engaged in parallel conduct with

23       respect to price, output, capacity, or any other term of competition;

24   •   They do not plead facts indicating that each Defendant made public statements

25       committing to a common scheme to engage in "capacity discipline" or restrain output;

26   •   They do not allege facts showing that Defendants actually adjusted their output or

27       capacity management strategies during the Class Period, much less made

28       contemporaneous, complex, and historically unprecedented changes;

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

- They fail to place their pleadings—even if true—in a factual context that plausibly suggests an illegal agreement; and

- They do not establish their constitutional or statutory standing to bring suit.

The IPPs would have this Court ignore these pervasive pleading failures, disregard *Twombly* and its Ninth Circuit progeny, and subject Defendants to expensive and protracted litigation on the basis of implausible and threadbare conspiracy allegations. The Court should decline this invitation. The IPPs' failure to allege sufficient evidentiary facts is fatal to their claims. Defendants respectfully ask the Court to dismiss the Complaint with prejudice.

## II.     ARGUMENT

### A.     Defendants' statements to investors and analysts during earnings calls and public events are neither direct nor circumstantial evidence of a conspiracy.

From the outset of their Opposition, the IPPs spin an implausible yarn, attempting to string together something resembling a conspiracy. Alternatively suggesting that Defendants' public statements amounted to a "facially coordinated supply restraint," Opp. at 22, or a system of "anti-competitive invitations to competitors" followed by "responsive assurances," *id.* at 8, the IPPs assert that Defendants publicly hatched an industrywide conspiracy to suppress production capacity, in plain view of government enforcers and antitrust plaintiffs' attorneys, through statements that were patently responsive to core investor concerns. No matter how the IPPs characterize Defendants' remarks, their theory is unsupportable. *No court* has held that public statements on individual firm strategy and matters of general investor concern can support an inference of conspiracy under *Twombly*.

### 1.     The IPPs concede that their excerpts of Defendants' public statements are not direct evidence of conspiracy.

Though the IPPs repeatedly insist that they have pleaded "facially coordinated conduct,"[1] they acknowledge—in contravention of this self-serving characterization—that their allegations

---

[1] *See* Opp. at xii ("facially coordinated output restrictions"), 3 ("facially coordinated conduct"), 22 ("facially coordinated supply restraint"), 29 ("facially coordinated capacity discipline").

do *not* amount to direct evidence of a conspiracy.[2]  That is, the IPPs concede that none of their allegations are "explicit and require no inferences to establish the existence of a conspiracy." *Oliver v. SD-3C LLC*, No. 11-cv-01260-JSW, 2015 WL 10890656, at *3 (N.D. Cal. Sept. 30, 2015).  Indeed, the IPPs fail to (i) explain how Defendants' public statements evince their "formation and operation of [a] conspiracy and the illegal acts done in furtherance of [a] conspiracy," *see Marsh v. Anesthesia Servs. Med. Grp.*, 200 Cal. App. 4th 480, 493 (2011); (ii) establish any connection between the "facially coordinated supply restraint" they posit in their Opposition and the supposed wafer capacity agreement they allege in their Complaint; or (iii) cite any legal authority recognizing a category of "facial" allegations distinct from direct or circumstantial evidence.  Because the IPPs admit that this is a circumstantial evidence case, the Defendants' public statements must be analyzed for their tendency—if any—to place the IPPs' allegations "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Twombly*, 550 U.S. at 557.

> ## 2.   Defendants' public statements do not give rise to a plausible suggestion of an agreement.

The IPPs stake their case on the proposition that Defendants' public statements are sufficiently analogous to those at issue in a line of "capacity discipline" cases—most notably *In re Domestic Airline Travel Antitrust Litigation*, 221 F. Supp. 3d 46 (D.D.C. 2016)—to suggest an inference of conspiracy without further inquiry, mooting any meaningful plus-factor analysis of the content of the statements or the context in which they were delivered.  Opp. at 8–16.[3]  The IPPs also contend that, in any event, the Ninth Circuit's decision in *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 906 F.2d 432 (9th Cir. 1990), forecloses Defendants' argument that "the 'public nature' of their statements makes 'it unreasonable to think

---

[2] *See* Opp. at 1 ("IPPs' detailed factual allegations . . . satisf[y] *Twombly*'s 'plausible standard' *based on circumstantial evidence*.") (emphasis added).

[3] *Cf. In re Nat'l Ass'n of Music Merchs., Musical Instruments & Equip. Antitrust Litig.*, No. 09-cv-2002, 2012 WL 3637291, at *4–*5 (S.D. Cal. Aug. 20, 2012), *aff'd sub nom. In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015) (analyzing allegedly "illicit or surreptitious" content of public statements "about new practices or developments" delivered "to a large, general audience"; concluding that statements were not "a 'plus factor' at all").

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

of [them] as an offer to conspire.'"  Opp. at 11 (quoting in relevant part from *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 841 (N.D. Ill. 2017)).  Finally, the IPPs attempt to distinguish *Musical Instruments* by asserting that Defendants' varied and intermittent public statements, made over the course of eight months, were sufficiently "contemporaneous" to create an inference of conspiracy.  Opp. at 16.  None of the IPPs' three volleys hits its mark.  Defendants' public statements—analyzed individually or considered alongside the IPPs' other plus-factor allegations, *see infra* Section B—are remarkably unremarkable, and fail to place the IPPs' claims "in a context that raises a suggestion of a preceding agreement."  *Twombly*, 550 U.S. at 557.

a.  <u>The IPPs fail to meet their own legal test for a "public statements" plus factor.</u>

The IPPs admit that their pleading burden is two-fold: they must plead facts showing (i) that Defendants' public statements are "more consistent with an illegal agreement than with rational and competitive business strategies, independently adopted by firms acting within an interdependent market," *Musical Instruments*, 798 F.3d at 1189, and (ii) that each Defendant made "a conscious commitment to a common scheme designed to achieve an unlawful objective," Opp. at 1 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  The IPPs do not satisfy either prong.

First, the IPPs insist that "an anticompetitive tacit agreement can be plausibly inferred from Micron's invitation and Samsung's and Hynix's responsive assurances and conduct."  Opp. at 11.[4]  But the allegations the IPPs tender in support of that mantra do not even satisfy the out-of-circuit pleading standards cited in their Opposition, much less controlling Supreme Court and Ninth Circuit precedent requiring the IPPs to plead "facts tending to exclude the possibility that [an] alternative explanation is true . . . in order to render [their] allegations plausible within the meaning of . . . *Twombly*."  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (citation omitted); *see GreenCycle Paint, Inc. v. PaintCare, Inc.*, 250 F. Supp. 3d 438, 446–47 (N.D. Cal. 2017) (antitrust conspiracy plaintiffs "cannot offer allegations that are 'merely

---

[4] *Cf. In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 872 (7th Cir. 2015) (Posner, J.) ("[T]he plaintiffs' counsel demonstrate a failure to understand the fundamental distinction between express and tacit collusion.  Express collusion violates antitrust law; tacit collusion does not.").

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

consistent with' their favored explanation but are also consistent with the defendant's alternative

explanation") (quoting *Century Aluminum*, 729 F.3d at 1108).[5]  The IPPs cannot recast Micron's

legitimate, generalized comments—often prompted by investor or analyst questions—as the type

of "detailed communications with no public purpose" that courts have interpreted as invitations to

collude.[6]  Moreover, the IPPs do not allege a *single* fact indicating that Samsung or SK hynix

acknowledged, responded to, or otherwise provided *any* "responsive assurance" to Micron.  Not

one.  *See In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal.

2008) ("[T]he complaint must allege that each individual defendant joined the conspiracy and

played some role in it because, at the heart of an antitrust conspiracy is *an agreement and a*

*conscious decision by each defendant to join it*.") (quotations omitted).[7]

As the IPPs are forced to concede, every single one of Samsung's and SK hynix's

statements centers on *independent* firm strategy—the companies announced individualized

strategies that were in no way contingent upon the actions of a competitor.  None of these

statements includes even an oblique mention of a *competitor's* strategy, and in fact, the phrase

"capacity discipline"—the supposedly magic words repeated throughout the IPPs'

---

[5] *Compare* Opp. at 2 ("[T]he 'choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.'") (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016)), *with Century Aluminum*, 729 F.3d at 1108 ("When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation.  Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, . . . in order to render plaintiffs' allegations plausible within the meaning of . . . *Twombly*.") (internal citations and quotation marks omitted).

[6] *See Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1276 (N.D. Ga. 2002).  The IPPs quibble with Defendants' citation to summary judgment decisions, but ignore the fact that the Ninth Circuit itself has repeatedly cited to apposite summary judgment precedent at the motion to dismiss stage.  *See, e.g.*, *Musical Instruments*, 798 F.3d at 1194 (applying *In re Citric Acid Litigation*, 191 F.3d 1090 (9th Cir. 1999), at motion to dismiss stage); *Name.Space, Inc. v. ICANN*, 795 F.3d 1124, 1130 (9th Cir. 2015) (affirming dismissal and applying three summary judgment opinions, including *Monsanto*, to reject plaintiffs' conspiracy allegations at motion to dismiss stage).  Given that the very same plus-factor analysis that applies at summary judgment "obtains in the context of a motion to dismiss," *Musical Instruments*, 798 F.3d at 1194 n.7, the Court should reject the IPPs' recommendation to ignore on-point precedent.

[7] Hereinafter, emphasis added unless otherwise indicated.

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

1  Opposition[8]—never appears in these Defendants' statements.  The IPPs consequently plead facts

2  that tend to *validate*, rather than exclude, the "alternative explanation" that each Defendant made

3  independent decisions about its own optimal level of production capacity during the Class Period.

4  *See Century Aluminum*, 729 F.3d at 1108.

5  　　　　Next, the IPPs assert that Defendants' public remarks were "remarkably similar" to the

6  statements at issue in *Domestic Airline*, in which executives from *each* defendant airline opined

7  "about their own commitment to [airline] capacity discipline as well as the importance of

8  maintaining the capacity discipline within the industry."  Opp. at 17 (quoting *Domestic Airline*,

9  221 F. Supp. 3d at 62).  Yet the IPPs do not cite a single Samsung or SK hynix remark that

10  "involves more than a mere announcement of [their] own planned course of conduct."  *Domestic*

11  *Airline*, 221 F. Supp. 3d at 62–63; *cf. TFT-LCD*, 586 F. Supp. 2d at 1116 (citing multiple

12  competitors' statements at widely attended industry event encouraging industrywide reduction of

13  output).  By contrast, the *Domestic Airline* court accorded special significance to *each* airline's

14  discussion of "capacity discipline *within the industry as a whole*."  221 F. Supp. 3d at 62.  The

15  allegation that each airline ventured beyond a "mere announcement of [its] own planned course of

16  conduct" and endorsed an industrywide strategy supported a plausible "inference that Defendants'

17  conduct was the result of an agreement."  *Id.* at 62–63; *see In re Broiler Chicken Antitrust Litig.*,

18  290 F. Supp. 3d 772, 798 (N.D. Ill. 2017) (*each* of the "large producers made public statements

19  calling for industry-wide production cuts" in immediate aftermath of industry convention).

20  　　　　Unlike the plaintiffs in *Domestic Airline*, the IPPs fail to allege concurrent public

21  statements from each Defendant that not only evince an individual commitment to a course of

22  conduct, but also emphasize *industrywide adherence* to the same goal.  *Domestic Airline*, 221 F.

23  Supp. 3d at 62; *see* Opp. at 1 (conceding duty to plead facts showing each Defendant's

24  "conscious commitment to a common scheme") (citation and quotation omitted).  Left in the

25  awkward position of arguing that Samsung's and SK hynix's plain-vanilla predictions of their

26  own "market growth levels" and promises to "maximize profitability" amounted to an acceptance

27

28  _____

[8] *E.g.*, Opp. at xii, 3, 9, 11, 13, 14, 16, 17, 18, 29.

*sub silentio* of Micron's purported generalized "invitation," the IPPs fail to satisfy even the most lenient pleading standards.  *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001 (N.D. Ill. 2011) (denying motion to dismiss but observing that "many of the public statements, which plaintiffs contend are part of a 'signaling' strategy meant to keep the conspiracy going, are very general statements to investors or regulators about the trajectory of the plasma therapies industry"); *id.* ("It is difficult to imagine how these generic statements render the conspiracy allegation more plausible.").  The varied public statements at issue here—whether examined in isolation or alongside the IPPs' other plus-factor allegations, *see infra* Section B—do not render the IPPs' theory of a "conspiracy in plain view" possible, much less plausible.

> b.  <u>*Petroleum Products*, a direct evidence case, does not support the IPPs' tortured interpretation of Defendants' public statements.</u>

The IPPs next contend that the Ninth Circuit's *Petroleum Products* decision forecloses any argument that "'the public nature' of [Defendants'] statements makes 'it unreasonable to think of the statements as an offer to conspire.'"  Opp. at 11 (quoting in relevant part from *Kleen Prods.*, 276 F. Supp. 3d at 841).  They direct the Court to a portion of that opinion—a pre-*Twombly* case—in which the Ninth Circuit analyzed competitors' public statements about future wholesale gasoline prices as circumstantial evidence of conspiracy, and arrived at the unremarkable conclusion that "'the form of [an information] exchange' should 'not be determinative of its legality.'"  Opp. at 12 (quoting *Petroleum Prods.*, 906 F.2d at 447).  But the IPPs neglect to mention that in *Citric Acid*, the Ninth Circuit clarified that its holding in *Petroleum Products* turned on the existence of "*direct* evidence of conspiracy, . . . thus making dicta any discussion therein of the standard applicable when plaintiffs rely exclusively on circumstantial evidence," as the IPPs do here.  191 F.3d at 1096 (emphasis in original and citations omitted).  And contrary to the IPPs' suggestion (Opp. at 11), Defendants do *not* argue that the public character of the statements is by itself determinative of their legality.  Rather, the point is that "[t]hese statements do not show that each Defendant committed to individual or industrywide 'capacity discipline,'" Mot. at 26, and that the IPPs' allegations are all the more *implausible* given the public setting in which Defendants are alleged to have conspired.

The Ninth Circuit's reasoning in *Petroleum Products* is not to the contrary.  In fact, the panel emphasized that not all public statements are created equal, and that inferring a conspiracy from the "dissemination or advertising of *retail* prices" would jeopardize the ability of "consumers to get the information they need to make efficient market decisions."  *Petroleum Prods.*, 906 F.2d at 448 n.14; *see also Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 894 (N.D. Ill. 2009) ("Public statements about output reduction, in the form of press releases or SEC filings, are fundamentally distinct from statements made at trade meetings directly to competing executives.").  It was only because the Ninth Circuit could not perceive *any* public purpose in the publication of wholesale price announcements that it viewed them as suggestive of an agreement.  *See Petroleum Prods.*, 906 F.2d at 448 (reasoning that "it is plausible to contend that independent considerations of self-interest would have led a company to . . . publish a price increase," but concluding that wholesale prices were "not of immediate significance to anyone other than" the purported conspirators and "served little purpose other than to facilitate interdependent or collusive price coordination.").[9]

Here, however, the IPPs never dispute that "the large majority of [Defendants' public statements] take the form of responses to bona fide questions about business strategy."  Mot. at 20.  It is obvious that Defendants' general statements to investors and analysts about the trajectory of the DRAM market targeted a core area of investor concern, and conveyed precisely the type of legitimate information that investors and analysts expected and repeatedly asked to hear.  *See, e.g.*, Mot. at 23 (citing analyst questioning Micron about "what will it take for" Micron and other DRAM suppliers to cut production); *id.* (citing analyst asking Micron if "there [is] risk in your mind in terms of additional supply coming online, any thoughts on that . . . ?").

In a parting shot, the IPPs perplexingly suggest that this Court should not even consider whether inferring a conspiracy from Defendants' public statements would implicate the Ninth Circuit's concern about jeopardizing access to "the information [market participants] need to

---

[9] *See id.* at 448 n.14 ("Our conclusion *would necessarily be different* were the appellants' inference of a price-fixing conspiracy based on . . . . the public announcement of *retail* prices by dealers").

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

make efficient market decisions." *Petroleum Prods.*, 906 F.2d at 448 n.14.  According to the

IPPs, the fact that *they* did not allege "such a threat" is conclusive.  Opp. at 13.  But Rule 12(b)(6)

does not require this Court to ignore the likely consequences of its own rulings.[10]  The question is

whether permitting an inference of conspiracy from Defendants' public statements about the

trajectory of the DRAM market would "significantly deter important legitimate conduct" and

impede "the efficient or rational operation of the market."  *Petroleum Prods.*, 906 F.2d at 448.

The answer—obvious from the vigorous give-and-take between Defendants' executives, analysts,

and investors on earnings calls and at investor events—is a resounding "yes."

c.  The IPPs misread *Musical Instruments* as accommodating "near simultaneous" statements that unfolded over the course of eight months.

The IPPs concede that Defendants' alleged public "signals" unfolded over the course of

eight months.  Opp. at 10–11.  And yet the IPPs insist that these temporally (and substantively)

diffuse remarks evince a "near simultaneous" change in conduct that plausibly supports an

inference of conspiracy.  Compl. ¶ 6; Opp. at 16.  The IPPs contend that the Ninth Circuit's

conclusion in *Musical Instruments*—that similar changes in each competitor's business strategy

made over the course of years did not make out a "plus factor," 798 F.3d at 1196—somehow

enhances the plausibility of their own claims about Defendants' various public statements over an

eight-month period.  Opp. at 16.  This argument bears no connection to temporal reality.

That the Defendants did not endorse a shared, unlawful (or lawful) objective ends the

argument at the outset.  But setting that point aside, it is obvious that public statements made

*eight months apart* are neither "simultaneous" nor "near simultaneous," and therefore do not

suggest a "complex and historically unprecedented chang[e] . . . made *at the very same time* by

multiple competitors."  *Musical Instruments*, 798 F.3d at 1195 (quoting *Twombly*, 550 U.S. at 557

n.4).  As the Ninth Circuit recently held in *Prosterman v. American Airlines, Inc.*, __ F. App'x __,

2018 WL 4018147 (9th Cir. Aug. 23, 2018), even allegations of concurrent and veritable "near

---

[10] *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009) (stating, at the pleading stage, that "[w]e also cannot ignore the consequence of concluding that an overt act [in furtherance of an alleged conspiracy] occurred under these facts"; affirming dismissal).

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

1   simultaneous" policy changes—there, the defendant airlines' public announcement of *identical*

2   fare code changes over the course of *three days*, which allegedly drove prices higher for certain

3   one-way fares—do not establish the "simultaneous adoption of similar policies" plus factor in the

4   absence of additional allegations suggesting a traditional antitrust conspiracy.  *See id.* at *2

5   (rejecting the plaintiffs' argument that the "the simultaneity of the decisions is evidence of an

6   agreement").  If the airlines' implementation of an *identical* change over a *three-day period* did

7   not give rise to this plus factor, then the IPPs' compilation of different, generalized, and often-

8   solicited public statements over the course of eight months flunks the test as well.

9   **B.**     **The IPPs fail to plead any parallel conduct in the first instance, much less abrupt,**
            **concurrent, and complex deviations from past behavior that would suggest the**
10           **existence of a conspiracy.**

11           Notwithstanding the IPPs' concession that they must plausibly allege parallel conduct and

12   "plus factors" to survive a motion to dismiss, they never plead facts (i) showing that Defendants'

13   statements or conduct were parallel or (ii) suggesting that Defendants undertook an

14   unprecedented, complex, and "abrupt departure from past competition for market share," Opp. at

15   3, as opposed to the obvious alternative explanation that Defendants adapted over time to a years-

16   long change in industry fundamentals,[11] "independent[ly] respon[ded] to common stimuli, or

17   [engaged in] mere interdependence *unaided by an advance understanding among the parties*."

18   *See Twombly*, 550 U.S. at 557 n.4; *see also Century Aluminum*, 729 F.3d at 1108 (requiring

19   plaintiffs to plead facts that tend to exclude plausible alternative explanations to survive a motion

20   to dismiss).  Instead, the IPPs propose that Defendants' "public statements regarding capacity

21   discipline [are] notable, because they '[are] a deviation from past business practices' and thus

22   ---

[11] The IPPs themselves quote from a January 2017 statement in which a Micron executive noted
23   that "the world is very different today *than it was a few years ago.*"  Opp. at 21; *see id.* at 16
     (conceding that the common "adoption of '[similar] policies over a period of several years'"
24   would not be sufficient to plausibly allege the simultaneous and similar action plus factor)
     (quoting *Musical Instruments*, 798 F.3d at 1196).  Notwithstanding the IPPs' mischaracterization,
25   Opp. at 18, Micron's public statements speak to its own perception of the market, and cannot be
     imputed to Samsung and SK hynix.  *See Kendall v. Visa U.S.A. Inc.*, 04-cv-04276-JSW, 2005 WL
26   2216941, at *2 (N.D. Cal. July 25, 2005) (holding that an antitrust plaintiff must plead facts
     suggesting each defendant's "knowing[], intentional[], and active[] participat[ion]" in an
27   individual capacity" in any alleged conspiracy).  Nor can those statements be construed to impute
     knowledge of Samsung's or SK hynix's views to Micron.

28

indicative of agreement."  Opp. at 18–19 (quoting *Domestic Airline*, 221 F. Supp. 3d at 63).  This latest effort to create a patina of conspiracy from Defendants' statements falls flat as well.

### 1.    The key "capacity discipline" cases underscore the inadequacies of the IPPs' parallel conduct and "unprecedented change" plus-factor pleadings.

The IPPs principally rely on three out-of-circuit decisions involving "capacity discipline": *Standard Iron Works, Broiler Chicken,* and *Domestic Airline*.  Opp. at 9–13.  But in contrast to the IPPs here, the plaintiffs in each of those cases pleaded facts demonstrating (i) parallel conduct and (ii) precisely the type of common, contemporaneous, and complex changes in behavior that "raise[] a suggestion of a preceding agreement."  *Twombly*, 550 U.S. at 557.  The IPPs skip the critical first step: unlike the plaintiffs in *Domestic Airline*—who presented capacity utilization data and pricing charts plausibly suggesting a parallel and abrupt change in policy at the start of 2009[12]—the IPPs cannot point to any *actual* change in conduct, concerted action, or market outcome evincing parallelism.  They fail to supply *any* market facts from which the Court could infer actual parallel conduct, such as market data reflecting parallel trends in DRAM supply, wafer production or wafer capacity movements, or bit output.

The IPPs at best plead that at some point over the 2015–2017 time period, certain Defendants publicly acknowledged that the pace of demand growth eclipsed their own rate of output growth, *see* Opp. at 20–21*,* a market reality that was obvious to nearly every observer rather than a telltale indicator of conspiracy.  *See Kleen Prods.*, 276 F. Supp. 3d at 841 ("It should not be a mark of conspiracy to say what is true, already known by the audience, and articulated by countless third-party analysts, academicians, and jurists alike.").  And contrary to the IPPs' assertion, *Domestic Airline* does not stand for the proposition that generalized public statements on quarterly earnings calls standing alone are the type of parallel conduct that is cognizable under *Twombly's* circumstantial evidence framework.  *See* Opp. at 14.  Rather, the *Domestic Airline*

---

[12] 221 F. Supp. 3d at 63 ("load factor" capacity utilization data suggested that, starting in 2009, defendants' utilization rates *increased* in the face of stagnating demand and diminishing costs— trends that would typically cause defendants' utilization rates to dip); *see id.* (citing pricing charts depicting a January 2009 price "deviation between fares on routes [for which] a *Defendant* was the largest carrier and routes when another airline was the largest carrier").

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

1    court pointed to each airline's "statements close in time regarding the exercise of capacity

2    discipline *and, in concert[] with these statements a new trend of limited capacity growth [that]*

3    *occurred within the industry*."  221 F. Supp. 3d at 69.

4         The IPPs' attempt to repackage Defendants' differing public statements to show an abrupt,

5    complex, and near simultaneous shift in industry strategy is also underwhelming.  Unlike the

6    IPPs, who allege that Defendants' varied public statements over eight months manifest an abrupt

7    and near simultaneous shift in industry strategy, the plaintiffs in *Standard Iron Works* pleaded

8    facts showing that *each* defendant's executives delivered remarks *directly* to competitors'

9    executives at industry meetings, that those remarks "confirmed that the industry needed to take

10   collective action to control the supply of steel," and that soon thereafter each steel manufacturer

11   undertook "*unprecedented industry-wide production cuts*"—idling blast furnaces and locking out

12   workers—"*exactly as encouraged and represented by [the] executives*."  639 F. Supp. 2d at 886–

13   93; 895–96.  Similarly, the plaintiffs in *Broiler Chicken* pleaded facts describing repeated

14   sequences in which the defendants' executives attended industry conferences, "immediately"

15   thereafter "made public statements calling for industry-wide production cuts," and then in fact

16   implemented the cuts in ways that included an "unprecedented slaughter or export of breeder

17   [chicken] flocks."  290 F. Supp. 3d at 798.

18        As these comparisons underscore, the IPPs do not plead facts situating their allegations in

19   the "capacity discipline" canon.  They fail to allege that Defendants engaged in parallel behavior,

20   or that Defendants made the type of unprecedented, concurrent, and complex changes that would

21   suggest the existence of a conspiracy.  *See Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 228–29

22   (3d Cir. 2011) (affirming dismissal of complaint failing to allege parallel conduct); *Wash. Cty.*

23   *Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 835–37, 845 (N.D. Ill. 2018)

24   (dismissing Sherman Act claim and citing plaintiffs' failure to plead cognizable parallel conduct).

25        **2.    The IPPs' average spot market price chart undermines their signaling theory,
          and reveals nothing about each Defendant's management of its own
26        production capacity.**

27        In another unavailing attempt to make out the "simultaneous adoption of similar policies"

28   plus factor, the IPPs point to a chart tracking average DRAM spot prices from 2014 to 2018.

                                          12                    DEFS.' REPLY I-S-O JOINT MOT. TO
                                                               DISMISS THE IPPS' COMPLAINT
                                                               4:18-CV-02518-JSW

1    Opp. at 21–22.  The IPPs urge that this chart shows "years of steep price declines" in DRAM

2    prices, followed by a reversal in May 2016 despite "stable costs" and a "tripling [of prices] by the

3    end of the conspiracy."  *Id.* at 21–22.  In the IPPs' telling, prices then "abruptly reverted back to

4    decline when the Chinese antitrust authorities began investigating at the end of 2017."  *Id.*  Once

5    again, the IPPs overpromise and underdeliver.

6         First, the IPPs fail to allege any connection—temporal or otherwise—between changes in

7    spot prices and Defendants' public statements purportedly forming a conspiracy.  The IPPs' chart

8    shows that spot prices actually *declined* after Samsung purportedly "responded" to Micron's

9    supposed "invitation" on January 29, 2016, *see id.* at 22 (change in average spot DRAM prices in

10   February 2016), and indicates that spot prices started ascending in April or May of 2016, *see id.*,

11   *months before* the IPPs allege that SK hynix first signaled its acceptance of the supposed

12   "invitation" at the end of July 2016, *see Mot.* at 18 (citing Compl. ¶ 97).  *See Wash. Cty.*, 328 F.

13   Supp. 3d at 839 (calling "plaintiffs' signaling theory into doubt" because of a temporal

14   misalignment between the purportedly conspiratorial conduct and alleged signals setting forth the

15   terms of coordination).  Even more notable is the fact that contract DRAM prices—which

16   according to the IPPs applied to "approximately 90%" of DRAM sales over the Class Period, *see*

17   Compl. ¶ 55—spiked and remained at a four-year high at the end of the Class Period in January

18   and February of 2018, *id.* ¶ 58, an allegation that flies in the face of the IPPs' assertion that

19   DRAM prices "abruptly reverted back to decline when the Chinese antitrust authorities began

20   investigating at the end of 2017."  Opp. at 22.

21        Similarly unacknowledged and unaddressed is an even more fundamental problem with

22   the IPPs' spot market pricing charts:

23        Each graph (i) tracks industrywide *average* DRAM prices on the spot market
24        without delineating the prices that each Defendant charged various customers
          over time, (ii) does not indicate whether the depicted prices are drawn from
25        worldwide or U.S. data on DRAM purchases, and (iii) does not and cannot
          demonstrate whether and to what extent Defendants' prices moved together
26        before, during, or after the Class Period.

27   Mot. at 12–13.  The IPPs chose to include pricing charts in their Complaint that, by definition,

28   average away any Defendant-by-Defendant variation in pricing.  Because the charts depict only

                                               DEFS.' REPLY I-S-O JOINT MOT. TO
                                               DISMISS THE IPPS' COMPLAINT
                                               4:18-CV-02518-JSW

1    *average* spot prices, they are incapable of showing whether any Defendant "change[d] [its]

2    behavior after the onset of the conspiracy," the extent to which any changes were abrupt and

3    common to all Defendants, or whether Defendants' prices even moved together at all.  Opp. at 21;

4    *see* David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in* REFERENCE MANUAL

5    ON SCIENTIFIC EVIDENCE 211, 239 (Fed. Judicial Ctr., 3d ed. 2011) ("The location of the center of

6    a batch of numbers *reveals nothing about the variation exhibited by these numbers*.").  By way of

7    analogy, the IPPs would argue that it is plausible to conclude that a handful of people in a room

8    made billions of dollars over the law few years, just because Jeff Bezos happens to be one of

9    them.  *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 129 (3d Cir. 1999) (criticizing expert

10   for reliance on average pricing data in lieu of "actual prices of the other companies" to derive a

11   conclusion about parallel pricing).

12        The IPPs attempt to buttress the plausibility of their price chart narrative by suggesting

13   that "notable" price increases followed shortly after trade association meetings.  They select four

14   trade association meetings over the course of four years (without ever explaining why they chose

15   those meetings in particular), Compl. ¶ 203; allege that two average spot price increases during

16   the Class Period "can be correlated" with the dates of those meetings, *see id.*; argue that those

17   price increases were "different from the historical trend", Opp. at 7; and speculate that Samsung

18   and Micron executives "may have" attended such meetings, Compl. ¶ 93.  In *Broiler Chicken*, by

19   contrast, the plaintiffs alleged repeated sequences in which the defendants' executives "made

20   public statements calling for industry-wide production cuts" to their competitors at industry

21   conferences, and then "immediately" implemented "unprecedented" cutbacks.  290 F. Supp. 3d at

22   798 (describing "unprecedented" slaughter or export of broiler chicken capacity); *see also*

23   *Prosterman*, 2018 WL 4018147, at *2–*3 (rejecting unsubstantiated allegation that defendants

24   used trade association meetings as a "coordination facilitating device" and noting that "[w]e have

25   long been skeptical that participation in a trade organization is suggestive of collusion, . . . and

26   that skepticism has only hardened since *Twombly* and its progeny.") (citations omitted).  The facts

27   pleaded here come nowhere close to those alleged in *Broiler Chicken*.

28

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

While no one argues that *Twombly* imposes "a probability requirement at the pleading stage," 550 U.S. at 556, it does require the IPPs to plead facts from which a court could plausibly infer that Defendants abruptly and simultaneously deviated from past practice to make out that plus factor. *See Musical Instruments*, 798 F.3d at 1195 (quoting *Twombly*, 550 U.S. at 557 n.4, and describing the "simultaneous adoption of similar policies" plus factor). The IPPs' "simultaneous adoption of similar policies" plus-factor pleadings neither vindicate their characterizations of Defendants' behavior, nor "tend[] to exclude the possibility that the alternative explanation"—here, that Defendants made independent and rational decisions about their individual production capacity over the course of months and years—is true. *See Century Aluminum*, 729 F.3d at 1108; *GreenCycle Paint*, 250 F. Supp. 3d at 446–47.

**C.    The IPPs' factual allegations are more consistent with a spike in demand or lawful conscious parallelism than with a conspiracy in plain view.**

In the Ninth Circuit, "courts *must* consider obvious alternative explanations for a defendant's behavior when analyzing plausibility."[13]  *Name.Space*, 795 F.3d at 1130 (citing *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)); *Century Aluminum*, 729 F.3d at 1108 (affirming dismissal and requiring plaintiffs to plead "facts tending to exclude the possibility that the alternative explanation is true . . . in order to render [their] allegations plausible within the meaning of . . . *Twombly*") (citations omitted).  Here, the IPPs

---

[13] The IPPs accuse Defendants of using "extraneous documents . . . to dispute the allegations" in the Complaint, and of impermissibly "offer[ing] a competing explanation for the widespread surge in class period DRAM prices."  Opp. at 27–28.  Neither objection has merit.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018), the very case on which the IPPs rely, demonstrates that the earnings call transcripts and February 6, 2018 *Reuters* article are appropriately before the Court.  *Khoja* makes clear that incorporation by reference is inappropriate only when the materials do not "form the basis of" plaintiffs' claims.  *Id.* at 1002–07.  Here, the transcripts "form the basis" of an essential element of the IPPs' claim: that Defendants' public statements manifest an anticompetitive agreement.  *See id.* at 1004 (holding that reports that "form[ed] the basis of Khoja's claim" were properly incorporated).  The same is true of the February 6, 2018 *Reuters* article.  Given the IPPs' heavy reliance on a February 1, 2018 *Reuters* article as support for their "government investigation" plus-factor allegations, the IPPs cannot prevent the Court from considering a follow-up article correcting the very inaccuracies on which they depend.  Rule 12(b)(6) does not require the Court to "don blinders."  *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984).

1    neither show that conspiracy is a plausible explanation for rising DRAM prices, nor do their

2    allegations tend to exclude "obvious alternative explanations" for that phenomenon, viz., a

3    groundswell of demand that coincided with the Class Period, or lawful conscious parallelism

4    "through observation of [] competitors' decisions, even absent an agreement.'" *Musical*

5    *Instruments*, 798 F.3d at 1195; *Prosterman v. Am. Airlines, Inc.*, No. 16-cv-02017-MMC, 2016

6    WL 7157667, at *4 (N.D. Cal. Dec. 8, 2016), *aff'd*, 2018 WL 4018147 (9th Cir. Aug. 23, 2018)

7    ("Reacting to a competitor's change by choosing to adopt the same or substantially similar

8    change . . . does not support a § 1 claim.").  An alleged production capacity restraint is also

9    fundamentally at odds with the IPPs' admission that DRAM production was expanding during the

10   relevant period–even if not as rapidly as exploding demand.  Compl. ¶¶ 105, 113, 120 (Micron

11   forecasted its bit *growth* between 15% and 20% in 2017; Samsung expected bit *growth* for 2017

12   in the high-teens; SK hynix stated its bit *growth* for 2017 would be at the low 20% range).

13       A spike in demand is both a plausible and an "obvious alternative explanation" for rising

14   prices, a point that the IPPs never seriously address.  The Complaint is littered with references to

15   a surge in demand.  *See id*. ¶ 98 ("increasing demand"); *id.* ¶ 131 ("strong demand"); *id.* ¶ 135

16   ("soaring demand").  And the IPPs concede that development costs were rising at a staggering

17   "13% annually."  *Id.* ¶ 163.  Regardless of whether each Defendant *could* have brought on more

18   production capacity in time to meet "soaring" demand—and the IPPs fail to plead that there was

19   any idle DRAM production capacity across the industry[14]—basic economic principles dictate that

20   prices would continue to rise so long as demand and costs exceeded output.  For all the reasons

21   previously discussed, the IPPs' theory that Defendants orchestrated a conspiracy in plain view is

22   implausible, but it is *especially* implausible given their admission that DRAM suppliers faced a

23   groundswell of demand during a period in which costs were rapidly escalating.

24

25   _____

26   [14] The IPPs' cite one statement in March 2017, in which Micron noted that it had available "white
     space" at two facilities.  Opp. at 15–16.  The IPPs fail to plead any facts suggesting that Micron

27   could have built out that white space to add another DRAM production line in time to meet
     demand, nor do they allege that the gains to be captured from additional capacity at that point in

28   time would outweigh the substantial upfront and continuing fixed costs attendant to any addition.

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

After sidestepping their obligation to square their conspiracy narrative with admitted increases in demand and costs, the IPPs compound their pleading failures by neglecting "to account for conscious parallelism and the pressures of an interdependent market." *Musical Instruments*, 798 F.3d at 1195. Put simply, the IPPs never grapple with the reality that it is perfectly rational for competitors to independently decide against expanding production capacity in an oligopoly. *See id.* at 1194–97 ("[F]irms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement."); *Prosterman*, 2018 WL 4018147, at *1–*3 (concluding that airlines' implementation of an identical fare code change over a three-day period "suggest[ed] only conscious parallelism in an interdependent oligopoly"). The IPPs' contention that a self-interested and rational DRAM manufacturer necessarily would have expanded production capacity irrespective of its competitors' likely reaction, flooded the market with supply, and driven down prices during the Class Period ignores *Twombly*'s central teaching. *See Twombly*, 550 U.S. at 566 ("[r]esisting competition is routine market conduct" in oligopolies); *Name.Space*, 795 F.3d at 1131 ("[W]e cannot infer an illegal agreement with outside interests simply because [the defendant's] rational business decisions favor the status quo rather than [the plaintiff's] untested alternative business model."). The IPPs cannot save an implausible claim by "ignor[ing] obvious realities about competition." *In re McCormick & Co., Pepper Prods. Mktg. & Sales Practices Litig.*, 275 F. Supp. 3d 218, 225 (D.D.C. 2017).

The IPPs briefly attempt to distinguish *Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 526 (9th Cir. 1987), and *Musical Instruments*—in which the Ninth Circuit recognized and then reiterated that "following the leader" does not give rise to an inference of conspiracy in an oligopolistic market—by suggesting that Micron engaged in "perilous leading" in late 2015. *See* Opp. at 23–24. The IPPs suggest that Micron, by speculating that it "could 'envision a future in which no additional DRAM wafer capacity is required,'" Compl. ¶ 69, embarked on a course of conduct that was "so perilous in the absence of advance agreement that no reasonable firm would [have] ma[d]e the challenged move without such an agreement." *Musical Instruments*, 798 F.3d at 1195. Again citing dicta from *Petroleum Products*, the IPPs suggest that Micron's comment was so risky, and so exposed it to a loss of market share and

1  sales, that it would never have offered the remark unless it had "some advance agreement from

2  [its] competitors" to adopt similar changes.  Opp. at 23 (citations omitted).

3      The IPPs fail to plead any of the necessary facts to substantiate that naked assertion.

4  Critically, their argument starts from a flawed premise: silicon wafers are not a measure of output

5  or capacity, they are a raw material input used to create DRAM chips.  Customers do not demand

6  wafers, they demand *memory*, and memory is measured in bits.  *See* Compl. ¶¶ 44, 64, 163, 180.

7  The IPPs' pleadings demonstrate that Defendants projected their DRAM bit output—the actual

8  measure of whether production was expanding—to *grow throughout the Class Period*.  *E.g.*, *id.*

9  ¶¶ 69–70, 97, 103, 112, 113 (describing each Defendant's planned *growth* in bit production).

10     The substance of the IPPs' "perilous leading" argument is equally misguided.  Perilous

11 leading is most likely when a "leader" commits to a change in strategy that (i) would be very

12 costly to reverse and (ii) rivals are very unlikely to follow.  *See* Phillip E. Areeda & Herbert

13 Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1425d1

14 (3rd & 4th eds., 2018 Cum. Supp. 2010–2017) ("[T]he peril will be small when rivals are very

15 likely to follow *or* reversal is relatively costless; the peril will be great when following is doubtful

16 *and* reversal is costly.") (emphasis in original).  Micron's investor relations comments did not

17 commit it to *any* course of conduct, much less a change that was so freighted with costs and risk

18 and so unlikely to be followed that it only made economic sense if Micron, Samsung, and SK

19 hynix had agreed in advance to a shared course of conduct.  To the contrary, Micron's comment

20 "had a future effective date that was never reached," *exactly* the type of conduct that antitrust

21 scholars identify as "paradigmatic no-risk lead[ing]" because it is rational "without any advance

22 agreement."  *See id.* ¶¶ 1425d1; 1425d3.

23     Unlike the *Broiler Chicken* plaintiffs, who demonstrated that the defendant producers

24 undertook an "unprecedented slaughter or export of breeder [chicken] flocks" to reduce

25 production, 290 F. Supp. 3d at 798, or the *Petroleum Products* plaintiffs, who showed that the

26 defendant refiners implemented reductions to oil refining capacity that would be impossible to

27 quickly reverse if unfollowed, 906 F.2d at 462–63, the IPPs fail to plead facts indicating that *any*

28 Defendant implemented costly or irreversible changes before, during, or after the Class Period.

To the contrary, the purported "invitation" here—that the DRAM manufacturers preserve the status quo with respect to wafer production—is quite possibly the least costly or risky suggestion imaginable, especially since wafer capacity does not directly correlate to DRAM bit capacity or output.  Regardless of whether the number of raw wafers grew over the Class Period, the IPPs acknowledge that the production process became more efficient over time, that each Defendant generated more bits from each wafer, and that this process resulted in continually growing bit supply, facts that are hardly suggestive of a potentially risky or costly change in strategy.  Compl. ¶¶ 69–70, 97, 163, 180.  Moreover, the IPPs scoff at the idea that Defendants could not timely ramp production to meet demand during the Class Period, *see* Opp. at 24–25, undercutting any argument that an invitation to stabilize wafer production would be difficult to reverse quickly if unfollowed.  The IPPs' perilous leading arguments simply do not align with the facts they allege.

Like the rest of their allegations and arguments, the IPPs' insistence that conspiracy is a plausible explanation for rising DRAM prices quickly falls apart.  None of their allegations tends to exclude the possibility that an obvious alternative explanation—here, a spike in demand or lawful oligopolistic "following-the-leader"—accounted for rising prices.

**D.**    **The IPPs have not demonstrated Article III or antitrust standing.**

**1.**    **The IPPs fail to allege a traceable injury as required under Article III.**

The IPPs seek damages based on purchases of an untold number of consumer products that incorporate DRAM—cloud servers, handheld phones, video game consoles, and thousands of other devices (each a separate "DRAM Device").  Compl. ¶ 244.  To be clear, the IPPs do not allege a conspiracy to inflate the price of DRAM Devices; they allege a conspiracy affecting the DRAM *components* in those devices.  *Id.* ¶¶ 1–3.  And yet their Complaint says nothing about how DRAM component prices affected the prices consumers paid for iPhones, notebook computers, "smart" kitchen appliances, or any other "DRAM Device."  *Id.* ¶¶ 234-43.  In other words, the IPPs have not shown an injury that is "traceable to Defendants' conduct," as required for Article III standing.  *Los Gatos Mercantile, Inc. v. E.I. du Pont de Nemours & Co. (Los Gatos II)*, No. 13-cv-01180-BLF, 2015 WL 4755335, at *13 (N.D. Cal. Aug. 11, 2015).  This failure is all the more galling given the "breadth of the defined market and the variation in the amount" and

1    type of DRAM found in the "expansive category" of DRAM Devices.  *See id.* at *14.

2           The IPPs do not address *Los Gatos II*.  They instead rely on a small handful of out-of-

3    district decisions, but even those cases do not help them.  For instance, the IPPs rely heavily on *In*

4    *re Automotive Parts Antitrust Litigation*, 29 F. Supp. 3d 982 (E.D. Mich. 2014), but gloss over

5    the fact that the complaints there (i) relied on criminal guilty pleas and Department of Justice

6    statements evidencing harm done to businesses and end-consumers, (ii) included detailed

7    allegations on "how Fuel Senders follow a traceable path through the distribution chain," and (iii)

8    demonstrated that "overcharges for Fuel Senders were passed through that distribution chain from

9    OEMs to Auto Dealers and End–Payors."  *Id.* at 997–98.  In contrast, here there are *no* guilty

10   pleas or DOJ statements evidencing consumer harm, and the Complaint is bereft of factual

11   allegations tracing alleged overcharges on DRAM components through *any* of the varied and

12   complicated distribution chains from which end-purchasers may obtain "DRAM Devices."[15]

13          The IPPs try but fail to distinguish *In re Magnesium Oxide Antitrust Litigation*, No. 10-cv-

14   5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011), a case in which the court dismissed indirect

15   purchaser claims for failure to allege an injury that was traceable to defendants.  *Id.* at *7.  The

16   IPPs assert that, unlike the *Magnesium Oxide* plaintiffs, they have alleged the specific DRAM

17   products they purchased.  Opp. at 32.  Patently untrue.  Though the IPPs identify some of the

18   specific end products purchased by the named Plaintiffs, they do not otherwise allege the "DRAM

19   Devices" that absent class members purchased.  The undefined term "DRAM Devices" could

20   very well encompass *thousands* of products, from wristwatches to automobiles.  Mot. at 32.

21   Defendants have no idea what those products are, nor are they on notice of how their alleged

22   conduct supposedly injured any class members who purchased those products.

23          In the end, the IPPs resort to asking the Court to use "common sense" to find Article III

24   standing, by simply assuming that DRAM *must* be a significant and traceable component part in

25   consumer electronics.  Opp. at 32.[16]  Even if this key factual proposition *were* common sense—

26   [15] Plaintiffs also cite *D.R. Ward Construction Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 493

27   (E.D. Pa. 2006), but Article III standing was not in dispute and not actually litigated.

28   [16] *Cf. In re Dynamic Random Access Memory (DRAM) Antitrust Litig.* (*DRAM I*), 516 F. Supp. 2d
     1072, 1091–92 (N.D. Cal. 2007) ("[T]he price for the actual product paid by plaintiffs is

                                                            DEFS.' REPLY I-S-O JOINT MOT. TO
                                                            DISMISS THE IPPS' COMPLAINT
                                                            4:18-CV-02518-JSW

1   and there is nothing to suggest that it is—mere "common sense" is not sufficient to demonstrate

2   Article III standing.  *See In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)

3   ("[M]erely conclusory unwarranted deductions of facts, or unreasonable inferences" are

4   insufficient to state a claim for relief) (quotation omitted).  The IPPs must plead facts.  They have

5   not done so here.

6       **2.      The IPPs lack standing to bring claims under the laws in states where they
            neither reside nor were injured.**

7

8       The IPPs argue that if they have standing to bring state-law claims in *some* states, they can

9   bring claims under *any* state law.  Opp. at 33.  They urge that this outcome follows from *In re*

10  *Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales Practices, and Products Liability Litigation*,

11  295 F. Supp. 3d 927 (N.D. Cal. 2018), but that is not the law.  The *Chrysler* court relied upon

12  *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015), to permit unrepresented state-law claims to

13  proceed; *Melendres* does not, however, stand for the general proposition that plaintiffs may

14  circumvent the standing requirement.  Rather, the Ninth Circuit decision addresses differing

15  injuries across class members, *not* whether named plaintiffs have standing to sue for absent class

16  members.  *See* 784 F.3d at 1261.  And *Chrysler* itself does not create a broad exception to the

17  approach followed by most courts in this district—*i.e.*, that named plaintiffs lack standing to bring

18  claims under the laws of states where no named plaintiff resides or where no named plaintiff

19  allegedly suffered injury.  *See, e.g.*, *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098,

20  1107 (N.D. Cal 2007) (dismissing claims under the state laws in which none of the named

21  plaintiffs resided); *Los Gatos Mercantile, Inc. v. E.I. du Pont de Nemours & Co.* (*Los Gatos I*),

22  No. 13-cv-01180-BLF, 2014 WL 4774611, at *7–*9 (N.D. Cal. Sept. 22, 2014) (string citing to

23  many opinions in this District finding the same).

24      If anything, *Chrysler* is limited to the unique facts presented there, where there was near-

25  complete overlap between states with named plaintiffs (43) and states where alleged injury

26  ────────────────────

27  reflective of much more than just the component price for DRAM.  Yet plaintiffs' complaint sets
    forth no allegations that demonstrate that, within the final purchase price of a given product
    purchased by plaintiffs for 'end use,' the ultimate cost of the DRAM component is somehow
28  directly traceable and/or distinguishable.")

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

occurred (50). 295 F. Supp. 3d at 955–56. No similar overlap exists here—the named IPPs reside in only five of the 25 states whose laws they invoke, and do not allege an injury outside the five states in which they reside. This Court should follow the weight of authority in this District, and dismiss the IPPs' claims under the laws of any state in which no named plaintiff resides or was injured.

### 3. The IPPs lack antitrust standing under *AGC.*

The Supreme Court's decision in *Associated General Contractors of California v. California State Council of Carpenters* (*AGC*), 459 U.S. 519 (1983), requires plaintiffs to plead an injury-in-fact causally connected to, and proximately caused by, the Defendants' alleged anticompetitive conduct. The IPPs assert that they must necessarily meet the *AGC* requirements because plaintiffs in two previous "computer-component" cases satisfied *AGC*. Opp. at 38–40 (citing *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014), and *TFT-LCD*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008)). Try as they might to ride those plaintiffs' coattails, the IPPs cannot escape their own pleading deficiencies—which *Batteries* and *TFT-LCD* only further serve to highlight:

- Unlike the IPPs, the *Batteries* plaintiffs specifically alleged that (i) a battery cell is a "substantial part" of the end product; (ii) battery cells "comprise[] a substantial component cost" of end-use products and "the *retail price* of the product is determined in *substantial* part by the cost of the battery it contains"; (iii) resulting price increases to consumers "*can be . . . isolated through regression analyses* such that the impact of the overcharge *can be measured and quantified*"; (iv) "battery cells remain physically unaltered through the chain of distribution"; and (v) "the physically distinct price-fixed battery cell can be traced" through the supply chain. 2014 WL 4955377, at *13–*15 (quotations omitted).

- Unlike the IPPs, the *TFT-LCD* plaintiffs specifically alleged that (i) LCD panels do not "become an indistinguishable part" of end products; (ii) "LCD panels *can be physically traced* through the supply chain; (iii) LCD panels "make up *60–70% of the cost* of an LCD television or computer monitor;" and (iv) "the distribution chain for LCD panels is

22

short" and "a large percentage of LCD products were sold by the first purchaser of LCD panels." 586 F. Supp. 2d at 1123–24 (internal citations and quotation marks omitted). The IPPs' allegations pale in comparison to those at issue in *Batteries* and *TFT-LCD*. Unlike the plaintiffs in those cases, the IPPs do not allege that (i) DRAM is a substantial part of the end "DRAM Devices"; (ii) DRAM "comprises a substantial cost" of end-use products; (iii) DRAM is significant cost (such as 60–70%) of a "DRAM Device"; (iv) DRAM remains physically unaltered through the chain of distribution; (v) DRAM remains distinguishable from the end product; (vi) consumers equate a DRAM component with the end product as consumers equate an LCD panel with an LCD TV; or (vii) the distribution chain for DRAM is short or that DRAM can be physically traced through the supply chain.[17]

Unable to satisfy *AGC*, the IPPs attempt to avoid it altogether by arguing that its requirements do not apply to many of their state-law claims.[18] The IPPs are wrong. This Court should defer to *state* courts' interpretations of their own *state* laws, just as numerous other courts in this District and elsewhere have done. *See DRAM I*, 516 F. Supp. 2d at 1094–95; *see also, e.g.*, *Contant v. Bank of Am. Corp.*, No. 17-cv-3139, 2018 WL 1353290, at *3–*4 (S.D.N.Y. Mar. 15, 2018) (California, Illinois, New York); *Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1039 (N.D. Ill. 2017) (Arizona, California, DC, Kansas, Maine, Michigan, Minnesota, Mississippi, New York, North Carolina, North Dakota, South Dakota, Vermont, Wisconsin); *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, No. 12-cv-169, 2013 WL 5503308, at *15 (D.N.J. Oct. 2, 2013) (Michigan); *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-MD-02042, 2013 WL 1431756, at *9–*10 (E.D. Mich. Apr. 9 2013) (Arizona, California, DC, Kansas, Maine, Michigan, New York, Wisconsin).[19] The

---

[17] The IPPs provide no indication of how to avoid duplicative recovery considering direct purchasers have also filed suit, or how they propose to apportion damages among purchasers of thousands of undefined DRAM Devices.

[18] The IPPs correctly concede that *AGC* applies to the laws of Iowa, Nebraska, and New Mexico. Opp. at 34.

[19] Similarly in line with *DRAM I* and decisions from other circuits, this Court should apply *AGC* to states with antitrust harmonization provisions absent state court indications that the

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

1    IPPs purport to bring claims under 20 state laws that are subject to *AGC*.[20]  Because the IPPs'

2    pleadings do not satisfy *AGC*, their claims under those state laws should be dismissed.

3        **E.**    **The IPPs have no claims under fourteen state and District of Columbia laws.**

4        The IPPs agree that their **California** UCL claim is predicated upon violations of federal

5    antitrust law.  Because those claims are deficient, the state-law claim also fails.  *See Digital Sun v.*

6    *Toro Co.*, No. 10-cv-4567-LHK, 2011 WL 1044502, at *5 (N.D. Cal. Mar. 22, 2011).

7        **Arizona** Rev. Stat. 44-1415.A states that "[p]roof of service [of the complaint] on the

8    attorney general shall be filed with the court."  Similarly, **New York** Gen. Bus. Law 340.5

9    requires the IPPs to provide notice to the New York Attorney General "[a]t or before the

10   commencement" of its action.  The IPPs did not meet either state's notice requirement.

11       The **District of Columbia**, **Kansas**, **Michigan**, **Mississippi**, **New York**, **North Carolina**,

12   **South Dakota**, **Tennessee**, **West Virginia**, and **Wisconsin** antitrust statutes require plaintiffs to

13   plead an intrastate effect.  The IPPs argue that alleging "a conspiracy *affecting all states*" suffices.

14   Opp. at 42.  This is wrong.  *E.g., DRAM I*, 516 F. Supp. 2d at 1099; *California v. Infineon Techs.*

15   *AG*, 531 F. Supp. 2d 1124, 1158–59 (N.D. Cal. 2007); *cf. Los Gatos I*, 2014 WL 4774611, at *9

16   n.10 (allowing claim where complaint specifically alleged the conspiracy "injured residents in

17   those states, that defendants promoted and sold [goods] in each of those states, and that

18   defendants harmed competition in those states").

19       The IPPs' Opposition claims violations of two statutes not mentioned in the Complaint,

20   the **Illinois** Consumer Fraud and Deceptive Business Act and the **Arkansas** Deceptive Trade

21   Practices Act.  These new claims must be dismissed.[21]  *Tietsworth v. Sears*, 720 F. Supp. 2d 1123,

22   1145 (N.D. Cal. 2010) ("[C]omplaint may not be amended by briefs in opposition to a motion to

---

23   harmonization provision does not apply.  *See DRAM I*, 516 F. Supp. 2d at 1095; *see also, e.g.*, *In*

24   *re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *10.

25   [20] *See* App. B to Defs.' Mot. to Dismiss.

26   [21] Regardless, the IPPs may not proceed under either of these statutes.  *In re Lidoderm Antitrust*
     *Litig.*, 103 F. Supp. 3d 1155, 1166–67 (N.D. Cal. 2015) (price-fixing not actionable under

27   Arkansas DTPA); *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 304 F. Supp. 3d 746, 765 (N.D.
     Ill. 2018) (rejecting Illinois CFDBA claim where, as here, "the circumstances relating to the

28   transaction [did not] occur primarily and substantially within [Illinois].") (quotation omitted).

                                                        DEFS.' REPLY I-S-O JOINT MOT. TO
                                                        DISMISS THE IPPS' COMPLAINT
                                                        4:18-CV-02518-JSW

dismiss.") (quotation omitted).  The IPPs' claims under their original theories must also be

dismissed.  The IPPs concede that the Arkansas Unfair Practices Act does not provide for a

private right of action.  *E.g.*, *DePriest v. AstraZeneca Pharms., L.P.*, 351 S.W.3d 168, 171 (Ark.

2009).  And courts uniformly hold that "Illinois' restrictions on indirect purchaser actions [under

the Illinois Antitrust Act] must be applied in federal court."[22]

> **Florida** Deceptive and Unfair Trade Practices Act claims must be pled with particularity,

for example, by identifying the specific defendant from which IPPs purchased "DRAM Devices."

*Wrestlereunion, LLC v. Live Nation Television Holdings, Inc.*, No. 8:07-cv-2093-JDW-MSS,

2008 WL 3048859, at *3 (M.D. Fla. Aug. 4, 2008).  The failure to meet this standard mandates

dismissal.  *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 1291, 1322 (S.D. Fla.

2010).  Also, IPPs may not circumvent Florida's antitrust indirect-purchaser bar.  *E.g.*, *In re

Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, MDL No. 2031, 2015 WL 3988488, at *18–

*19 (N.D. Ill. June 29, 2015); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 544 (E.D. Pa.

2010) (predicting that "the Florida Supreme Court, applying the direct benefit rule, would

preclude [the IPPs] in this case from stating an unjust enrichment claim" under FDUTPA).

## III.   CONCLUSION

> Plausibility requires more than the IPPs' repeated incantation of the phrase "capacity

discipline."  The IPPs fail to cross the threshold from possible to plausible, and it is now clear—in

light of their theory that Defendants' public statements to investors amounted to a "facially

coordinated supply restraint"—that they never will.  Because it is not clear *how* the IPPs could

amend their complaint in a way that would render their allegations plausible, and because

amendment would force the Court and Defendants to unnecessarily invest even more resources in

addressing a repackaged set of the same implausible allegations, Defendants respectfully request

that the Court dismiss the IPPs' Complaint with prejudice.

---

[22] *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 677 (E.D. Pa. 2010); *see, e.g., United Food & Comm'l Workers Local 1776 v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1084 (N.D. Cal. 2014); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016).

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

1

2
      Dated:  November 29, 2018

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

By:   */s/ Ian Simmons*
       Ian Simmons

IAN SIMMONS (*pro hac vice*)
isimmons@omm.com
BRIAN P. QUINN (*pro hac vice*)
bquinn@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC  20006
Telephone:   +1 202 383 5300
Facsimile:    +1 202 383 5414

STEPHEN J. MCINTYRE (S.B. #274481)
smcintyre@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone:   +1 213 430 6000
Facsimile:    +1 213 430 6407

*Attorneys for Defendants Samsung Electronics
Co., Ltd. and Samsung Semiconductor, Inc.*

By:   */s/ Harrison Frahn*
       Harrison (Buzz) Frahn

HARRISON (BUZZ) FRAHN (S.B. #206822)
hfrahn@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California 94304
Telephone:   +1 650 251 5065

JOHN TERZAKEN (*pro hac vice*)
jterzaken@stblaw.com
ABRAM J. ELLIS (*pro hac vice*)
aellis@stblaw.com
SIMPSON THACHER & BARTLETT LLP
900 G Street N.W.
Washington, DC 20001
Telephone:   +1 202 636 5500

*Attorneys for Defendants Micron Technology,
Inc. and Micron Semiconductor Products, Inc.*

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

1

2

By:    */s/ Nathan P. Eimer*
       Nathan P. Eimer

3

4

5

6

7

8

9

10

NATHAN P. EIMER (*pro hac vice*)
neimer@eimerstahl.com
VANESSA G. JACOBSEN (*pro hac vice*)
vjacobsen@eimerstahl.com
JACOB M. HAMANN (*pro hac vice*)
jhamann@eimerstahl.com
BRIAN Y. CHANG (S.B. #287757)
bchang@eimerstahl.com
JUNGMIN LEE (*pro hac vice*)
jlee@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone:   +1 312 660 7600

11

*Attorneys for Defendants SK hynix, Inc.  and
SK hynix America, Inc.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

1

## <u>ATTESTATION OF CONCURRENCE IN FILING</u>

2

Pursuant to Civil Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of this

3

Reply in Support of Defendants' Joint Motion to Dismiss the Indirect Purchaser Plaintiffs'

4

Complaint has been obtained from each of the signatories.

5

6

       Dated:  November 29, 2018              Respectfully submitted,

7

By:    */s/ Ian Simmons*
           Ian Simmons

8

9

IAN SIMMONS (*pro hac vice*)
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC  20006
Telephone:   +1 202 383 5300
Facsimile:   +1 202 383 5414

10

11

12

*Attorney for Defendants Samsung Electronics*
*Co., Ltd. and Samsung Semiconductor, Inc.*

13

14

cc: All Counsel of Record (via ECF)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' REPLY I-S-O JOINT MOT. TO
DISMISS THE IPPS' COMPLAINT
4:18-CV-02518-JSW

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 29, 2018, I electronically filed the foregoing Reply in Support of Defendants' Joint Motion to Dismiss the Indirect Purchaser Plaintiffs' Complaint with the Clerk of the Court using the CM/ECF system, which distributed notification to all counsel of record.

Dated:  November 29, 2018

Respectfully submitted,

By:      */s/ Ian Simmons*
         Ian Simmons

IAN SIMMONS (*pro hac vice*)
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC  20006
Telephone:    +1 202 383 5300
Facsimile:     +1 202 383 5414

*Attorney for Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.*