IAN SIMMONS (*pro hac vice*)
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: 202 383 5300
Facsimile: 202 383 5414

*Attorney for Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.*

NATHAN P. EIMER (*pro hac vice*)
neimer@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, Illinois 60604
Telephone: 312 660 7601
Facsimile: 312 692 1718

*Attorney for Defendants SK hynix Inc., and SK hynix America, Inc.*

HARRISON (BUZZ) FRAHN (S.B. #206822)
hfrahn@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California 94304
Telephone: 650 251 5065
Facsimile: 650 251 5002

*Attorney for Defendants Micron Technology, Inc. and Micron Semiconductor Products, Inc.*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litigation

Case No. 4:18-cv-2518-JSW-KAW

**Defendants' Joint Notice of Motion and Joint Motion to Dismiss Indirect Purchaser Plaintiffs' Consolidated Amended Class Action Complaint and Memorandum of Points and Authorities**

Hearing Date: 1/17/2020
Time: 9:00 AM
Place: Courtroom 5, 2nd Floor
Judge: Hon. Jeffrey S. White

*Oral Argument Requested*
*Proposed Order Filed Concurrently*

## NOTICE OF MOTION AND MOTION

To all parties and their counsel of record:

Please take notice that on January 17, 2020, at 9:00 am or as soon thereafter as the matter may be heard, Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., SK hynix Inc., and SK hynix America, Inc. (collectively, the "Defendants") will and hereby do move the Court, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), for an order dismissing the Indirect Purchaser Plaintiffs' Consolidated Amended Class Action Complaint with prejudice. This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the oral argument of counsel, and all other pleadings and proceedings herein.[1]

[1] Citations to "Op. at *__" reference the star-paginated Westlaw version of the Court's Order Granting in Part and Denying in Part Motions to Dismiss, entered on September 3, 2019. *Jones v. Micron Tech. Inc.*, No. 18-cv-02518-JSW, __ F. Supp. 3d __ , 2019 WL 4232417 (N.D. Cal. Sept. 3, 2019), ECF No. 98. Citations and references to "CAC ¶ __" are to the IPPs' Consolidated Amended Class Action Complaint filed on October 25, 2019. ECF No. 109. Citations to "Dkt. __" reference docket entries in this action.

## STATEMENT OF THE ISSUES TO BE DECIDED

Invoking Federal Rule of Civil Procedure 12(b)(1), this Court held that the Indirect Purchaser Plaintiffs' ("IPPs") pleadings did not establish constitutional standing to sue under Article III of the Constitution or statutory standing to sue under the Sherman Act or its state-law analogues. The Court separately held that the IPPs did not state a claim for relief under Federal Rule of Civil Procedure 12(b)(6). It concluded that the IPPs' allegations in support of their federal and state-law claims were "just as consistent with innocent behavior as unlawful behavior, and therefore d[id] not 'nudge' the conspiracy from conceivable to plausible." Op. at *16. Although the Court dismissed the IPPs' federal and state-law claims, it granted them leave to amend their Complaint. This Motion to Dismiss the Consolidated Amended Class Action Complaint presents the following issues to be decided:

1. Whether the IPPs' circumstantial allegations of an antitrust conspiracy, as amended, are more consistent with an unlawful agreement than with independent, lawful conduct in an oligopolistic market; and

2. Whether the IPPs have cured the deficiencies that led the Court to hold that they failed to plead facts establishing their constitutional and statutory standing to bring suit against Defendants.

## SUMMARY OF ARGUMENT

I. The IPPs' amendments to their conspiracy allegations do not carry their claims across the plausibility threshold. This Court held that the IPPs' first round of "factual allegations—public statements and responsive [behavior], membership in trade associations, market conditions—[we]re just as consistent with innocent behavior as unlawful behavior, and therefore d[id] not 'nudge' the conspiracy from conceivable to plausible." Op at *16 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That conclusion applies with equal force to the IPPs' new allegations. After firing every conceivable arrow in their quiver, the IPPs have yet to hit the target: evidentiary facts "'that are largely inconsistent with unilateral, lawful conduct but largely consistent with explicitly coordinated action.'" *See* Op. at *10 (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015)). As before, their plus-factor allegations "amount to a 'restatement of the conscious parallelism endemic to an oligopoly.'" *See id.* at *16 (quoting *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 461–62 (9th Cir. 2018)).

II. The Court should dismiss the CAC for an additional reason: it does not establish the IPPs' constitutional or statutory standing to sue. The IPPs do not define the "nebulous parameters of th[e] market" for DRAM Products in which they allegedly suffered harm, *see id.* at *4, nor do they "sufficiently allege[] a chain of causation between Defendants' purported anticompetitive behavior and [their] injury," *see* Op. at *8. Once again, the IPPs fall short of raising a plausible inference "that the supracompetitively-priced DRAM component and its supracompetitive price wended their way into the DRAM Products Plaintiffs purchased." *See id.* at *4 (citing *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 997 (E.D. Mich. 2014)).

III. Finally, the IPPs' failure to raise a plausible inference of conspiracy infects their state-law causes of action, which they otherwise fail to support with evidentiary facts. The Court has accorded the IPPs every opportunity to plausibly plead their claims, and should now bring this case to a close.

## TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION .......... i

STATEMENT OF THE ISSUES TO BE DECIDED .......... ii

SUMMARY OF ARGUMENT .......... iii

INTRODUCTION .......... 1

STATEMENT OF RELEVANT FACTS .......... 1

LEGAL STANDARD .......... 4

ARGUMENT .......... 5

I. The IPPs' Additional Circumstantial Allegations of Conspiracy Do Not Carry Their Claims Across the Plausibility Threshold .......... 5

A. Defendants' statements to analysts and investors do not permit a plausible inference of conspiracy, because they are consistent with lawful, unilateral behavior in an oligopolistic market .......... 6

B. The IPPs have not cured the deficiencies of their "deviation from past behavior" and "action against self-interest" plus-factor allegations .......... 10

C. Defendants' attendance at trade events and standard-setting meetings does not imply the existence of an anticompetitive agreement .......... 14

D. The IPPs cannot state a claim on the basis of past guilty pleas and prior admissions of anticompetitive behavior .......... 15

E. Examined together, the IPPs' plus-factor allegations do not support a plausible inference of conspiracy .......... 17

II. The IPPs Have No Constitutional or Statutory Standing to Sue .......... 18

A. The IPPs still do not allege an injury that is traceable to Defendants .......... 18

B. The IPPs lack standing to bring claims for "absent-purchaser" products .......... 22

C. The IPPs have not established any antitrust injury .......... 22

D. The IPPs lack antitrust standing under *AGC* .......... 23

III. The IPPs' State-Law Claims Should Be Dismissed .......... 24

CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 10, 18

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*,
459 U.S. 519 (1983) .......... 23

*AT&T Mobility LLC v. Phone Card Warehouse, Inc.*,
No. 6:08-cv-1909-ORL-18GJK, 2009 WL 10671270 (M.D. Fla. June 25, 2009) .......... 25

*Bardin v. DaimlerChrysler Corp.*,
136 Cal. App. 4th 1255 (2006) .......... 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... passim

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*,
203 F.3d 1028 (8th Cir. 2000) .......... 14

*Feitelson v. Google, Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) .......... 5

*GreenCycle Paint, Inc. v. PaintCare, Inc.*,
250 F. Supp. 3d 438 (N.D. Cal. 2017) .......... 5, 18

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
790 F. Supp. 2d 106 (S.D.N.Y. 2011) .......... 16

*In re Auto Parts Antitrust Litig.*,
29 F. Supp. 3d 982 (E.D. Mich. 2014) .......... iii

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) .......... 15

*In re Capacitors Antitrust Litig.*,
106 F. Supp. 3d 1051 (N.D. Cal. 2015) .......... 3, 20

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) .......... 5, 18

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015) .......... 16

## TABLE OF AUTHORITIES (continued)

Page(s)

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999)....................8

*In re Dynamic Random Access Memory (DRAM) Direct Purchaser Antitrust Litig.*,
4:18-cv-03805-JSW-KAW (N.D. Cal. Oct. 28, 2019)....................3

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)....................16

*In re German Auto. Manufacturers Antitrust Litig.*,
392 F. Supp. 3d 1059 (N.D. Cal. 2019)....................15

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015).................... passim

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015)....................2

*In re TFT-LCD Antitrust Litig.*,
586 F. Supp. 2d 1109 (N.D. Cal. 2008)....................23

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009)....................25

*Kleen Prods. LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017)....................12

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000)....................13, 24

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*,
No. 13-cv-01180-BLF, 2014 WL 4774611 (N.D. Cal. Sept. 22, 2014)....................24

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*,
No. 13-cv-1180-BLF, 2015 WL 4755335 (N.D. Cal. Aug. 11, 2015).....19, 20, 21, 22

*Marsh v. Anesthesia Servs. Med. Grp.*,
200 Cal. App. 4th 480 (2011)....................25

*Prosterman v. Am. Airlines, Inc.*,
747 F. App'x 458 (9th Cir. 2018)....................iii, 5, 8, 17

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995)....................2

## TABLE OF AUTHORITIES (continued)

Page(s)

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) ........ 18

*Sprewell v. Golden State Warriors*,
266 F.3d 979(9th Cir. 2001) ........ 5, 10, 12

*Stark v. Visa U.S.A. Inc.*,
No. 03-055030-CZ, 2004 WL 1879003 (Mich. Cir. Ct. July 23, 2004) ........ 24

*Vinci v. Waste Mgmt., Inc.*,
36 Cal. App. 4th 1811 (1995) ........ 24

*Wash. Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
328 F. Supp. 3d 824 (N.D. Ill. 2018) ........ 4, 5, 12, 13

*Williamson Oil Co. v. Philip Morris USA*,
346 F.3d 1287 (11th Cir. 2003) ........ 7

*Wrobel v. Avery Dennison Corp.*,
No. 05-cv-1296, 2006 WL 7130617 (Kan. Dist. Ct. Feb. 1, 2006) ........ 24

**Statutes**

HAW. REV. STAT. ANN. § 480-3 ........ 24

KAN. STAT. ANN. § 50-163(b) ........ 24

**Other Authorities**

VI Areeda & Hovenkamp, ANTITRUST LAW ¶ 1415e (3d ed. 2010) ........ 14

## INTRODUCTION

This case should come to an end. The Indirect Purchaser Plaintiffs ("IPPs"), a putative class of consumers who purchased electronic devices containing Dynamic Random-Access Memory ("DRAM"), allege that DRAM manufacturers entered into a sweeping conspiracy to reduce supply from mid-2016 through early 2018. In their initial Complaint, the IPPs averred that executives from Samsung, Micron, and SK hynix (the "Defendants"), in a sequence of public remarks at investor events and responses to analysts' questions during earnings calls, proposed and then manifested an agreement to curtail DRAM supply. The Court—cognizant that the oligopolistic structure of the DRAM market made it unremarkable, and certainly not unlawful, for the Defendants to monitor and mimic one another—dismissed the Complaint.

While heavy on atmospherics, the allegations in the IPPs' new Complaint (the "CAC") lack substance, and do not improve upon those the Court already deemed inadequate. In a peripatetic narrative, the IPPs trumpet unattributed statements of "confidential witnesses"; repackage excerpts from the same public remarks cited in their original Complaint; produce vague graphs and charts that assume away the oligopolistic character of the DRAM market and fail to distinguish unilateral from collusive conduct; speculate about what could have happened during industry events; and re-plumb the record of Defendants' past misconduct in a futile effort to link it to their conspiracy allegations. What the CAC lacks is the essential feature of any antitrust conspiracy claim: evidentiary facts that are more consistent with an *agreement* to coordinate than with unilateral, lawful conduct in an interdependent market. That omission is fatal. And because it is now clear that the IPPs cannot cure that problem, the Court should dismiss the CAC with prejudice.

## STATEMENT OF RELEVANT FACTS

The DRAM industry is "highly concentrated," with Micron, Samsung, and SK hynix collectively accounting for 96% of global sales. CAC ¶¶ 238, 246. "By definition,

oligopolists are interdependent,”[2] meaning that they invariably “base their actions in part on the anticipated reactions of their competitors.”[3] As this Court observed, “oligopolists ‘watch each other like hawks.’” Op. at *14 (quoting *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 874–75 (7th Cir. 2015)); *see* CAC ¶ 120 (Defendants “monitored each other’s plans”).

From 2014 to mid-2016, “supply exceed[ed] demand” in the DRAM industry, which caused prices to plummet. CAC ¶¶ 105–07. Because costs were “stable,” *id.* ¶ 196, free-falling prices wreaked havoc on DRAM manufacturers’ margins. Given that Defendants were “cognizant of—and reacting to—similar market pressures,”[4] some of them unsurprisingly responded to this unsustainable trend in a similar and rational fashion: by exercising caution in expanding DRAM capacity. *Id.* ¶¶ 6–7, 17. The IPPs allege that in the third quarter of 2016, Samsung made a “unilateral decision” to temper its capacity growth, with Micron and SK hynix purportedly making similar decisions later that year. *Id.* ¶¶ 171–72; *cf.* Op. at *12 (explaining that oligopolists often “follow[] each other’s pricing decisions . . . without prior agreement”).

The IPPs allege that, in contrast to the prior period of oversupply, each Defendant’s supply *growth* was in line with, or just below, demand growth during the class period.[5] Defendants achieved this supply growth at least in part through migration to higher-density DRAM technology, which enabled the production of more “bits” (i.e., more output) per wafer. CAC ¶¶ 137–38, 146, 153. For instance, Defendants transitioned “to an 18nm process in 2016,” “reducing the distance between transistors” so as to increase “memory density” per wafer. *Id.* ¶¶ 203, 206. Technology transitions

[2] *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir. 1995).

[3] Op. at *10 (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015)).

[4] Op. at *10 (quoting *Musical Instruments*, 798 F.3d at 1193).

[5] *See* CAC ¶¶ 15, 139 (Samsung sought to “keep its growth in line with the market”); *id.* ¶ 136 (SK hynix stated that its “bit growth for the year would be . . . in line with market growth”); *id.* ¶ 160 (Micron forecasts growth “at or slightly below” market).

"[t]ypically" result in "higher prices" for a time. *Id.* ¶ 204.

But as demand began to "soar[]," *id.* ¶ 187, there were limits to what Defendants could do in the short-term. SK hynix stated that it could not "quickly ramp up wafer capacity" because it did not have "enough clean room space," *id.* ¶¶ 152, 166, though, contrary to the IPPs' theory, it did "signal[] to the industry its intent to increase capacity."[6] Micron similarly indicated that it had only "some clean room space" to spare. *Id.* ¶ 144. And Samsung stated that it was "investing capacity" to "offset wafer loss from technology transitions," and would "try to cover the market demand" through "technology migration" to higher-density DRAM. *Id.* ¶¶ 146, 153.[7]

Even if Defendants could have taken additional steps to create new capacity in the short-term—and the IPPs do not identify any—that would not necessarily be rational, particularly in an oligopoly. Fresh off a period of oversupply and crashing margins, each Defendant expressed an unsurprising, and sometimes completely generic, intention to pursue profitability. *Id.* ¶¶ 126–27, 147. Tempering supply to increase prices, which is not specifically alleged as to all Defendants, is "but one method companies use to turn a profit." Op. at *15.

Profitability is the preeminent concern for shareholders and central to the long-term viability of any business. As the IPPs acknowledge, Defendants' alleged public statements were broadly intended to "reassure[] investors." *E.g.*, CAC ¶¶ 127, 134, 137, 139, 142, 144, 146, 150, 164–65. Defendants made a huge portion of the alleged statements in response to specific questions posed by investors and analysts. *E.g.*, *id.*

---

[6] Direct Purchaser Pls. ("DPP") Consol. Compl. ¶ 113, *In re Dynamic Random Access Memory (DRAM) Direct Purchaser Antitrust Litig.*, 4:18-cv-03805-JSW-KAW (N.D. Cal. Oct. 28, 2019), ECF No. 56. This Court may consider the DPPs' allegations in assessing the CAC. *See In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1060–1064 (N.D. Cal. 2015) (considering defendants' extensive references to indirect purchasers' separate complaint in deciding defendants' motion to dismiss direct purchasers' complaint); *see also* discussion *infra* note 9.

[7] The IPPs also allege that inventory levels were low during the relevant period, CAC ¶ 148, which suggests that Defendants took steps to meet demand.

¶¶ 14, 16, 84, 127–29, 134, 137, 144–46, 150, 152–53, 155–57, 160, 163, 165, 167, 183–84. They fielded questions about industry conditions, competitors' actions or statements, business strategy, and their own supply plans and outlook. *E.g.*, *id.* ¶¶ 16, 129, 134, 144–45, 150, 163. And as in most markets, investors and analysts publish "trend information" about the DRAM industry, sometimes after speaking with industry participants (suppliers and customers alike). *Id.* ¶¶ 4, 237. As rational businesspeople, Defendants may read these reports. *Id.*

Ignoring the oligopolistic nature of the DRAM industry, the IPPs interpret these mundane facts to mean that Defendants must have "agreed to delay or slow capacity growth, or not to expand capacity" in an effort to increase DRAM prices. *Id.* ¶ 119. They allege that Defendants formed this agreement by "communicat[ing] their shared intentions to limit DRAM capacity through public statements" and "each tak[ing] actions in response." *Id.* This theory is implausible.

## LEGAL STANDARD

To bring a claim under Section 1 of the Sherman Act, a plaintiff must plead "enough factual allegations to suggest an agreement was made." Op. at *10 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). This pleading requirement is especially important in cases involving oligopolies, as "rational, independent actions . . . can be nearly indistinguishable from horizontal price fixing." *Id.* at *12 (quoting *Wash. Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 842 (N.D. Ill. 2018)). Allegations that are just as consistent with conscious parallelism as with conspiracy do not suffice. *Id.* at *16; *see Musical Instruments*, 798 F.3d at 1193–94.

To establish standing to sue under Article III of the Constitution, plaintiffs must "demonstrate (i) that [they] suffered an injury-in-fact (ii) which resulted from the [D]efendant[s'] conduct and (iii) that a favorable ruling would redress the injury." Op. at *3. Plaintiffs must separately establish statutory standing to sue under federal and state antitrust laws. While "[n]o single factor is dispositive" of that inquiry, they must adequately plead an antitrust injury that is "the result of . . . unlawful conduct,"

and also "the type of injury antitrust laws were intended to prevent." *Id.* at *7 (citing *Feitelson v. Google, Inc.*, 80 F. Supp. 3d 1019, 1027 (N.D. Cal. 2015)).

## ARGUMENT

### I. The IPPs' Additional Circumstantial Allegations of Conspiracy Do Not Carry Their Claims Across the Plausibility Threshold.

The IPPs must plead facts that tend to exclude the possibility that Defendants acted unilaterally or in a way that was rational "even absent an agreement." Op. at *15 (quoting *Wash. Cty.*, 328 F. Supp. 3d at 832).[8] They do not carry that burden. The CAC is mostly a repackaging of the same allegations that the Court already deemed inadequate. Op. at *16 (holding that Defendants' "public statements and respons[es], membership in trade associations, market conditions" did not support an inference of conspiracy). The IPPs' few genuinely new allegations, including those sourced from "confidential witnesses," fare no better. Like their predecessors in the IPPs' original Complaint, they amount to a "'restatement of the conscious parallelism endemic to an oligopoly.'" *See id.* (quoting *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 461 (9th Cir. 2018)).[9] All of the IPPs' factual allegations—the new and the newly repackaged—are "just as consistent with innocent behavior as unlawful behavior, and

[8] *See GreenCycle Paint, Inc. v. PaintCare, Inc.*, 250 F. Supp. 3d 438, 446–47 (N.D. Cal. 2017) ("[W]hen faced with two possible explanations for a defendant's behavior, a [Section 1] plaintiff cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the defendant's alternative explanation. . . . 'Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, . . . in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*.'") (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108–10 (9th Cir. 2013)).

[9] The IPPs fail at the outset to plead facts from which the Court could conclude that all Defendants acted in parallel. *See* Dkt. 52 at 9–12; *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences" at the pleading stage). The crux of the IPPs' case is that Defendants, purportedly in parallel, planned to grow DRAM supply between 15-20%, even though demand was expected to grow 20-25%. *See, e.g.*, CAC ¶¶ 13–15, 116–17, 138, 142–45, 163. But they then go on to plead that after the alleged conspiracy began, SK hynix "stated that its bit growth for the year would be in the low to mid 20 percent range."

therefore do not 'nudge' the conspiracy from conceivable to plausible." *See* Op. at *16. The Court should dismiss the CAC with prejudice.

### A. Defendants' statements to analysts and investors do not permit a plausible inference of conspiracy, because they are consistent with lawful, unilateral behavior in an oligopolistic market.

Earlier in this case, the IPPs invoked selectively excerpted public statements to investors and analysts to argue that "an anticompetitive tacit agreement can be plausibly inferred from Micron's invitation and Samsung's and Hynix's responsive assurances and conduct." Dkt. 77 at 11. The Court disagreed, holding that Defendants' "indications of their own future behavior and descriptions of their past behavior, predictions of industry trends, and observations about competitor behavior" did not support an inference of conspiracy because "they [we]re not 'largely inconsistent with unilateral, lawful conduct.'" Op. at *13–*14. The Court indicated that it was "not at all surprised that competitors in [an oligopolistic] market would be poised to make observations about the behavior of other competitors," and that Defendants' statements "reflect[ed] the trade knowledge of [what] the firms in the industry all knew and what constitutes basic economic common sense: when volume is decreased, price increases." *Id.* at *14. That holding is sound, and none of the IPPs' three principal amendments to this category of plus-factor allegations calls it into question.

*First*, the IPPs misfire with the allegation featured most prominently in the CAC: that Samsung employees disclosed a planned, unilateral DRAM price increase to an industry analyst in early 2016, in the hope that he would publish that plan in the trade press. CAC ¶¶ 1, 4, 113 (citing conversations with "CW1," an unidentified former U.S.-based Samsung executive). It is not clear how or why the IPPs believe

---

*Id.* ¶ 136. That is precisely the level at which the IPPs assert supply growth should have been absent the alleged conspiracy. *Compare id.* ¶ 138 (referencing "industry plan of keeping supply growth between 15-20%"), *with id.* ¶ 152 ("[C]urrent projection for about 20% level growth."), *and id.* ¶ 161 (growth rate "at low 20%"), *and id.* ¶ 166 (referencing "attempts to increase supply"). The IPPs' allegations against SK hynix remain "significantly sparser" than their other allegations (Op. at *16 n.17), and fail to show that all Defendants acted in parallel.

that this allegation—which confirms that Samsung acted unilaterally—is relevant to or otherwise advances their conspiracy claims. The gravamen of the IPPs' Complaint is that Defendants "each made public statements affirming their commitment to [a] common plan to curtail supply, and to not compete for each other's market share by supply expansion." *Id.* ¶ 13. The alleged "price-increase leak" is a non sequitur, not only because it does not speak to the existence of the alleged *supply restraint* conspiracy—the CAC confirms that Samsung unilaterally made the decision to disclose this *pricing* plan—but also because the IPPs do not even allege that the analyst actually *published* the information, that Samsung actually increased its prices, or that Micron or SK hynix followed suit. But even if the Complaint did allege this "chain reaction"—publishing, observing, and reacting—that would just provide more of what the Court found deficient: parallel conduct that is just as consistent with unilateral decision-making as it is with unlawful concerted conduct. Op. at *16; *see also Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1306 (11th Cir. 2003) ("PM's announcement of its plan to increase prices on premium brands . . . does not tend to exclude the possibility of independent behavior.").

The IPPs also contradict their assertion that Samsung conceived of the "price increase leak" as a means "to secretly communicate its intention to raise prices to the other Defendants to spur joint action." *Id.* ¶ 112. Samsung chose the worst conceivable messenger if its intention was to convey a "secret[]" price increase to its competitors. As the IPPs aver in the very next paragraph of the CAC, "Samsung's purpose was to have [the analyst], who published a widely-respected monthly report on DRAM prices subscribed to by industry participants, *publish information* about Samsung's intention to raise prices" in his report. *Id.* ¶ 113 (emphasis added). Publication to the world is the antithesis of secrecy.

Moreover, as the Ninth Circuit recognized in *Musical Instruments* and *Prosterman*, the strategy that the IPPs impute to Samsung—unilaterally announcing a price increase in the hope that others would follow—is both rational and often profitable in

an oligopoly without any prior agreement. *See Musical Instruments*, 798 F.3d at 1195 (explaining that through the "follow the leader" process, "supra competitive prices . . . can spread through a market without any prior agreement"); *Prosterman*, 747 F. App'x at 461 ("[I]n an interdependent oligopoly it may be in a company's interest to raise prices in the hope that its competitors play 'follow the leader.'"). As this Court previously held, "[a] Section 1 violation cannot . . . be inferred from . . . an industry's follow-the-leader pricing strategy." Op. at *14 (quoting *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999)). This allegation, like the IPPs' others, amounts to "a restatement of the conscious parallelism endemic to an oligopoly." *See id.* at *16 (quoting *Prosterman*, 747 F. App'x at 461–62).

*Second*, the IPPs' latest attempt to divine a conspiracy from Defendants' public statements to analysts and investors fares no better than their first. They excerpt different portions of the same earnings calls that failed to state a claim last time. The CAC references a Samsung executive who noted that "supply and demand continue[] to be solid and price rose strongly due to restrictions of industry supply." CAC ¶¶ 1, 18, 153. The IPPs assert, as they did in their original Complaint, that Samsung's remarks evince "a shared commitment to restricting DRAM supply among the Defendants." *Id.* They do not. The "new" statements are substantively indistinguishable from the public remarks that the Court previously held inadequate, including those in which individual Defendants "observed that, in the DRAM market, demand exceeded supply." Op. at *13 (discounting statements predicting that competitors "would make 'some really rational supply decisions' involving 'lower supply growth' and no 'significant DRAM capacity expansion'").[10]

[10] The IPPs suggest that certain statements cited in the CAC are new, when in fact they appeared in their original Complaint. *Compare* CAC ¶ 1 (citing statements from Micron indicating that it would be "foolish for it to be the first ones to take capacity off;" that "we all are going to either benefit or be hurt by excess supply in the marketplace;" that "I actually remain bullish on . . . the DRAM business and the actions of the competitors in the marketplace;" about a "good balance between supply and demand as long as capital discipline is exercised;" and describing strategy of "refrain[ing]

Samsung's statements and the other Defendants' repackaged remarks reflect common knowledge among industry participants and "basic economic common sense: when volume is decreased, price increases." *Id.* at *14. This Court held that it "is not at all surpris[ing] that competitors in such a market would be poised to make [those] observations," and that they do not "tip the parallel conduct into the realm of the unlawful" because they are "consistent with lawful conscious parallelism." *See id.* Nothing in the CAC calls that conclusion into question or describes circumstances in which Defendants "called upon their competitors to 'exercise' discipline . . . [or] invited them to behave in a certain way." *See id.* at *13. The IPPs rearrange the puzzle pieces, but the picture remains the same: Defendants' public statements are as consistent with "rational and competitive business strategies, independently adopted by firms acting within an interdependent market" as they are with unlawful agreement. *Musical Instruments*, 798 F.3d at 1189.

*Finally*, the IPPs do not plead any facts to substantiate their naked assertion that "Defendants . . . used third party research firms to exchange information." CAC ¶¶ 24, 237. Based on their conversations with a former marketing executive from SK hynix, the IPPs allege (1) that SK hynix relied on output projections generated by Gartner Research when making "major decisions, such as building another production plant," and (2) that Gartner published "industry trend information," sometimes after speaking with SK hynix, Samsung, and Micron DRAM employees. *Id.* From those unremarkable allegations, the IPPs jump to a remarkable conclusion: that Defendants used third-party research firms as a conduit for competitor communications. But the IPPs never actually allege that Gartner or any other third party facilitated secret communications between Defendants. And at the pleading stage, the Court is not "required to accept as true allegations that are merely conclusory, unwarranted

---

from, for example, increasing market share, fighting on volume") (emphasis omitted), *with* Dkt. 1 ¶¶ 6, 92, 116, 121 (same statements). As the Court previously held, those statements "do not suggest unlawful restraint of trade." Op. at *14.

deductions of fact, or unreasonable inferences." *Sprewell*, 266 F.3d at 988. Where, as here, the plaintiffs ask the Court to "credit [their] [C]omplaint's conclusory statements without reference to [their] factual context," the Court can and should decline. *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009).

**B. The IPPs have not cured the deficiencies of their "deviation from past behavior" and "action against self-interest" plus-factor allegations.**

In dismissing the original Complaint, this Court held that even if the Defendants' alleged follow-the-leader conduct constituted a "change in market behavior," that behavior was consistent with lawful conscious parallelism. Op. at *14. By the same token, the Court held that the IPPs did not plausibly allege that Defendants had acted against their self-interest during the class period, because tempering output—even in the face of rising demand—is consistent with "common sense" and "can be in an entity's best interest." *Id.* at *15. The CAC, like the IPPs' prior pleadings, does not allege any deviation from past behavior or identify any action against self-interest that tends to exclude the possibility of independent behavior.

As the Court observed, "deviation from past behavior is a poor plus factor because it merely relabels parallel conduct." *Id.* at *14. Even where competitors "simultaneously implement[]" a new policy or practice, that "does not reveal anything more than similar reaction to similar pressures within an interdependent market, or conscious parallelism." *Musical Instruments*, 798 F.3d at 1196. Consistent with that observation, this Court concluded that the IPPs "sufficiently pled that the Defendants' supply reduction constituted a change in market behavior," but nevertheless held that there was no basis for inferring anything "nefarious" from that change. Op. at *14.

The CAC does not add anything of substance to support this "poor plus factor." The IPPs focus all but exclusively on *Samsung's* alleged change in behavior. CAC ¶¶ 126, 162, 179–85. They assert that Samsung had previously "grown supply in an effort to take market share away from competitors," but in 2016 shifted focus to "profitability rather than increasing volume." *Id.* ¶ 126 (emphasis omitted). As part of

this shift, Samsung supposedly became less likely to "grant pricing decreases on DRAM to win business." *Id.* ¶ 11. The IPPs also claim that Samsung made the "*unilateral* decision to reduce its DRAM output" in Q3 2016, *id.* ¶ 171 (emphasis added), which led Micron and SK hynix to allegedly make "production cuts of their own" in the following quarter, *id.* ¶ 172. The IPPs offer two new charts in an attempt to illustrate these allegations. *Id.* ¶¶ 171–72. But the charts are unintelligible,[11] and are undermined by allegations in the CAC indicating that capacity production was actually *increasing*. *See*, *e.g.*, *id.* ¶ 135 (alleging Defendants merely "kept supply . . . growth restrained" from June 2016 to the end of 2016); *id.* ¶ 129 (Samsung forecasted that its 2016 DRAM shipments would "be in line with market growth"); *id.* ¶ 136 (SK hynix stated that its "bit growth for the year would be in the low to mid 20 percent range," which is consistent with, and not below, the forecasted 20–25% demand growth); *id.* ¶ 138 (alleging Micron "reaffirmed the industry plan of keeping supply growth between 15–20% through minimal additions of wafers" in October 2016).

Factual inconsistences aside, the CAC's "deviation from past practices" allegations suffer from a deeper flaw: they are indistinguishable from those this Court already deemed inadequate. As the Court previously emphasized, the desire to enhance or maintain profit margins is entirely consistent with independent, lawful conduct. Op. at *15 ("Selling goods at higher prices can be in an entity's best interest—this is but one method companies use to turn a profit."). And in an interdependent market, "one firm can risk being the first to raise prices"—or, as relevant here, the first to

[11] Neither chart specifies the purported measure of "production" or "output." Whether the IPPs used "bit growth" (*e.g.*, CAC ¶ 6), "gigabytes" (*id.* ¶ 171), "wafer capacity" (*e.g.*, *id.* ¶ 176), or "wafer starts" (*e.g.*, *id.* ¶ 72) matters a great deal. As the IPPs acknowledge, technology transitions enable manufacturers to increase the memory density of each wafer, boosting total bit output while wafer output remains flat. *See id.* ¶ 164 ("[I]nvestments are mainly for technology transition with the desire to keep wafer starts roughly flat, . . . [which] will allow the industry to grow bits."); *id.* ¶ 203 (noting that technological advancements may "increase in memory density, . . . *i.e.*, reducing the distance between transistors"). Graphs with unidentified, unexplained, and unsourced data do not make the IPPs claim more plausible.

temper one's output—"confident that if its price is followed, all firms will benefit." *Musical Instruments*, 798 F.3d at 1195; *Wash. Cty.*, 328 F. Supp. 3d at 832 (that defendants signaled output cuts to one another did not state conspiracy claim, since "the nature of an oligopoly" meant that "the mere fact that [defendants] restricted their own production of IV saline solution after learning of output reductions by the other sheds little light on the existence *vel non* of an unlawful agreement"). Here, that shoe fits: the IPPs admit that Samsung's supposed output restriction was a "unilateral decision," and that SK hynix and Micron allegedly followed it. CAC ¶¶ 171–72. As this Court recognized, "Samsung was the market leader," and "[i]t is just as consistent with innocent behavior as with unlawful behavior that Micron and Hynix would mimic Samsung's actions." Op. at *14.

For many of the same reasons, the IPPs do not plausibly allege that Defendants took actions against self-interest. They assert that it was against each Defendant's "unilateral self-interest" for Samsung to "cut" production in Q3 2016 and for Micron and SK hynix to allegedly follow suit the next quarter, CAC ¶¶ 9–10, but offer no facts to support that conclusion. *See Sprewell*, 266 F.3d at 988 (inviting lower courts to disregard allegations that are "merely conclusory, unwarranted deductions of fact"). They claim that "*in a competitive market*, Samsung's rivals would have either maintained or increased output to gain market share in the face of rising demand, which is part of the reason why Samsung's conduct would have been irrational without knowledge that its rivals would not [sic] also decrease output." CAC ¶ 10 (emphasis added); *but see id.* at ¶ 136 (alleging higher SK hynix bit growth).[12] But here is the rub: the IPPs do not allege a perfectly "competitive market"; they allege an oligopoly. *See Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 819 (N.D. Ill. 2017) ("[O]ligopolistic

[12] To the extent Samsung allegedly anticipated that SK hynix and Micron would also "cut" capacity, it was merely acting as any oligopolist would. As this Court stated, "[a]ny rational decision within an oligopoly *must* anticipate, or at the very least consider, the reactions of the other competitors." Op. at *12 (emphasis added).

competition differs from perfect competition insofar as the interdependent, oligopolistic firms act in similar ways . . . . However, it is like perfect competition in that such similar behavior does not evidence coordination."). "An action that would seem against self-interest in a competitive market may just as well reflect market interdependence giving rise to conscious parallelism." *Musical Instruments*, 798 F.3d at 1195.

In other words, the IPPs' action-against-self-interest allegations "fail to account for conscious parallelism and the pressures of an interdependent market." *Id.* As this Court previously explained, the allegation that "Defendants restricted their output, a move that common sense suggests would raise prices, . . . can be in an entity's best interest." Op. at *15. Due to "the nature of an oligopoly," there is "a substantial likelihood that—even absent an agreement—[Defendants] would have tried to capitalize on output restrictions signaled by the other, as it was in their independent interest to restrict supply and drive up prices." *Id.* (quoting *Wash. Cty.*, 328 F. Supp. 3d at 832). That Defendants supposedly refrained from "increas[ing] output to gain market share," CAC ¶ 10, is entirely consistent with independent decision-making in a concentrated market, *see Twombly*, 550 U.S. at 553–54 (holding that "conscious parallelism" with respect to "output decisions" is "not in itself unlawful") (quotation omitted). It also reflects "basic economic common sense: when volume is decreased, price increases." Op. at *14.

Finally, the IPPs claim that restricting capacity was against Defendants' independent self-interest because *everyone* supposedly forfeited profits and market share.[13] These allegations are nonsensical.[14] Without showing any of the so-called

---

[13] CAC ¶ 9 (alleging Samsung lost "an estimated $47 million in immediate profits" and "sacrificed approximately 5% of the total market share"); *id.* ¶ 10 (alleging that "Micron and Hynix sacrificed respectively $30 million and $27 million in lost profits by failing to maintain their output growth rate," and forfeited "market share").

[14] "It is axiomatic that antitrust claims must 'make economic sense.'" *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 1002 (9th Cir. 2000) (quotation omitted). Actions against self-interest are not a valid plus-factor unless they are "contrary to the actor's self-interest in the absence of a conspiracy, but . . . make economic sense

"available data" to support their conclusory allegation, the IPPs claim it was against the self-interest of each Defendant to forgo tens of millions of dollars in profit in the fourth quarter of 2016 to "reap enormous profits" with *billions* in "record-high revenue" in 2017. CAC ¶¶ 19, 209. That sounds exactly like each Defendant acted in its self-interest. VI Areeda & Hovenkamp, ANTITRUST LAW ¶ 1415e (3d ed. 2010) ("One must not characterize a firm's sacrifice of short-run interest in favor of long-run interest as contrary to its self-interest."). Making "enormous profits" is in each firm's unilateral self-interest. Op. at *15 ("[T]he nature of an oligopoly makes i[t] such that there is a substantial likelihood that—even absent an agreement—[Defendants] would have tried to capitalize on output restrictions signaled by the other, as it was in their independent interest to restrict supply and drive up prices.").

### C. Defendants' attendance at trade events and standard-setting meetings does not imply the existence of an anticompetitive agreement.

Previously, the Court discounted the IPPs' allegations that trade association meetings facilitated a conspiracy. It held that "[m]embership in associations and attendance at trade meetings presents nothing more than an opportunity to collude, and an opportunity, without more, is insufficient to state a claim under § 1." Op. at *12. The IPPs' first Complaint, the Court noted, did not even "describe any suspected or actual interactions between Defendants at these trade association [gatherings]—not to mention interactions that suggest the establishment or confirmation of an agreement to unlawfully restrain trade." *Id.*

The CAC does not cure those deficiencies. Citing another confidential witness, the IPPs now allege that Defendants sent employees to meetings "at JEDEC, [where] you *could* talk to competitors about what they were seeing in future volume. You *can* talk about overall volume expectations." CAC ¶ 212 (emphasis added). That is it. Even with the assistance of a purported insider, the IPPs do not allege that anyone *actually*

---

as part of a conspiracy." *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1046 (8th Cir. 2000).

*discussed* "future volume" or "volume expectations" at a JEDEC meeting, at any point in time. The witness's suggestion that executives "*could* talk to competitors" just states the obvious: attendance at industry events gave Defendants an opportunity to conspire. The Court has already held that the opportunity for collusion does not plausibly support an inference that anyone *actually* colluded. Op. at *12; *cf. In re German Auto. Manufacturers Antitrust Litig.*, 392 F. Supp. 3d 1059, 1071–72 (N.D. Cal. 2019) (holding that plaintiffs did not "plausibly support that Defendants used working groups and trade associations to reach the broad anticompetitive agreement that is alleged," in part because they "never identif[ied] what was agreed to in these meetings and instead only vaguely refer[red] to clandestine agreements").[15]

Finally, the IPPs allege—again based on purported intel from a confidential witness—that "people in the industry know each other personally" and "have a friendly relationship." CAC ¶ 23. But this Court held that "opportunities for social interaction or side conversations" do not imply a conspiracy. Op. at *12. "Company personnel do not often operate in a vacuum or 'plastic bubble'; they sometimes engage in the longstanding tradition of social discourse." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 133 (3d Cir. 1999) (social contacts not circumstantial evidence of conspiracy). Banal social interactions are consistent with unilateral decision-making. Op. at *12.

### D. The IPPs cannot state a claim on the basis of past guilty pleas and prior admissions of anticompetitive behavior.

The IPPs do not plead facts that plausibly suggest any linkage between historical price fixing in the semiconductor industry and the output conspiracy that they posit. The CAC makes clear that there is almost no "factual overlap between the prior events and the ongoing matter," other than the product at issue. Op. at *15. As the IPPs note, the prior events encompassed direct "price-related contacts" between

[15] Even assuming Defendants' employees spoke to one another—and the CAC is silent on this—that does not imply an agreement. *See Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement").

competitors, agreements to fix prices, and direct information exchanges. CAC ¶¶ 271–79. There is zero overlap between that conduct and the alleged public-statement output conspiracy at issue here. Out of necessity, the IPPs resort to "unabashed propensity reasoning—the fallacy that 'if it happened there, it could have happened here'"—in an effort to root their current allegations in past misconduct. *See In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 403 (3d Cir. 2015). They go about that task in two principal ways, neither of which moves their claims toward plausibility.

*First*, they allege that Defendants employed, or continue to employ, five individuals implicated in price-fixing during the early 2000s. CAC ¶¶ 273, 275, 281–83. The IPPs' allegations do not suggest the involvement of any of those individuals in the events giving rise to their current claims, and they appear to concede that only one—Kun Chul Suh of SK hynix, Inc.—worked for a Defendant during the class period. *Id.* ¶ 281. These pleadings offer no insight into the output conspiracy that the IPPs posit.

*Next*, the IPPs assert that Sewon Chun of Samsung Electronics Co., Ltd. is tainted by dint of having worked from 2000 to 2002 under the supervision of Il Ung Kim, a former Samsung executive who pleaded guilty to fixing prices. *Id.* ¶¶ 29, 273. As one antitrust court confronting a similarly attenuated claim recognized, "[s]uch an allegation, ascribing guilt based on association, cannot 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *See Hinds Cty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 116 (S.D.N.Y. 2011) (quoting *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007)). Moreover, no pleaded facts support the IPPs' apparent assumption that Mr. Chun was more, rather than less, likely to engage in anticompetitive conduct after seeing Mr. Kim serve the "longest ever imprisonment for a foreign defendant charged with price-fixing in the United States." CAC ¶ 29. Like the IPPs' other allegations, these "historic behavior" pleadings do not tend to exclude the possibility that Defendants acted unilaterally during the class period.[16]

[16] In spite of the Court's holding that "allegations of investigations or cases outside of the United States are fully unpersuasive," Op. at *15, the IPPs redouble their efforts

### E. Examined together, the IPPs' plus-factor allegations do not support a plausible inference of conspiracy.

Given the Court's holding that the IPPs' initial set of plus-factor allegations "were just as consistent with innocent behavior as unlawful behavior," the key question is whether the CAC alleges new facts that tip the balance toward conspiracy. The answer is no. The allegations that the IPPs now feature most prominently—Samsung's attempt to lead a price increase; Defendants' alleged prioritization of profitability over expanding capacity; public statements describing the circumstances of the market and observing competitor behavior; attendance at standard-setting meetings; and interacting with third-party research firms—are either procompetitive or "simply activities one would expect in an interdependent market." *See Prosterman*, 747 F. App'x at 461 (citing *Musical Instruments*, 798 F.3d at 1194–97). The IPPs do not point to "economic actions and outcomes that are largely inconsistent with unilateral lawful conduct but largely consistent with explicitly coordinated action." *See* Op. at *10.

The IPPs couple their failure to account for conscious parallelism with a perfunctory approach to evidence that cuts against their preferred narrative, and suggests that the observed market outcomes made sense in the *absence* of any agreement. For example, the IPPs acknowledge that technology transitions—migrations to new DRAM products—entail periods of higher prices and diminished capacity or "wafer loss." CAC ¶¶ 153, 155, 201. They assert that these transitions "do[] not explain Defendants' price increases during the Class Period" because one transition—the migration from the 25 nanometer to 20 nanometer generation of DRAM—occurred before the class period began in 2016. *Id.* ¶ 206. Other allegations in the CAC blunt the force of that argument: the IPPs acknowledge that Defendants migrated "to an 18nm process in 2016," *id.*, and that market-leader Samsung was in the middle of a migration

---

to portray an investigation in China as a plus factor that renders their conspiracy narrative plausible, CAC ¶¶ 20, 186–94. Those allegations "do not factor into the Court's analysis." *See* Op. at *15.

to the "1X" process node during an April 27, 2017 earnings call, *id.* ¶ 153 (describing plan "to invest[] capacity to make up for the loss that happens as we migrate to the 1X"). Similarly, the IPPs aver that "there also were no unanticipated sharp increases in demand that could explain the abrupt and continuous increase in prices." *Id.* ¶ 207. Once again, the IPPs' factual allegations undermine the already dubious value of that "bare assertion[]." *See Iqbal*, 556 U.S. at 681. They concede that demand for DRAM was "soaring" during the class period, *id.* ¶ 187; refer to "increasing" and "strong" demand," *id.* ¶¶ 98, 111; and allege that "demand growth exceeded 20%," *id.* ¶ 142.

In conjunction with the defining characteristic of the DRAM market—interdependence—"soaring" demand and capacity-diminishing technology migrations present a plausible alternative explanation for the price increases during the class period. Because the IPPs summarily brush aside those explanations and do not make any attempt to rebut them with *factual* allegations, their conspiracy claims remain "stuck in 'neutral territory'" at best, and do not cross the line that divides the conceivable from the plausible. *See Century Aluminum*, 729 F.3d at 1108 (quoting *Twombly*, 550 U.S. at 557); *see also GreenCycle Paint*, 250 F. Supp. 3d at 446–47 (holding that a Section 1 plaintiff needs "'[s]omething more . . . such as facts tending to exclude the possibility that [an] alternative explanation is true'" to overcome a motion to dismiss) (quoting *Century Aluminum*, 729 F.3d at 1108).[17]

## II. The IPPs Have No Constitutional or Statutory Standing to Sue.

### A. The IPPs still do not allege an injury that is traceable to Defendants.

The Court dismissed the IPPs' original Complaint for failure to plead Article III standing, a jurisdictional requirement that applies to all of the IPPs' claims. Op. at *4–6. The Court held that the IPPs did not plead an injury traceable to Defendants'

[17] *Cf. Somers v. Apple, Inc.*, 729 F.3d 953, 965 (9th Cir. 2013) (affirming dismissal of monopolization claim and holding, *inter alia*, that "'obvious alternative explanation[s]'" for supracompetitive music pricing undermined plausibility of plaintiffs' allegations) (quoting *Twombly*, 550 U.S. at 567).

alleged conduct—that is, that the overcharge they supposedly paid for products incorporating DRAM resulted from Defendants' allegedly unlawful inflation of the price of DRAM itself. *Id.* The Court stated that it could not "infer both that the supracompetitively-priced DRAM component *and* its supracompetitive price wended their way into the DRAM Products Plaintiffs purchased." *Id.* at *4.

The CAC attempts to cure this deficiency in two ways. *First*, the IPPs reduce the types of products on which they base their claims. CAC ¶¶ 44–50. *Second*, the IPPs offer what they describe as "statistical" evidence showing that DRAM comprises between 5% and 50% of the price of finished DRAM Devices, which they say demonstrates a correlation between price increases in DRAM and price increases in finished "DRAM Devices" generally. *Id.* ¶¶ 1, 85. None of these allegations establishes that the IPPs suffered any injury traceable to the alleged conspiracy.

*First*, the IPPs again "run into difficulty [with] the lack of detail concerning the varieties of types, makes, and models of the products implicated." Op. at *4. The named Plaintiffs purchased just eight products, each a type of cellular phone or laptop manufactured by Lenovo, Apple, Motorola, or Samsung. CAC ¶¶ 44–50; *cf*. Op. at *4 (each named Plaintiff purchased "a type of smartphone or laptop"). But as the Court observed last time, "smartphones and laptops . . . are barely the tip of the iceberg." Op. at *4. The IPPs acknowledge that DRAM is "widely used in digital electronics" and is "one of the most common forms of semiconductor memory." CAC ¶ 67. Reflecting that ubiquity, the IPPs broadly define "DRAM Devices" to include "cellular phones, computers, network servers, tablets, graphical processing units ('GPUs'), and computer memory products." *Id.* ¶ 31.[18] There are almost certainly "thousands of products, some of which have countless formulations." *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, No. 13-cv-1180-BLF, 2015 WL 4755335, at *14 (N.D. Cal. Aug. 11, 2015) ("*Los Gatos II*"). The parameters of this market are, once again, "nebulous,"

---

[18] The IPPs do not define computer "memory product," though they do claim that DRAM itself (DDR3) so qualifies—conflating direct and indirect purchases. CAC ¶ 95.

"'sprawling[,] and indefinite.'" Op. at *4 (quoting *Los Gatos II*, 2015 WL 4755335, at *14); *see Capacitors*, 106 F. Supp. 3d at 1063 (raising concerns about indirect purchaser claims that encompassed "one of the most basic functional units in electronics circuits"). This does not "meet the traceability threshold." Op. at *4.

That is not the only problem with the IPPs' alleged "DRAM Device" market. The "thousands of products" at issue were "passed down [through] thousands of distribution chains," *Los Gatos II*, 2015 WL 4755335, at *14–15, and yet the IPPs say virtually nothing about those chains. Like the original Complaint, the CAC does not "identify the pertinent OEMs or retailers who manufactured and/or sold the 'relevant' DRAM Products." *See* Op. at *4. The IPPs provide a list of top ten "consumer electronics retailers," CAC ¶ 103, but do not allege that these retailers sell any of the relevant "DRAM Devices," much less which ones. In fact, the IPPs do not even identify the retailers from whom the *named Plaintiffs* purchased their smartphones and laptops. Compounding that error, the IPPs are essentially silent on the upstream intermediaries through which "DRAM Devices" traveled. As this Court held, the IPPs must plead facts showing that "some or all of [the alleged] overcharge was passed on to indirect purchasers through *each of the various intermediate levels* of the distribution chain." Op. at *4 (emphasis added). They have not done it.

*Second*, the IPPs' purported "statistical" allegations do not remedy their traceability defects. The IPPs promise "specific evidence that rising DRAM prices during the class period caused corresponding increases in the price of DRAM Devices," CAC ¶ 1, but in truth, they never get past speculation. The IPPs claim that DRAM comprises between 5% and 50% of the overall cost to manufacture DRAM Devices, *id.*, but they do not plead facts demonstrating that any alleged "supracompetitive price wended [its] way into the DRAM Products Plaintiffs purchased." Op. at *4.

For example, the IPPs assert that DRAM "accounts for approximately 5-10% of the bill of materials cost" for certain Apple and Samsung phones, but make no allegations connecting those "bill of material[]" costs to the end-product prices the IPPs

claim to have paid. CAC ¶ 88. The IPPs also claim that analysts "specifically noted that rising DRAM prices had led to increases in the average sales prices" of personal computers ("PCs"), *id.* ¶ 86, but cite just a single analyst who is quoted as saying that PC prices were "up almost entirely due to higher memory costs"—but who did not mention *DRAM*, *id.* The IPPs concede that "memory cost" is not the same as "DRAM cost"; NAND memory, for instance, often accounts for a large if not larger cost component of memory than DRAM does. *Id.* ¶ 91 (showing NAND memory is a larger cost component than DRAM in Microsoft Surface products).

The IPPs next point to cost statistics for particular models of network servers, PCs, tablets, and GPUs, *id.* ¶¶ 89–94, but glide past the fact that *no named Plaintiff* purchased any of these devices. This is precisely the type of misdirection that courts reject as inadequate to plead Article III standing. *See Los Gatos II*, 2015 WL 4755335, at *14 (allegations about a product not purchased by plaintiffs do not support traceability "given the breadth of the defined market and the variation in the amount of titanium dioxide found in the expansive category" of relevant products). Not only that, these allegations are not tied to the class period. The pleadings about tablets are based on articles from 2010 and 2012, which say nothing about whether DRAM was a significant cost component in tablets between June 1, 2016, and February 1, 2018. *See* CAC ¶¶ 88, 91. In other cases, the IPPs simply misstate or mischaracterize their own sources. *Id.* ¶ 88 (article does not mention DRAM); *id.* ¶ 89 (article discusses cost to "build out" data centers); *id.* ¶ 92 n.15 (article discusses HPM 2 memory as a cost component); *id.* ¶ 93 (article does not claim that rising cost is due to DRAM prices).

And while the IPPs point to HP's website (from whom no named Plaintiff purchased any products) in making the unremarkable claim that "changes in the amount of memory included in otherwise identical PC configurations will result in a changed price for the PC," *id.* ¶ 87, they do not plead anything about DRAM as a cost component of that end product, much less whether the price changes on HP's website are attributable to the cost of DRAM itself or instead to other costs associated with

operating more memory, like stronger circuitry boards and power connections, larger casings, more heat sinks and cooling fans, or other hardware needs.

For all this misdirection, the IPPs do not remedy the defect this Court identified: the CAC, like the original Complaint, does not plead facts showing that "some or all of [the alleged] overcharge was passed on to indirect purchasers through each of the various intermediate levels of the distribution chain." Op. at *4. Each of the IPPs' claims should be dismissed for want of Article III standing.

### B. The IPPs lack standing to bring claims for "absent-purchaser" products.

"[S]tanding is claim- and relief-specific: a plaintiff must establish Article III standing for each of his claims and for each form of relief he seeks." Op. at *4 (internal quotations omitted). Plaintiffs must have standing to bring their own "*certain claims*, not standing 'to obtain relief for unnamed class members' for the same injury." *Id.* at *5. The IPPs do not have standing to bring claims for the absent-purchaser products because named Plaintiffs did not purchase network servers, tablets, computer graphical processing units, or computer DRAM memory products. Because the IPPs plead a single DRAM Devices market rather than separate proposed classes for each type of DRAM Device, the CAC in its entirety fails. *See Los Gatos II*, 2015 WL 4755335, at *15 (dismissing complaint where plaintiffs' product definition included products they did not purchase).

### C. The IPPs have not established any antitrust injury.

The Court also previously found that the IPPs did not adequately allege antitrust injury, a "necessary, though not always sufficient" element of antitrust standing. Op. at *7–10 (quotations omitted). The IPPs have not cured this deficiency. Because the IPPs' cost component allegations are often not DRAM-specific or unassociated with the relevant time period, the IPPs have not plausibly alleged that "DRAM represents a certain portion of" the cost of the DRAM Devices that named Plaintiffs purchased. *See id.* at *8. Even if they had, the IPPs do not plausibly allege that the market

for DRAM Devices is "inextricably intertwined" with the market for DRAM or that DRAM is a "substantial component cost" of DRAM Devices because their broad "5% to 50%" range, especially at the low end, includes devices for which DRAM represents a mere fractional cost of the price of the finished product. *See id.* at *7–8; *In re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123–24 (N.D. Cal. 2008) (finding that markets could be inextricably intertwined where the component comprised a set 60% to 70% of the cost of the end-products at issue). Accordingly, the IPPs lack antitrust injury.

### D. The IPPs lack antitrust standing under *AGC*.

The Court previously held that the IPPs had not demonstrated antitrust standing under *Associated General Contractors of California, Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519 (1983). Op. at *7–*9. The CAC fares no better under *AGC* and the IPPs' Sherman Act claims should be dismissed accordingly:

*Nature of the injury*. The IPPs fail here for the same reasons as antitrust injury.

*Directness of the injury*. The IPPs repeat the same allegations that the Court cited as weighing against standing: DRAM is "fairly ubiquitous," is "incorporated into a wide variety of consumer electronics," and "each product in which DRAM is a component[] contains numerous other components, all of which *collectively* determine the final price." Op. at *8; *see* CAC ¶¶ 67, 83. For example, by claiming DRAM is 5–6% of the cost of materials for a cellular phone, the IPPs confirm that "the price for the actual product paid by plaintiffs is reflective of much more than just the component price for DRAM." Op. at *8 (internal citations and quotations omitted). Consequently, the IPPs do not and cannot allege sufficient directness of their purported injury to the alleged conduct in the market for DRAM.

*Speculative Damages*. Untraceable damages are speculative. *Id.*

*Apportionment of damages*. Untraceable damages are unapportionable. *Id.*

*Risk of duplicative discovery*. The Court held that this factor is "neutral." *Id.*

Because all factors weigh against antitrust standing (or are neutral), the Court

should dismiss the IPPs' Sherman Act claim, as well as their claims under California, Hawaii, Kansas, and Michigan law.[19]

## III. The IPPs' State-Law Claims Should Be Dismissed.

The IPPs' failure to plead a conspiracy and their lack of standing is fatal to all state law claims–but those claims should be dismissed on additional grounds.

Claims under California, Kansas, Michigan, and Hawaii should be dismissed under *AGC*. Because a California Court of Appeal has applied *AGC* to its own state law, *Vinci*, 36 Cal. App. 4th at 1814, this Court should too just as the Ninth Circuit has done before without fear of "bypass[ing] … all state appellate courts," Dkt. 98 at 16.[20] Similarly, state courts in Kansas and Michigan have applied *AGC* to their respective state laws, *Wrobel*, No. 05-cv-1296, 2006 WL 7130617, at *2–*4;[21] *Stark*, No. 03-055030-CZ, 2004 WL 1879003, at *4, which this Court should do as well since "a lower state court is in a better position than this Court to predict its highest court's approach." *See Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, No. 13-cv-01180-BLF, 2014 WL 4774611, at *4 (N.D. Cal. Sept. 22, 2014). Also, Hawaii has a mandatory harmonization statute which instructs that courts "shall . . . construe [Hawaii's antitrust statute] in accordance with judicial interpretations of similar federal antitrust statutes" which means this Court should apply *AGC* to the Hawaii state law claim. HAW. REV. STAT. ANN. § 480-3.

---

[19] *See Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814 (1995) (applying *AGC* to California law); *Knevelbaard Dairies*, 232 F.3d at 987–92 (same); *Wrobel v. Avery Dennison Corp.*, No. 05-cv-1296, 2006 WL 7130617, at *2–4 (Kan. Dist. Ct. Feb. 1, 2006) (Kansas law); Stark v. Visa U.S.A. Inc., No. 03-055030-CZ, 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23, 2004) (Michigan); HAW. REV. STAT. ANN. § 480-3 ("This chapter shall be construed in accordance with judicial interpretations of similar federal antitrust statutes.").

[20] *See Knevelbaard Dairies*, 232 F.3d at 987–92.

[21] State court application of *AGC* to state law in Kansas is mandatory under Kansas' harmonization statute. KAN. STAT. ANN. § 50-163(b) ("The Kansas restraint of trade act shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States supreme court.")

The failure to plead a conspiracy under the Sherman Act and Cartwright Act[22] means IPPs' claim under California's UCL cannot stand on its own. *See* Op. at *17 ("A UCL claim for unlawful behavior is predicated on a violation of a separate statute or common law regime. . . .").[23]

Finally, the IPPs' claims under the Florida Deceptive and Unfair Trade Practices Act fail for two reasons. First, the underlying antitrust claim is deficient. *AT&T Mobility LLC v. Phone Card Warehouse, Inc.*, No. 6:08-cv-1909-ORL-18GJK, 2009 WL 10671270, at *5 (M.D. Fla. June 25, 2009) ("[W]hen an antitrust claim serves as the sole basis for a FDUTPA claim, the success of the latter rises or falls with that of the former."). Second, even though the Court provided the IPPs a near-explicit invitation to allege "the who, what, where, when, and how" of their transactions to plead their FDUPTA claim with particularity, they fail to provide any "other details of the indirect purchasers' transactions" beyond the products they purchased. Op. at *20–*21.

**CONCLUSION**

For these reasons, and because further amendment would be futile, the Court should grant this Motion and deny leave to amend. In the CAC, the IPPs "repackage[d] the same set of legal conclusions under a different theory [and] pile[d] on . . . additional examples of public statements that [they] believe comprise a conspiracy." Dkt. 52 at 40–41. They have not earned another opportunity to do the same.

---

[22] For the reasons explained, the IPPs do not plead a Cartwright Act claim given their failure to "plead the formation and operation of the conspiracy and the illegal acts done in furtherance of the conspiracy." *See Marsh v. Anesthesia Servs. Med. Grp.*, 200 Cal. App. 4th 480, 493 (2011).

[23] The IPPs' claim under the UCL's "fraudulent" prong should also be dismissed because the IPPs do not plead with particularity "that members of the public were likely to be deceived" by Defendants' business acts. *See Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1274 (2006); *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (explaining that claims under the fraudulent prong of California's UCL are subject to Rule 9(b)'s heightened pleading requirement).

Dated: November 19, 2019

Respectfully submitted,

By: */s/ Ian Simmons*
Ian Simmons

IAN SIMMONS (*pro hac vice*)
isimmons@omm.com
BRIAN P. QUINN (*pro hac vice*)
bquinn@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone: +1 202 383 5300
Facsimile: +1 202 383 5414

STEPHEN J. MCINTYRE (S.B. #274481)
smcintyre@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: +1 213 430 6000
Facsimile: +1 213 430 6407

*Attorneys for Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.*

By: */s/ Harrison Frahn*
Harrison (Buzz) Frahn

HARRISON (BUZZ) FRAHN (S.B. #206822)
hfrahn@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California 94304
Telephone: +1 650 251 5065

JOHN TERZAKEN (*pro hac vice*)
jterzaken@stblaw.com
ABRAM J. ELLIS (*pro hac vice*)
aellis@stblaw.com
SIMPSON THACHER & BARTLETT LLP
900 G Street N.W.
Washington, DC 20001
Telephone: +1 202 636 5500

*Attorneys for Defendants Micron Technology, Inc. and Micron Semiconductor Products, Inc.*

By: */s/ Nathan P. Eimer*
Nathan P. Eimer

NATHAN P. EIMER (*pro hac vice*)
neimer@eimerstahl.com
VANESSA G. JACOBSEN (*pro hac vice*)
vjacobsen@eimerstahl.com
JACOB M. HAMANN (*pro hac vice*)
jhamann@eimerstahl.com
BRIAN Y. CHANG (S.B. #287757)
bchang@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: +1 312 660 7600

*Attorneys for Defendants SK hynix, Inc. and SK hynix America, Inc.*

## ATTESTATION OF CONCURRENCE IN FILING

Pursuant to Civil Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of this Joint Notice of Motion and Joint Motion to Dismiss and the accompanying appendices, declaration, and exhibits has been obtained from each of the signatories.

Dated: November 19, 2019

Respectfully submitted,

By: */s/ Ian Simmons*
Ian Simmons

IAN SIMMONS (*pro hac vice*)
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone: +1 202 383 5300
Facsimile: +1 202 383 5414

*Attorney for Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.*

cc: All Counsel of Record (via ECF)

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2019, I electronically filed the foregoing Joint Notice of Motion and Joint Motion to Dismiss the IPPs' Consolidated Amended Class Action Complaint with the Clerk of the Court using the CM/ECF system, which distributed notification to all counsel of record.

Dated: November 19, 2019

Respectfully submitted,

By: */s/ Ian Simmons*
Ian Simmons

IAN SIMMONS (*pro hac vice*)
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone: +1 202 383 5300
Facsimile: +1 202 383 5414

*Attorney for Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.*